**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC

RECEIVED

MAJOR MIKE WEBB, d/b/a MAJOR ) 
MIKE WEBB FOR VA, a/k/a FRIENDS )
FOR MIKE WEBB, d/b/a MAJOR MIKE )
WEBB FOR CONGRESS, d/b/a ANGELS )
OF LIBERTY, )
    ***Petitioner, Pro Se,*** )
)
v. )
)
META PLATFORMS, INC., formerly )
FACEBOOK, INC., and OFFICE OF )
MANAGEMENT & BUDGET (OMB) )
    ***Respondents.*** )

Case: 1:23−cv−00816
Assigned To : Unassigned
Assign. Date : 3/24/2023
Description: FOIA/Privacy Act (I−DECK)

## **VERIFIED COMPLAINT**

1. Comes now Petitioner/Major Mike Webb, doing business as Major Mike Webb for VA, a candidate for State Delegate in Virginia's newly designated Third House District ("Third District"), the former 49th House District ("Fighting 49th"), also known as Friends for Mike Webb and Major Mike Webb for Congress, to revive actions, dismissed, without prejudice, and arising under the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, and the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C. § 248, and to raise other related claims arising under state and federal law as to Respondents Meta Platforms, Inc., formerly Facebook, Inc., and hereinafter referred to as Facebook/Meta, as well as the Office of Management & Budget (OMB).

## **Jurisdiction**

2. Paragraphs 1 is incorporated by reference.

3. Jurisdiction is proper under 28 U.S.C. § 1331, because the controversy involves a federal question.

RECEIVED
Mail Room
MAR 27 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

4.  Jurisdiction is proper under 28 U.S.C. § 1332, because there is diversity amongst the parties to the action in a controversy exceeding $75,000.

## Statement of Facts

5.  Paragraphs 1 to 4 are incorporated by reference.

6.  "To survive, 'a complaint must contain factual matter, accepted as true, to 'state a claim of relief that is plausible on the face'", *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)), and a claim is presumed to have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged". *Twombly*, 550 U.S., at 544.

7.  Petitioner has had other matters, akin to the present matter, raised under the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, dismissed for alleged offense to Fed.R.Civ.Pro. 8, which requires a plain statement, but, it is clear, as some have suggested, "[m]ore than three years after the start of the global pandemic there has yet to be a comprehensive forensic investigation into its origins", and "[w]ith more than a million Americans dead from Covid-19, and an estimated 15 million dead worldwide, that's inexcusable." Jamie Metzl & Matt Pottinger, "We Still Don't Know the Truth About Covid," *Wall Street Journal*, February 8, 2023.

8.  The present claims had been brought, subjected an amendment order in July 2021, and later dismissed, without prejudice, on suspicious grounds, *see Webb v. Fauci*, Civil Action No. 3:21-CV-00432 (E.D.Va. 2021), and arising from actions at a time when the President had acknowledged that:

> As I've told you before, I carry a card in my pocket with the number of Americans who
> have died from COVID to date. It's on the back of my schedule. As of now, the total

deaths in America: 527,726. That's more deaths than in World War One, World War Two, the Vietnam War, and 9/11 combined.

They were husbands, wives, sons and daughters, grandparents, friends, neighbors — young and old. They leave behind loved ones unable to truly grieve or to heal, even to have a funeral. Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11, 2021.

9. The present claims were raised again, and dismissed, without prejudice, on a denial of an application to proceed *in forma pauperis*, while "[t]he Supreme Court has held that 'punishing a person for his poverty' is unconstitutional", Matthew Menendez, et al., "The Steep Costs of Criminal Justice Fees and Fines," Brennan Center for Justice, November 21, 2019, and, in tragic irony, by last year it was known that "[b]ased on a data analysis of more than 3,000 counties across the US, it finds that people in poorer counties have died overall at almost twice the rate of those in richer counties." Ed Pilkington, "Covid had devastating toll on poor and low-income communities in US," *The Guardian*, April 4, 2022.

### *Recent Events*

10. Paragraphs 1 to 9 are incorporated by reference.

11. "Raccoon dogs, bamboo rats, palm civets: these are just some of the animals whose DNA has been found in swabs taken from the Huanan Seafood Wholesale Market in Wuhan, China, which has been linked to the origin of the COVID-19 pandemic", and recent news accounts report that "[t]he *swabs also tested positive* for SARS-CoV-2, which causes the disease", Smriti Mallapaty, "COVID-origins study links raccoon dogs to Wuhan market: what scientists think," *Nature*, March 21, 2023, a distinct finding from one asserting that the animals were infected.

12. Mindful that "[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself", *Cordova v. Hood*, 84 U.S. 1 (1872), yet, some have suggested that "[t]he analysis — posted on 20 March to the research repository Zenodo1 — *provides evidence*

*supporting the hypothesis that SARS-CoV-2 spilled over from animals to humans at the market*, say some researchers." Smriti Mallapaty, "COVID-origins study links raccoon dogs to Wuhan market: what scientists think," *supra*.

13. "On 16 March, The Atlantic first reported on the analysis", but "[t]he Zenodo posting, which has not been peer reviewed, is the first time that the full work has been released publicly — which could pave the way for follow-up studies, such as an investigation of where the animals in the market came from." *Id.*

14. "The new data were from *environmental samples from stalls and wastewater at the market* collected as early as January 2020", and "[a]long with SARS-CoV-2, some samples contained human DNA as well as mitochondrial DNA from several animal species, including some known to be susceptible to the virus", Lisa Schnirring (University of Minnesota), "WHO details discussions over newly revealed Wuhan market SARS-CoV-2 sequences," *CIDRAP*, March 20, 2023, which, in forensic evidence, is a distinct clinical finding from locating evidence of infected animals or humans.

15. Yet, it was reported that "[t]he preprint study said raccoon dogs weren't tested, but the new data—showing high levels of raccoon dog mitochondrial DNA—*suggest that raccoon dogs and other animals may have been* at the market before it was cleaned as part of the outbreak response", and "[e]arlier photographic evidence has shown that raccoon dogs and other animals were sold at the specific stalls in the past", but "[s]peculative fear of future harm does not constitute an injury in fact sufficient to confer standing", *Sancho v. Dep't of Energy*, Record No. 08-17389 (9 th Cir. 2010) (citing *Mayfield v. U.S.*, 599 F.3d 964 (9th Cir. 2010)), and "such cursory and 'highly speculative' arguments are an unacceptable substitute for the reasoned evaluation that is required". *Zauderer v. Office of Disciplinary Counsel of*

*Supreme Court of Ohio*, 471 U.S. 626 (1985) (quoting *Central Hudson Gas & Electric Corp.*

*v. Public Service Comm'n of New York*, 447 U.S. 557 (1980).

### *Infectious Dose*

**16.** Paragraphs 1 to 15 are incorporated by reference.

**17.** The CDC has conceded that "[t]he infectious dose of SARS-CoV-2 needed to transmit

infection has not been established", Staff, "Scientific Brief: SARS-CoV-2 Transmission,"

*CDC*, May 7, 2021, a relevant quantum of knowledge for evaluating recent claims regarding

evidence alleged to have been recovered from the Huanan Wholesale Seafood Market, in

support of arguments proffered that "the more likely explanation is a mutual evolution from

an animal host to a human", Jerry Dunleavy, "Fauci says he still thinks nature, not Wuhan

lab, 'most likely' origin for COVID-19," *Washington Examiner*, July 17, 2021, which a

person in the profession of medicine or biology would reasonably be expected to be more

aware than a mere layman.

**18.** The Court may take judicial notice that "the science", as even proclaimed in the abstract for

an official publication of the Health and Human Service Department states:

> For two centuries, Koch's postulates have set the gold standard for establishing the
> microbiological etiology of infection and disease. Genomic sequencing now brings finer
> resolution to both bacterial strain variation and the host genetic state that may predispose
> to disease. Julia A. Segre, *What does it take to satisfy Koch's postulates two centuries
> later? Microbial genomics and Propionibacteria acnes*, 133 J Invest Dermatol. 9 , pp
> 2141-2142 (September 2013), doi:10.1038/jid.2013.260.

**19.** This publication further explains that, "[d]eveloped in the 19th century, Robert Koch's

postulates are the four criteria designed to assess whether a microorganism causes a disease",

and "Koch's postulates have been critically important in establishing the criteria whereby the

scientific community agrees that a microorganism causes a disease." *Id.*

20. Stated in Sesame Street Simplicity, this causation validation test, under the Third Postulate, is simply the "How Many Licks Does It Take to Get to the Center of a Tootsie Roll Pop" Test.

21. It was known very early in the public health crisis that, even if not widely discussed, that researchers had required between $10^5$ and $10^7$ particles of a suspected recombinant chimera acknowledged to have been adapted uniquely for acquisition to the human physiology to cause an infection of a Syrian hamster, Jasper Fuk-Woo Chan, *et al.*, *Simulation of the Clinical and Pathological Manifestations of Coronavirus Disease 2019 (COVID-19) in a Golden Syrian Hamster Model: Implications for Disease Pathogenesis and Transmissibility*, 71 Clin. Infect. Dis. 9 pp. 2428-2446, December 3, 2020, doi: 10.1093/cid/ciaa325, *Epub.*, March 26, 2020, which, *ceteris paribus*, should be far greater for a human infection, unless such pathogen had been uniquely adapted to the human physiology.

22. And, early studies of the original strain found that it required at least an hour of exposure to transmit an infectious dose to only ten of 93 persons seated in a 145 square meter dining room, restricted to a 30 square meter section, Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 Emerg. Inf. Dis. 7 (July 2020). *See also* Lidia Morawska1 & Donald K. Milton, *It is Time to Address Airborne Transmission of COVID-19*, Oxford University Press for the Infectious Diseases Society of America, July 10, 2020;Linsey C. Marr, "Yes, the Coronavirus Is in the Air," *NYT*, July 30, 2020, ironically equal to the parameters for the effective range of a standard smoke grenade munition. *See* Staff, "40mm Low-Velocity Grenades: Gary's U.S. Infantry Weapons Reference Guide," *Inetres*, http://www.inetres.com/gp/military/infantry/grenade/40mm_ammo.html (accessed September 25, 2020); Staff, "Model: 1082; SKU: 1011574; Riot Control Continuous

Discharge Grenade, CS," *Defense Technology*, https://www.defense-

technology.com/product/riot-control-continuous-discharge-grenade-cs/ (accessed September

25, 2020); TM 43-0001-29, *Technical Manual: Army Ammunition Data Sheets for Grenades*,

June 1994 (Obsolete).

23. While at least one researcher had reported that he had determined the infectious dose, safely

through use of E6 Vero cells, without reporting the exact quantum, John A. Lednicky, *et al.*,

*Isolation of SARS-CoV-2 from the air in a car driven by a COVID patient with mild illness*,

108 Int. J. Infect. Dis., pp. 212-216 (July 2021), doi: 10.1016/j.ijid.2021.04.063, *Epub*. April

24, 2021, according to a recent study, choosing a very small sample size of only 36

participants, had determined that some persons, perhaps as high as 50% appear to be far more

susceptible, lacking an apparent "natural immunity," according to a recent challenge study, in

which "[h]ealthy adult volunteers were challenged intranasally with SARS-CoV-2", finding

only half vulnerable to infection after being intranasally inoculated with wild live virus, Ben

Killingley, *et al.*, *Safety, tolerability and viral kinetics during SARS-CoV-2 human challenge

in young adults*, 28 Nat. Med., pp. 1031–1041 (May 2022), *Epub*. March 31, 2022, stacking

the odds greatly against a successful launch of an emerging pandemic pathogen.

24. On March 23, 2021, noting that "infectious dose," or "how much of the pandemic virus it

takes to become infected," Christopher Snowbeck, "University of Minnesota leads work

group on infectious dose of COVID-19," Star Tribune, July 11, 2020, had found reports that

"experts still don't know exactly how much of the coronavirus is required to make

someone sick", Sarah Gibbens, "See how a sneeze can launch germs much

farther than six feet," *National Geographic*, April 17, 2020, Petitioner, in good faith, made an

inquiry, under the *FOIA*, to determine whether this metric was, in fact, classified information,

a request acknowledged as accepted by the White House on that date, as in evidence at Exhibit **A**.

### *Secondary Attack Rate*

25. Paragraphs 1 to 24 are incorporated by reference.

26. At least within the judicial departments, regarding agency action, "[i]f this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron, U.S.A., Inc.*, 467 U.S. 837 (quoting *U.S. v. Shimer*, 367 U.S. 374 (1961). *Accord Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984).

27. However, "as a practical matter, 'when an agency refuses to act' there is no action to 'provide[ ] a focus for judicial review'" *DHS v. Regents of Univ. of Calif.*, 591 U.S. ___ (2020) (quoting *Heckler v. Chaney*, 470 U.S. 821 (1985), where action is found, "[d]eciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Id.*

28. And,"[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743 (2015).

29. And, "[i]f those grounds are inadequate, a court may remand for the agency to" determine whether "the agency can offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" *Id.* (quoting *Pens. Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990). *See also Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (CADC 2006).

30. Compounding a theory of a natural origin of a highly contagious disease, which, if valid, should have found a far larger incidence of infection, is the fact that, according to reports,

"[w]ith a population of more than 11 million people according to government figures, Wuhan is the capital city of Hubei province and the biggest city in China's central region", and "[t]he city, spanning 8,494 square kilometers, has played a major role in the government's plan to rejuvenate the nation's central region for more than a decade." Maggie Hiufu Wong, "Wuhan: Inside the Chinese city at the center of the coronavirus outbreak," *CNN*, January 23, 2020.

31. Yet, after a robust examination, conducted by 1,800 teams of at least five epidemiologists, it was reported by the WHO that, "[a]mong 55,924 laboratory confirmed cases reported as of 20 February 2020, the median age is 51 years (range 2 days-100 years old; IQR 39-63 years old) with the majority of cases (77.8%) aged between 30–69 years", and, "[a]mong reported cases, 51.1% are male, 77.0% are from Hubei and 21.6% are farmers or laborers by occupation." *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, February 16-24, 2020.

32. A finding that "there ha[d] been widespread community transmission, and in the importation provinces, where *family clusters appear to have driven the outbreak*", and that "[t]here [we]re *distinct patterns of intra-familial transmission of COVID-19*", drove a conclusion that "[i]t is unclear whether or not there are *host factors, including genetic factors,* that influence susceptibility or disease course", *Id.*, suggesting some indications of a genetics driven targeting preference, from whatever possible cause.

33. This intriguing targeting preference would also later feature prominently, during the infections outbreak aboard the *Diamond Princess*, a cruise ship that had departed Yokohama, Japan, carrying approximately 3,700 passengers and crew, where "among 428 U.S. passengers and crew, 107 (25.0%) had positive test results for COVID-19", the highest

incidence of infection, Leah F. Moriarity, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships —Worldwide, February–March 2020*, 69 MMWR 12, pp. 347-352, March 27, 2020, as well as aboard the *U.S.S. Theodore Roosevelt*, where the virus appeared, upon presentation, after all personnel departing from Da Nang had cleared quarantine, to express a targeting preference for flight deck crew and reactor personnel, Secretary of the Navy, *Hot Topics: TR Investigation*, "Appendix F: Analysis of USS Theodore Roosevelt (CVN 71) Binnacle List,"

https://www.secnav.navy.mil/foia/readingroom/HotTopics/Forms/AllItems.aspx (accessed March 4, 2023), aboard a nuclear powered major force projection platform, one of only two in the Sino-Pacific Theater, both of which had suffered outbreaks, limited to the aircraft carrier in a carrier battle group, Andrew Court & Reuters, "Both US aircraft carriers in the Pacific are taken out of action for up to a MONTH [emphasis in original] after sailors get infected with coronavirus - giving China an almost free hand in the region as Pentagon raises threat level to second highest setting," *Daily Mail (UK)*, March 27, 2020; Valerie Edwards, "China takes advantage of USS Roosevelt being crippled by coronavirus and threatens Taiwan with aircraft carrier and warship strike group as it increases military presence in the disputed region" *Daily Mail (UK)*, April 13, 2020; Stephen Bryen, "Why the US withdrew its bombers from Guam," *Asia Times*, April 28, 2020; Dina Fine Maron, "'Wet markets' likely launched the coronavirus. Here's what you need to know," *National Geographic*, April 15, 2020, and compelling the withdrawal of the forward deployed strategic bomber force from that territorial island, Stephen Bryen, "Why the US withdrew its bombers from Guam," *Asia Times*, April 28, 2020.yet, on all evidence, raising no concerns regarding national security.

**34.** According to Kristian G. Andersen, "[f]ailure to comprehensively investigate the zoonotic

origin through collaborative and carefully coordinated studies would leave the world

vulnerable to future pandemics arising from the *same human activities* that have repeatedly

put us on a collision course *with novel viruses*", Edward C. Holmes, *et al.*, *The origins of*

*SARS-CoV-2: A critical review*, 184 Cell 19, pp. 4848-4856, September 16, 2021, doi:

10.1016/j.cell.2021.08.017, *Epub*. August 19, 2021, and, noting the high incidence of

infections amongst farming families, it is of at least probative value that "[t]he conflation of

'wet markets' and 'wildlife markets' has caused confusion during the coronavirus pandemic,

with some U.S. leaders making public calls for the closure of wet markets and lambasting

China for continuing to allow them", Dina Fine Maron, "'Wet markets' likely launched the

coronavirus. Here's what you need to know," *National Geographic*, April 15, 2020, and that

"the Detroit of China", "[l]ocated at the Yangtse River the capital of Hubei Province Wuhan

has been one of China's industrial and economical hubs for decades", is so large that, "[i]f

you make a circle of 2,000 kilometres with Wuhan as the centre point 80% of all cities in

China will be inside." Leif Almo, "Business – Detroit of China," *Visit Wuhan*,

https://visitwuhan.com/wuhan-a-city-with-limitless-business-opportunities/business-detroit-

of-china/ (accessed March 3, 2023).

**35.** Mindful that, "facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged", *Twombly*, 550 U.S., at 544, proponents of a natural evolution and spillover now

posit that:

> The earliest split in the SARS-CoV-2 phylogeny defines *two lineages—denoted A and B*
> (Rambaut *et al.*, 2020)—that likely circulated contemporaneously [figure omitted].
> Lineage B, which became dominant globally, was observed in early cases linked to the
> Huanan market and environmental samples taken there, whereas lineage A contains a

case with exposure to other markets [figures omitted] as well as with later cases in Wuhan and other parts of China (World Health Organization, 2021). This phylogenetic pattern is consistent with the emergence of SARS-CoV-2 involving one or more contacts with infected animals and/or traders, including multiple spill-over events, as potentially infected or susceptible animals were moved into or between Wuhan markets via shared supply chains and sold for human consumption (Xiao *et al.*, 2021). The potential emergence of SARS-CoV-2 across multiple markets again mirrors SARS-CoV in which high levels of infection, seroprevalence, and genetic diversity in animals were documented at both the Dongmen market in Shenzhen (Yaqing, 2004; Guan *et al.*, 2003) and the Xinyuan market in Guangzhou (Tu *et al.*, 2004; Wang et al., 2005). Edward C. Holmes, *et al.*, *The origins of SARS-CoV-2: A critical review*, 184 Cell 19, pp. 4848-4856, September 16, 2021, doi: 10.1016/j.cell.2021.08.017, *Epub*. August 19, 2021. (emphasis added)

36. Yet, as a preliminary consideration, "viral particles are by far the most abundant biological entities on our planet" Patrick Forterre, *Defining life: the virus viewpoint*, 40 Orig. Life Evol. Biosph. 2, pp. 151-160, March 3, 2010, doi:10.1007/s11084-010-9194-1, and, notwithstanding oft-repeated claims by Dr. Lederberg that "'[t]he single biggest threat to man's continued dominance on the planet is the virus'", and that "' we could do little better than to sit back and wait for the avalanche'", Robin Marentz Henig, "Experts warned of a pandemic decades ago. Why weren't we ready?" *National Geographic*, April 8, 2020, these appear to be the things of which fairytales and summer blockbuster films are made, because, empirically, around the time of the emergence of MERS, in 2012, Awad Al-Omari, *et al.*, *MERS coronavirus outbreak: Implications for emerging viral infections*, 93 Diagn. Microbiol. Infect. Dis. 3, pp. 265-285, October 18, 2019, doi: 10.1016/j.diagmicrobio.2018.10.011, there were only a total of 119 viruses harmful to mankind, Mark Woolhous *et al.*, *Human viruses: discovery and emergence*, Phil. Trans. R. Soc. B, 367, pp. 2864-2871 (2012); and, by probability, there would be low confidence of an emerging virus threat, this being infinitesimally small, when considering the Law of Large Numbers. *See generally* Kelly Sedor, *The Law of Large Numbers and Its Applications*,

Lakehead University (2015); Juan M. Sanchez, *An Exercise in Sampling: The Effect of Sample Size and Number of Samples on Sampling Error*, 4 World Journal of Chemical Education 2, pp. 45-48 (2016).

37. Furthermore, notwithstanding claims that that "the DOE determined with 'low confidence' that the COVID-19 virus likely stemmed from a lab in Wuhan, China, where the virus was first detected in 2019—making it the second federal agency to come to that conclusion", Andrew Stanton, "John Kirby Warns 'Not a Consensus' on COVID Origins Following Report," *Newsweek*, February 28, 2023, or, in the alternative, that "[f]our other agencies, however, maintain the virus likely spread naturally", while "[t]wo others remain undecided on its origins", *Id.*, it should be axiomatic that "getting the virus is a function of whether someone's got it, how long they're exposed, and how much virus they are shedding." Julia Belluz, "China's cases of Covid-19 are finally declining. A WHO expert explains why: 'It's all about speed': the most important lessons from China's Covid-19 response," *Vox*, March 3, 2020.

38. Yet, anomalously and intriguingly, after examining 19 times more cases than had yet been reported in the entire U.S., Jessie Yeung, *et al.*, "March 15 coronavirus news," *CNN*, March 15, 2020[1], world health public authorities reported:

> China has a policy of meticulous case and contact identification for COVID-19. For example, in Wuhan more than 1800 teams of epidemiologists, with a minimum of 5 people/team, are tracing tens of thousands of contacts a day. Contact follow up is painstaking, with a high percentage of identified close contacts completing medical observation. Between 1% and 5% of contacts were subsequently laboratory confirmed cases of COVID-19, depending on location. For example:
>
> - As of 17 February, in Shenzhen City, among 2842 identified close contacts, 2842(100%) were traced and 2240 (72%) have completed medical

---

[1] "US cases grow: There are now more than 3,000 cases of the novel coronavirus in the US, according to government agencies and the CDC." *Id.*

observation. Among the close contacts, 88 (2.8%) were found to be infected with COVID-19.
- As of 17 February, in Sichuan Province, among 25493 identified close contacts, 25347 (99%) were traced and 23178 (91%) have completed medical observation. Among the close contacts, 0.9% were found to be infected with COVID-19.
- As of 20 February, in Guangdong Province, among 9939 identified close contacts, 9939 (100%) were traced and 7765 (78%) have completed medical observation.
- Among the close contacts, 479 (4.8%) were found to be infected with COVID-19. *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19).*

39. "The Delta variant (B.1.617.2), discovered in October 2020, was designated as a [variant of concern or] VOC by the WHO on May 11, 2021", and that "[t]he enhanced transmissibility of Delta variant ha[d] been associated with critical mutations such as D614G, L452R, P681R, and T478K in the S-protein", finding that "[t]he increased affinity of the S-protein and ACE2 ha[d] been postulated as a key reason for decreased vaccine efficacy", Manish Dhawan, *Delta variant (B.1.617.2) of SARS-CoV-2: Mutations, impact, challenges and possible solutions*, 18 Hum. Vaccin. Immunother. 5, pp. 2068883, November 30, 2022, doi: 10.1080/21645515.2022.2068883, *Epub.* May 4, 2022, and by that time the findings in Wuhan had been revalidated with regard to the secondary attack rate for COVID-19, even if not yet acknowledged by the CDC, in what was promoted as "the largest contact tracing study — which is the process of identifying people who came into contact with an infected person — conducted in the world for any disease", that the secondary attack rate was only 4.6%. Ramanan Laxminaraya, *Epidemiology and transmission dynamics of COVID-19 in two Indian states*, 370 Science 6517, pp. 691-697 November 6, 2020, doi: 10.1126/science.abd7672, *Epub.* September 30, 2020.

40. For comparison, Lieutenant General Jody Daniels, Chief of Army Reserve and Commanding General, U.S. Army Reserve Command, has proposed, "If I play roulette and contract the

virus, I could be asymptomatic or on a respirator", Michael Sauret, "Shoot to kill the virus: Chief of Army Reserve receives COVID-19 vaccine shot," *USAR*, January 11, 2021, and, to obtain a 35 to 1 payout on an American roulette table, for a single number, one of only 37 slots, a gambler would have a 2.70% winning the jackpot, compared to 2.60%, on a European roulette table, with 36 slots, omitting the choice of "00". Luke Holmes, "Roulette Odds and Probability Guide 2023 – Bet Payouts and Winning Chances," *Roulette Sites*, December 9, 2022, or double the chances of getting infected by another person with the original strain, which secondary attack rate would relate to the alleged zoonotic evolution, or, in the alternative, escape from a laboratory, or about the 5.3% chances of a two number combination on an American roulette table. *Id.*

41. In American roulette, a gambler may increase odds to 15.8% with a six number combination, to 31.6% by betting on a column or dozen, or as high as 47.4% by betting Even/Odd, Red/Black or High/Low, *Id.*, none of which factors present in either the natural spillover or lab leak hypotheses.

42. "One recent roundup of 135 studies found that the overall spread of disease within a home— an epidemiological phenomenon that is unfortunately named 'household secondary attack rate'—was 42.7 percent for the earliest forms of Omicron", a better chance at winning a coin toss than catching the Omicron variant of concern, the most transmissible variant yet, Yasmin Tayag, "The Odds of Getting COVID From Your Housemate Are 'About a Coin Flip'," *The Atlantic*, August 15, 2022. *See also* Zachary J. Madewell, *et al.*, *Household Secondary Attack Rates of SARS-CoV-2 by Variant and Vaccination Status: An Updated Systematic Review and Meta-analysis*, 5 JAMA Netw. Open 4, pp. e229317, April 28, 2022, doi:10.1001/jamanetworkopen.2022.9317.

**43.** And, as noted above, on March 23, 2021, finding no official determination from CDC with regard to this standard metric of transmissibility risk, *see generally* Principles of Epidemiology in Public Health Practice, Third Edition: An Introduction to Applied Epidemiology and Biostatistics, "Lesson 3: Measures of Risk: Section 2: Morbidity Frequency Measures," *CDC*, May 18, 2012, Petitioner merely made inquiry, under the *FOIA*, to determine whether such metric was classified information.

**44.** Certainly, Dr. Rochelle Walensky, was mindful of the White House directive on medical misinformation, *see* Steve Nelson, "White House 'flagging' posts for Facebook to censor over COVID 'misinformation'," *New York Post*, July 15, 2021, and yet still had stated to reporters, "With the delta variant, the R-naught is 8 or 9," Meg Tirrell, "CDC director says the Covid pandemic's end date depends on human behavior," CNBC, October 8, 2021.

**45.** Yet, it is a fact that her agency has stated that that metric is "easily misrepresented, misinterpreted, and misapplied", "dependent on model structures and assumptions," should be "applied with great caution because this basic metric is far from simple", and "cannot be modified through vaccination campaigns", Paul Delameter, *et al.*, *Complexity of the Basic Reproduction Number ($R_0$)*, 25 Emerging Infectious Diseases 1 (January 2019), and the preferred measure of transmissibility risk being the secondary attack rate. *Principles of Epidemiology in Public Health Practice, Third Edition: An Introduction to Applied Epidemiology and Biostatistics*, "Lesson 3: Measures of Risk: Section 2: Morbidity Frequency Measures," *supra*.

**46.** Yet, by the first anniversary of the pandemic declaration, the President had noted:

> As I've told you before, I carry a card in my pocket with the number of Americans who have died from COVID to date. It's on the back of my schedule. As of now, the total deaths in America: 527,726. That's more deaths than in World War One, World War Two, the Vietnam War, and 9/11 combined.

They were husbands, wives, sons and daughters, grandparents, friends, neighbors —
young and old. They leave behind loved ones unable to truly grieve or to heal, even to
have a funeral. Briefing Room, "Remarks by President Biden on the Anniversary of the
COVID-19 Shutdown," *The White House*, March 11, 2021.

47. "Globally, as of 6:06pm CET, 21 March 2023, there have been 761 071 826 confirmed cases

of COVID-19, including 6 879 677 deaths, reported to WHO", and "[a]s of 19 March 2023, a

total of 13 244 177 602 vaccine doses have been administered." Staff, "WHO Coronavirus

(COVID-19) Dashboard," *WHO*, March 21, 2023, https://covid19.who.int/ (accessed March

22, 2023).

48. "Surely we have learned by now, that we underestimate this virus at our peril." Newsroom,

"2021 Year in Review: 'We underestimate this virus at our peril'," U.N. News, December

27, 2021.

### *"On the Down Low"*

49. Paragraphs 1 to 48 are incorporated by reference.

50. According to neuroscientists, "change blindness and inattentional blindness are not the only

kinds of cognitive illusions magicians can pull out of a hat", and "Teller, half of the

renowned stage magic act known as Penn & Teller, explains that if he raises his hand for no

apparent reason, he is more likely to draw suspicion than if he makes a hand gesture—such

as adjusting his glasses or scratching his head—that seems natural or spontaneous", and, at

least "[t]o magicians, such gestures are known as 'informing the motion.'" Susana Martinez-

Conde & Stephen L. Macknik, "Magic and the Brain: How Magicians," *The Scientific*

*American*, December 1, 2008.

51. Accordingly, despite much emphasis on ancillary matters, including celebrations of

Juneteenth, Jon Blisten, "Pharrell Joins Virginia Gov. Ralph Northam in Call to Make

Juneteenth a State Holiday," *Rolling Stone*, June 16, 2020; Lauren Egan, "Biden signs into

law bill establishing Juneteenth as federal holiday," *NBC News*, June 17, 2021,

demonstrations for George Floyd, Derek Bryson Taylor, "George Floyd Protests: A

Timeline," *The New York Times*, November 5, 2021, razing Confederate statues, Alan

Taylor, "The Statues Brought Down Since the George Floyd Protests Began," *The Atlantic*,

July 2, 2020, critical race theory, Anthony Zurcher, "Critical race theory: the concept

dividing the US," *BBC*, July 22, 2021, and even renaming military installations, Jim

Garamone, "DOD Begins Implementing Naming Commission Recommendations," *DoD

News*, January 5, 2023, before the first anniversary of the pandemic declaration, and just a

few weeks before Petitioner's *FOIA* request, it was reported that "[n]ationwide, Black people

ha[d] died at 1,4 times the rate of white people", that "[w]e've lost at least 73 462 Black lives

to COVID-19 to date" and that "Black people account[ed] for 15% of COVID-19 deaths

where race [wa]s known." Boston University & The Atlantic, "The COVID Racial Data

Tracker," *COVID Tracking Project*, March 7, 2021, https://covidtracking.com/race (accessed

March 22, 2023).

52. Similarly, despite a national focus on LGBTQ issues, *see generally* Francisco Durán & Reid

Goldstein, "APS Statement in Response to Proposed Virginia Policies Affecting Transgender

Students," *APSVA*, September 19, 2022, it is of note that before pandemic, "[a]ge-specific

mortality was significantly higher for gay and bisexual men than all men aged 30-44", Robert

S. Hogg, *et al.*, *Modelling the Impact of HIV Disease on Mortality in Gay and Bisexual Men*,

26 Int. J. Epidemiol. 3, pp. 657-661 (June 1997), doi: 10.1093/ije/26.3.657, while, in

pandemic, "[p]eople living with HIV had higher risk of COVID-19 death than those without

HIV after adjusting for age and sex: hazard ratio (HR) 2·90 (95% CI 1·96–4·30; p<0·0001)."

Krishnan Bhaskaran, *et al.*, *HIV infection and COVID-19 death: a population-based cohort*

*analysis of UK primary care data and linked national death registrations within the OpenSAFELY platform*, 8 The Lancet 1, pp. E24-E32 (January 2021)[2].

53. "People living with HIV were more likely to be male, of Black ethnicity, and from a more deprived geographical area than the general population", and "[t]here was some evidence that the association was larger among people of Black ethnicity: HR 4·31 (95% CI 2·42–7·65)." versus 1·84 (1·03–3·26) in non-Black individuals (p-interaction=0·044)." *Id.*

54. Moreover, while the national case fatality rate is only 1.1%, Coronavirus Resource Center, "Mortality Analyses," *Johns Hopkins University*, March 10, 2023, https://coronavirus.jhu.edu/data/mortality (accessed March 22, 2023), some have reported that "[t]he total death rate in HIV-positive patients with COVID-19 was about 9%,Mohsen Heidary, *et al.*, *COVID-19 in HIV-positive patients: A systematic review of case reports and case series*, 36 JCLA 4, pp. e24308, February 20, 2022, https://doi.org/10.1002/jcla.24308, while others have reported that:

> The overall pooled RR of COVID-19 mortality associated with HIV was 1.78 (95% CI 1.21–2.60), implying there is nearly an 80% excess risk of death among HIV patients as compared to the individuals without HIV/AIDS. Between-study variation was moderate (I2=78, p=0.002; Fig. 5). The pooled mortality rate among HIV positive patients was 12.65% (95% CI 6.81–22.31%, I2=74%; p<0.01; Fig. 6). The pooled mortality rate ranged from a high of 35% (95% CI 10–72%) in the United States to a low of 4% (95% CI 1.07–15.48%; Fig. 6) in Italy. Tesoriero and colleagues reported that among PLWHA, hospitalization risk increased with disease progression from HIV stage 1 to stage 2 (adjusted RR [aRR] [95% CI] 1.27 [1.09–1.47]) and stage 3 (aRR [95% CI] 1.54 [1.24–1.91]), and for those virally unsuppressed (aRR [95% CI] 1.54 [1.24–1.91]) [footnote omitted] No association was observed between HIV status and ICU admission among COVID-19 patients. Paddy Ssentongo, *Epidemiology and outcomes of COVID-19 in HIV-infected individuals: a systematic review and meta-analysis*, 11 Sci. Rep., Article number: 6283, March 18, 2021.

---

[2] "The association was attenuated, but risk remained high, after adjustment for deprivation, ethnicity, smoking and obesity: adjusted HR 2·59 (95% CI 1·74–3·84; p<0·0001). There was some evidence that the association was larger among people of Black ethnicity: HR 4·31 (95% CI 2·42–7·65) versus 1·84 (1·03–3·26) in non-Black individuals (p-interaction=0·044)." *Id.*

55. An early, but withdrawn, study in preprint had suggested that "We found 4 insertions in the spike glycoprotein (S) which are unique to the 2019-nCoV and are not present in other coronaviruses", and "Importantly, amino acid residues in all the 4 inserts have identity or similarity to those in the *HIV-1 gp120 or HIV-1 Gag*." Prashant Pradhan, *et al.*, *Uncanny similarity of unique inserts in the 2019-nCoV spike protein to HIV-1 gp120 and Gag*, BioR$_x$IV, January 31, 2020 (withdrawn). (emphasis added)

56. Later studies confirmed that "[t]he early stages of viral binding and entry for both HIV-1 and coronaviruses, including SARS-CoV-2, bear similarities, from the presentation of a trimeric spike on both viral surfaces (glycoproteins gp41/gp120 and the S (spike) glycoprotein, respectively), to the recognition and binding of these viral spikes to ubiquitous cell surface structures, heparan sulfate proteoglycans (HSPGs)." Lauren Wells, *et al.*, *Sulfoglycodendrimer Therapeutics for HIV-1 and SARS-CoV-2*, 4 Adv. Ther. (Weinh) 4, pp. 2000210, April 2021.

57. One study "first evaluated the cellular co-expression of SARS-CoV-2 spike glycoprotein with HIV-1 Gag, concluding that it has no significant negative effect in cell growth and viability", and reported that "HIV-1 Gag VLPs share similar characteristics with wild-type severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) virus, making them a *suitable platform for the expression of its spike membrane protein* to generate a potential vaccine candidate for COVID-19." Arnau Boix-Besora, *et al.*, *Optimization, Production, Purification and Characterization of HIV-1 GAG-Based Virus-like Particles Functionalized with SARS-CoV-2*, 10 Vaccines (Basel) 2, pp. 250, February 7, 2022. (emphasis added)

58. More recently, a study in which the notorious "Bat Woman", Alice Fuller, "BATTED BACK [emphasis in original] China's 'bat woman' Shi Zhengli slams Wuhan lab leak claims saying

'the world is trying to pour filth on me'," *The Sun (UK)*, June 14, 2021, had been a co-author, it was reported that:

> In our data, SARSCoV-2 showed significant infection of activated T cells, suggesting there should be a new entry mechanism in T cells. The identification of *LFA-1*, as an entry molecule that contributed to a SARS-CoV-2 infection of T cells would be important for developing clinical therapeutics, although future questions remain." Xu-Rui Shen, *et al.*, *ACE2-independent infection of T lymphocytes by SARS-CoV-2*, 7 Signal Transduc. & Targ. Ther. (Nature) 83, March 11, 2022. (emphasis added)

59. Dr. Shi demonstrated that "SARS-CoV-2 infected T lymphocytes, mainly CD4 + T cells, in an ACE2-independent manner. SARS-CoV-2 infection triggered pronounced T-cell death, which potentially *contributed to lymphopenia in patients with COVID-19.*" *Id.* (emphasis added)

60. This study found that "[a]part from the respiratory system, multiple organs including the immune system of COVID-19 patients were also targeted by SARSCoV-2 infection. Notably, lymphopenia was observed in 83.2% of the patients on admission, and fatal infections were associated with more severe lymphopenia over time", *Id.*, and it is well-acknowledged that "[l]ymphopenia (also called lymphocytopenia) is a disorder in which your blood doesn't have enough blood cells called lymphocytes, according to N I H. AIDS patients routinely have lymphocytopenia, which arises from destruction of CD4+ T cells infected with H I V." National Heart, Lung & Blood Institute, "Lymphopenia: What Is Lymphopenia?" *NIH*, May 31, 2022, https://www.nhlbi.nih.gov/health/lymphopenia (accessed March 22, 2023).

61. As the Fourth Circuit has acknowledged, gender dysphoria is a serious mental health condition, identified on the DSM-V, and "[l]eft untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide." *Grimm v. Gloucester Cy. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).

### Claims

### *Count One: FOIA*

62. Paragraphs 1 to 61 are incorporated by reference.

63. Petitioner is entitled, by right, to a response to a request submitted in the *FOIA*.

64. The origins of the novel coronavirus have been described as "a mystery that has divided the eight U.S. government agencies investigating the source", and the President has stated. "'We need to get to the bottom of COVID-19's origins to help ensure we can better prevent future pandemics.'" Maureen Groppe & Joey Garrison, "President Biden signs bill ordering declassification of COVID origins information," *USA Today*, March 20, 2023, *updated* March 21, 2023.

65. The nation's highest court has stated that "[a]bsent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide." *U.S. v. Nixon*, 418 U.S. 683 (1974).

66. Moreover, Article III Courts have determined that "[i]t is clear that the *FOIA* contemplates that the courts will resolve fundamental issues in contested cases on the basis of *in camera* examinations of the relevant documents." *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) (citing *Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976); 5 U.S.C. § 552(a)(4)(B), *as amended* (Supp. V 1975)).

67. Pursuant to Section 1.8(a), Executive Order 12,958, *Classified National Security Information*, April 17, 1995, "[i]n no case shall information be classified in order to: (1) *conceal violations of law*, inefficiency, or administrative error; (2) prevent embarrassment to

a person, organization, or agency; (3) restrain competition; or (4) *prevent or delay the release of information that does not require protection in the interest of national security*."

68. And, furthermore, in accordance with Part I, Section 1.1(b), "'[i]nformation' means any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government."[3]

69. Yet, under Part I, Section 1.5, "[i]nformation may not be considered for classification unless it concerns: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding nuclear materials or facilities; or (g) vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security".

70. As noted above, on March 23, 2023, Petitioner had a *FOIA* request acknowledged as accepted by the White House regarding a request seeking to determine whether the standard metrics of secondary attack rate and/or infectious dose were classified information, and the White House did and continues to refuse to reply in any manner to the request, asserting a presumptive claim of executive privilege, reserved for matters of national security.

71. "President Biden this week signed legislation requiring the Director of National Intelligence to declassify information related to the origins of the coronavirus, and in particular ties

---

[3] "'Information' means may information or material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." Section 6.1(b), Executive Order No. 12,356, *National Security Information*, April 2, 1982.

between a biolab in the Chinese city of Wuhan and the pandemic that swept the globe, killing

millions", and stated: "In implementing this legislation, my Administration will declassify

and share as much of that information as possible, consistent with my constitutional authority

to protect against the disclosure of information that would harm national security." Olivier

Knox, "Biden signs law to declassify Covid origins. But...," *Washington Post*, March 22,

2023.

72. "The legislation applies only to material related to the Wuhan Institute of Virology as a

potential source of the virus that causes COVID-19 – a politically charged issue", and

"Republicans have accused Biden of not being tough enough on China." Maureen Groppe &

Joey Garrison, "President Biden signs bill ordering declassification of COVID origins

information," *supra*.

73. Nonetheless, Justice Kavanagh had recently reminded all that, "courts traditionally have been

reluctant to intrude upon the authority of the Executive in military and national security

affairs", *Department of Navy v. Egan*, 484 U. S. 518 (1988), and, under Executive Order

12,958, as the Commander in Chief, the President holds the exclusive authority, as the

ultimate original classification authority, with all other subordinate departments holding that

which is merely a derivative delegation of that power, for, as Justice Harlan had reminded in

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (citing 1 Story's Const. § 462), "no power

can be exerted to that end by the United States unless, apart from the *Preamble*, it be found in

some express delegation of power or in some power to be properly implied therefrom."

74. Of record, Petitioner has related to Dana Remus that the legislation from the Congress was an

inappropriate usurpation of executive power, and, certainly in a far better position to

comprehend the proscriptions under Executive Order 12,958, one might, in legislative

deference, presume that the Congress was fully aware of the compromised position of the

White House on the origins issue, and "[h]ad the legislature intended. . . [any other purpose

or meaning]. . . , it would have said so." *Alger v. Com.*, 40 Va. App. 89 (2003), *aff'd*, 267 Va.

255 (2004). *See also Hughes v. Commonwealth*, 39 Va.App. 448 (2002); *Barnes v.*

*Commonwealth*, 33 Va.App. 619 (2000); *Reynolds v. Commonwealth*, 30 Va.App. 153

(1999).

75. Alternatively, under the *FOIA*, agencies are directed to "make available to the public

information", 5 U.S.C. § 552(a), and "determine within 20 days (excepting Saturdays,

Sundays, and legal public holidays) after the receipt of any such request whether to comply

with such request and shall immediately notify the person making such request of. . .

    (I)      such determination and the reasons therefor;

    (II)     the right of such person to seek assistance from the FOIA Public Liaison of the

            agency; and

    (III)    in the case of an adverse determination—

                (aa) the right of such person to appeal to the head of the agency, within a

                period determined by the head of the agency that is not less than 90 days

                after the date of such adverse determination; and

                (bb) the right of such person to seek dispute resolution services from the

                FOIA Public Liaison of the agency or the Office of Government

                Information Services". 5 U.S.C. § 552(a)(6)(A)(i).

76. "Thus, a statute should be read to give reasonable effect to the words used and to promote

the ability of the enactment to remedy the mischief at which it is directed." *Mayhew v.*

*Commonwealth*, 20 Va.App. 484 (1995); moreover, "'[w]here a particular construction of a

statute will result in an absurdity, some other reasonable construction which will not produce the absurdity will be found.'" *Mayhew*, 20 Va.App. at 484 (quoting *Miller v. Commonwealth*, 180 Va. 36 (1942)).

77. Yet, such did not occur, in this instance, and, "[o]n complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

78. And yet, despite the fact that "[a]ny person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph", 5 U.S.C. § 552(a)(6)(c)(i), such did not occur, in the first instance, when Petitioner raised the matter in complaint, *see Webb v. Fauci*, *Webb v. Fauci*, Civil Action No. 3:21-CV-00432 (E.D.Va. 2021), *aff'd* Record No. 212394 (4th Cir. 2021), *cert. denied* Record No. 21-8242 (U.S. 2022); *see also Webb v. Fauci*, Record No. 21-6868 (U.S. 2022) (application for prejudgment), mindful of the fact that in accordance with 28 U.S.C. § 1657(a), "[n]otwithstanding any other provision of law, each court of the United States shall determine the order in which civil actions are heard and determined, except that the court *shall expedite the consideration of. . .  any action for temporary or preliminary injunctive relief*, or any other action if good cause therefor is shown", and mindful of the fact that "[f]or purposes of this subsection, 'good cause' is shown if a right under the *Constitution of the United States* or a Federal Statute (including rights

under section 552 of title 5) would be maintained in a factual context that indicates that a

request for expedited consideration has merit", *Id.*,

79. Similarly, on a second attempt to gain redress, Petitioner's action to obtain a response under

the *FOIA*, was rebuffed by the courts, having the action dismissed after an application to

proceed *in forma pauperis*, under 28 U.S.C. § 1915(a), had been denied, *Webb v. OMB*, Civil

Action  NO. 3:22-cv-00418-DJN (E.D.Va. 2022), *aff'd* Record No. 22-1698 (4th Cir. 2023),

while, tragically, "within the top 300 counties with the highest death rates, 45% of the

population on average lives below the poverty line as defined as 200% of the official poverty

measure", and "[t]he consequences of such racial inequity are still only now becoming

visible." Ed Pilkington, "Covid had devastating toll on poor and low-income communities in

US," *supra*.

80. Recent findings suggest, indicative of targeting a particular human physiology, that

81. And, yet, as explained by the U.S. Department of Justice (DoJ), "[o]n his first full day in

office, January 21, 2009, the President[, Barack Obama,] issued a memorandum to

all executive departments and agencies emphasizing that the *FOIA* reflects a 'profound

national commitment to ensuring an open Government'", *Department of Justice Guide to the

Freedom of Information Act*, "President Obama's *FOIA* Memorandum and Attorney General

Holder's FOIA Guidelines," *DoJ*, July 23, 2014, calling for "federal executive departments

and agencies to administer the *FOIA* with 'a clear presumption: [i]n the face of doubt,

openness prevails.'" *Id.*

82. According to (DoJ), President Obama "directed departments and agencies not to withhold

information 'merely because public officials might be embarrassed by disclosure, because

errors and failures might be revealed, or because of speculative or abstract fears'", *ibid*, and

"[h]e instructed agencies to respond to requests 'promptly and in a spirit of cooperation.'" *Id.* (quoting *Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act*, 74 Fed. Reg. 4683 (Jan. 21, 2009)).

83. "The President further directed agencies to adopt a presumption in favor of disclosure with regard to all *FOIA* decisions", *ibid.*, and "[t]hat presumption requires agencies to proactively release records, without waiting for specific requests, and use technology to inform citizens 'about what is known and done by their [g]overnment.'" *Ibid.*

84. And, under the *Fourteenth Amendment*, "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

85. Moreover, it has oft been repeated in the judiciary that "[t]he fundamental requisite of due process of law is the opportunity to be heard", *Grannis v. Ordean*, 234 U.S. 385 (1914), and that such should occur "at a meaningful time and in a meaningful manner", *Armstrong v. Manzo*, 380 U.S. 545 (1965).

86. Yet, may the Court take judicial notice that, as Petitioner, a member of the Intelligence Community, albeit in retired status, had recently related to the DNI, in a matter considering patent protection for a type of bacteria, the Supreme Court had established the rule that "'the patent laws . . . at the present time are understood to cover only inventions or discoveries in the field of inanimate nature'," *Diamond v. Chakrabarty*, 447 U.S. 303 (1980) (quoting S.Rep. No. 315, 71st Cong., 2d Sess., 8 (1930); H.R.Rep. No. 1129, 71st Cong., 2d Sess., 7-9 (1930), at Appendix A), and had held that the plaintiff's "claim is not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring manufacture or composition of matter --

a product of human ingenuity 'having a distinctive name, character [and] use'" *Id.* (citing *Hartranft v. Wiegmann*, 121 U.S. 609 (1887), hence, eligible for patent protection.

87. Similarly, in *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), the Supreme Court had held "that a naturally occurring DNA segment is a product of nature and not patent eligible merely because it has been isolated, but that cDNA is patent eligible because it is not naturally occurring".

88. And, hence, it is clear that, under the law, no proprietary interest can be recognized for any biological agent that is naturally occurring, and such ownership interest may only vest for a biological agent that had been manipulated or cultivated in an unnatural process, and the novel coronavirus would, by operation of law, could not have found genesis in a natural zoonosis and spillover event.

89. Article III Courts have held that "mere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding it." *Luteran v. U.S.*, 93 F.2d 395  (8th Cir. 1937) (citing *Burkhardt v. U.S.*, 13 F.2d 841 (6th Cir. 1926)).

### ***Count Two: FACE Act***

90. Paragraphs 1 to 89 are incorporated by reference.

91. has been the victim of a violation of the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C. § 248.

92. "Whoever. . . by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the *First Amendment* right of religious freedom at a

place of religious worship. . . shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c)". 18 U.S.C. § 248(a)(2).

93. "Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection. . . (a)(2) only by a person lawfully exercising or seeking to exercise the *First Amendment* right of religious freedom at a place of religious worship". 18 U.S.C. § 248(c)(1)(A).

94. "In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 248(c)(1)(B).

95. "With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." *Id.*

96. On July 7, 2021, Petitioner brought suit under the *FOIA*, 5 U.S.C. § 552(a)(4)(B). in the Eastern District of Virginia, as noted above, *see Webb v. Fauci*, Civil Action No. 3:21-CV-00432 (E.D.Va. 2021), and was immediately ordered to amend his complaint, having been deemed to have offended Fed.R.Civ.Pro. 8, notwithstanding the priority of civil actions under 28 U.S.C. § 1657(a), and notwithstanding the established position in the Fourth Circuit that "its district courts must be especially solicitous of civil rights plaintiffs."[4]

---

[4] "This solicitude for a civil rights plaintiff with counsel must be heightened when a civil rights plaintiff appears *pro se*. In the great run of *pro se* cases, the issues are faintly articulated and often only dimly perceived. There is, therefore, *a greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done*. So, although the Court of Appeals cannot mean that it expects the district courts to assume the role of advocate for the *pro se* plaintiff, radiations from *Burris* [*v. State Dep't of Pub. Welf. of S.C.*, 491 F.2d 762 (4 Cir. 1974)] strongly suggest that the district court must examine the *pro se* complaint to see whether the facts alleged, or the set of facts which the plaintiff might be able to prove,

97. "Researchers ha[d] found just 12 people [we]re responsible for the bulk of the misleading claims and outright lies about COVID-19 vaccines that proliferate on Facebook, Instagram and Twitter", and "'The 'Disinformation Dozen' produce[d] 65% of the shares of anti-vaccine misinformation on social media platforms,' said Imran Ahmed, chief executive officer of the Center for Countering Digital Hate, which identified the accounts." Shannon Bond, "All Things Considered: Just 12 People Are Behind Most Vaccine Hoaxes On Social Media, Research Shows," *NPR*, May 14, 2021.

98. As the COVID-19 countermeasures rollout was "reaching a critical stage in which most adults who want[ed] the vaccine ha[d] gotten it, but many others [we]re holding out, these 12 influential social media users st[oo] to have an outsize impact on the outcome", and "[a]fter th[at] story [was] published. . . , Facebook said it had taken down more of the accounts run by these 12 individuals." *Id.*

99. On July 15, 2021, "White House press secretary Jen Psaki said. . . Thursday the Biden administration is identifying "problematic" posts for Facebook to censor because they contain "misinformation" about COVID-19", and "Psaki disclosed the government's role in policing social media during her daily press briefing after Surgeon General Vivek Murthy called on companies to purge more pandemic posts", Steven Nelson, "White House 'flagging' posts for Facebook to censor over COVID 'misinformation'," *supra*, and four days later, Petitioner's account was permanently disabled, not for medical misinformation, but rather, expressly for "security reasons", as in evidence at Exhibit **B**.

---

could very well provide a basis for recovery under any of the civil rights acts or heads of jurisdiction in the federal arsenal for redress of constitutional deprivations. Accordingly, the Court in considering the defendants' motion to dismiss will not permit technical pleading requirements to defeat the vindication of any constitutional rights which the plaintiff alleges, however inartfully, to have been infringed." *Id.* (citing *Canty v. City of Richmond, Va., Police Dept.*, 383 F.Supp. 1396 (E.D.Va.1974), *aff'd*, 526 F.2d 587 (4 Cir. 1975), *cert. denied*, 423 U.S. 1062 (1976)).

100.    It is well-established that, under the time/decision rule, articulated in *Reid v. MSPB*, 508

F.3d 674 (Fed. Cir. 2007), that, if an adverse action occurs within a reasonable time of a

protected activity, a complainant "need not demonstrate the existence of a retaliatory motive.

. . to establish that [the protected activity]. . . was a contributing factor", *Kewley v. HHS,* 153

F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)).

101.    It has been said, "it can hardly be doubted that the constitutional guarantee has its fullest

and most urgent application precisely to the conduct of campaigns for political office",

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971), and Petitioner, of record, has been

throughout the public health crisis a political candidate, engaged in campaign activity,

wherein "a candidate's expenditure of his personal funds directly facilitates his own political

speech", *Buckley v. Valeo*, 424 U.S. 1. N. 58 (1976), yet with an experience contrary to  the

constitutional guarantees. *See Webb v. FEC*, Civil Action No. 3:2022cv00047 (E.D.Va.

2022); *Webb v. Dep't of Treas.*, Civil Action No. 1:2022cv02034 (D.C. 2022).

102.    Of public record, it is the partisan boast, on a Virginia progressive blog, regarding

Petitioner, that "[n]ow and again, analysts will refer to the determined and wildly successful

Arlington Democrats in battle-hardened military terms", that "[o]nslaught, commando, and

scorched earth come to mind", and that "[t]hose are usually employed in relation to the fall

campaign when yet another Republican, an "independent" who is really a Republican, or a

real independent (often a pesky candidate who finds a way onto the ballot almost every year)

is about to be drubbed in an election in the small but intensely political county just across the

Potomac from the nation's capital." Cragg Hines, "Arlington Dems Pour It On, Boost

"Regular" Dem Mary Kadera to Big Victory in School Board Caucus Over "Insurgent

Candidate," *Blue Virginia*, May 26, 2021.

**103.**    Of note, and informing context, despite being *pro se* litigant, Petitioner, early identified

nationally as being "against current government efforts and recommendations for safety

during the COVID-19 pandemic." Staff, "Mary Kadera: Democrat," *Progressive Voters

Guide*, September 15, 2021,

https://progressivevotersguide.com/index.php/virginia/2021/general/mary-kadera (accessed

June 25, 2022), in the matter, *Webb v. Davenport*, Case No. CL22W03079-00 (Chesterfield

Cir. 2022), had successfully persuaded the Circuit Court for the County of Chesterfield to

certify a matter to the Chief Justice for the State Supreme Court on a petition for writ of

mandamus against the Commonwealth Attorney, as in evidence at Exhibit **C**, arising from

facts surrounding the infection and death of Bishop Gerald Glen, the former Senior Pastor for

the New Evangelistic Church, Michelle Boorstein, "Prominent Virginia pastor who said 'God

is larger than this dreaded virus' dies of covid-19," *Washington Post*, April 13, 2020, which

had occurred simultaneously with the report of 30 faith leaders in the Black Pentecostal

denomination, before the first Easter in pandemic. *See generally* Michelle Boorstein, "Covid-

19 has killed multiple bishops and pastors within the nation's largest black Pentecostal

denomination," *Washington Post*, April 19, 2020.

**104.**    Petitioner, essentially a former biological warfare planner, and arguably a competent

witness for purposes of providing an affidavit to support the issuance, under Va. Code 19.2-

217 for a Commonwealth Attorney to  charge under information, had served as

the *Aide de Camp* to the Commander, as in evidence at Exhibit **D**, and as

the Operations Officer for all U.S. Army Strategic counterintelligence, as in evidence at

Exhibit **E**, the most junior commissioned officer to have ever served in those capacities.

**105.**    In those assignments, Petitioner had the pandemic advantaged opportunity to play a critical staff role in standing up the Armed Forces Medical Center (AFMIC), *see generally* DODD 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the precursor to the National Medical Intelligence Center (NMIC), *see generally* DODI 6420.01, National Center for Medical Intelligence (NCMI), March 20, 2009, *incorporating* Change 3, *effective* September 8, 2020, which was the subject of the ABC News report, Josh Margolin & James Gordon Meek, "Intelligence report warned of coronavirus crisis as early as November: Sources 'Analysts concluded it could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020. *See also* Fed.R.Evid. 702[5].

### Count Three: Religious Freedom Restoration Act (RFRA)

**106.**    Paragraphs 1 to 105 are incorporated by reference.

**107.**    Petitioner's religious freedom on social media has been infringed upon through direct government action.

**108.**    Pursuant to the *Religious Freedom Restoration Act (RFRA)*, 42 U.S. Code § 2000bb–1(a), "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability"; however, "Government may substantially burden a person's exercise of religion *only if it demonstrates that application of the burden to the person. . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."*

---

[5] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.*

109.    As noted above, the Government has, in fact, burdened Petitioner's free exercise right,

with no credible evidence supporting a compelling government interest, and certainly not

through use of the least restrictive means.

### Count Four: Section 1983

110.    Paragraphs 1 to 109 are incorporated by reference.

111.    Petitioner's civil rights have been violated, entitling him to redress in an award of

attorney fees.

112.    As observed in *Doe v. Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d 823 (E.D. La.

2009) "[t]he loss of *First Amendment* freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury", *id.* (quoting *Elrod v. Burns*, 427 U.S. 347

(1976)).

113.    Moreover, at least with regard to the issue of abortion, it has been said that, under *Roe v.*

*Wade*, 410 U. S. 113 (1973), "the right protects the woman from unduly burdensome

interference with her freedom to decide whether to terminate her pregnancy" *Planned*

*Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992).

114.    Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress, except that in
> any action brought against a judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable. For the
> purposes of this section, any Act of Congress applicable exclusively to the
> District of Columbia shall be considered to be a statute of the District of
> Columbia.

115.    Moreover, under 42 U.S.C. § 1988(b),

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 *et seq.*], the *Religious Freedom Restoration Act of 1993* [42 U.S.C. 2000bb *et seq.*], the *Religious Land Use and Institutionalized Persons Act of 2000* [42 U.S.C. 2000cc *et seq.*], title VI of the *Civil Rights Act of 1964* [42 U.S.C. 2000d et seq.], or section 12361 of title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

116.    This controversy arises consequent to a violation of Petitioner's constitutional rights to guaranteed under the *First Amendment* for religious liberties, and Petitioner is entitled to such relief as deemed proper under 42 U.S.C. § 1983  and 1988(b).

## *Count Five: Section 1985*

117.    Paragraphs 1 to 116 are incorporated by reference.

118.    Pursuant to 42 U.S.C. § 1985(3), "[i]f *two or more persons in any State or Territory conspire. . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws*; or for the purpose of *preventing or hindering the constituted authorities* of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons *conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person. . .* as a Member of Congress of the United States; or to *injure any citizen in person or property on account of such support or advocacy*; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so

injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators".

119. And, as averred above, in denial of a statutory right, and in deprivation of both is right to free exercise, as well as disabling of his political candidate account on Facebook, Petitioner avers a direct and actual injury, as detailed above, entitling him to relief under 42 U.S.C. § 1985(3).

120. And, in accordance with 42 U.S.C. § 1986, *"[e]very person who, having knowledge that any of the wrongs conspired to be done*, and mentioned in section 1985 of this title, are about to be committed, *and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do*, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action" (emphasis added), while, under Fed.R.Crim.Pro. 6(a), "[w]hen the public interest so requires, the court must order that one or more grand juries be summoned."

121. Moreover, in accordance with 42 U.S.C. § 1988(b), in relevant part, "[i]n any action or proceeding to enforce a provision of sections. . . 1983, 1985, and 1986 of this title, . . . [and/or] *the Religious Freedom Restoration Act of 1993* [42 U.S.C. 2000bb et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer

shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."

### Count Six: Civil Conspiracy

**122.**    Paragraphs 1 to 121 are incorporated by reference.

**123.**    "'Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff' through an overt action done pursuant to the agreement", *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 622–37 (W.D. Va. 2015) (quoting *William v. AES Corp.*, 28 F.Supp.3d 553 (E.D.Va.2014) (citing *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F.Supp.2d 610 (E.D.Va.2009)), and clear and convincing evidence establishes that Facebook/Meta, along with senior persons in the White House and Executive Branch had, as participants in a conspiracy, as alleged above, did, in fact, conspire with another to deprive Petitioner of access to his Facebook account, in direct injury to his free speech as a candidate, and in direct injury to his free exercise rights.

### Count Seven: Intentional Affliction of Emotional Distress

**124.**    Paragraphs 1 to 123 are incorporated by reference.

**125.**    Under American law, certainly, "[t]he term 'moral turpitude' refers to behavior 'that shocks the public conscience as being inherently base, vile, or depraved'," *Uribe v. Sessions*, 855 F.3d 622 (4th Cir. 2017) (quoting *Mohamed v. Holder*, 769 F.3d 885 (4th Cir. 2014)(citations omitted), while "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," rebutting even a claim in defense of sovereign immunity. *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998), and some American courts have focused on the

heinousness of the underlying crime, or *actus reus*, see *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996)[6], while others have opined that and reasoned prudentially that:

> "There is no such defect in the law," it was said, "as that the person who intentionally inflicts a wound calculated to destroy life, and from which death ensues, can throw responsibility for the act upon either the carelessness or ignorance of his victim, or shield himself behind the doubt which disagreeing doctors may raise as to the treatment proper for the case." In conformity with these authorities, Greenleaf lays it down that "if death ensues from a wound given in malice, but not in its nature mortal, but which being, neglected or mismanaged the party died, this will not excuse the prisoner who gave it, but he will be held guilty of the murder, unless he can make it clearly and certainly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of his death; for, if the wound had not been given, the party had not died." *Clark v. Commonwealth*, 90 Va. 360 (1893) (citing 3 *Greenl. Ev.* § 139).

126. "Under Virginia law, in an action for intentional infliction of emotional distress a plaintiff must show that the defendant's conduct (1) is intentional or reckless; (2) offends generally accepted standards of decency or morality; (3) is causally connected with the plaintiff's emotional distress; and (4) caused emotional distress that was severe." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (citing *Falwell v. Flynt*, 797 F.2d 1270, n. 4 (1986) (citing *Womack v. Eldridge*, 215 Va. 338 (1974))).

127. The conduct by now three-time defendants OMB and Facebook/Meta have been intentional or reckless, offending standards of morality or decency, as averred above.

128. "Bipolar disorder is, by definition, recurrent", and a condition that is "uncurable but treatable." Samantha Boyd, "Security Report: Michael David Webb," U.S. Army, December 10, 2005.

---

[6] "[I]n cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short. In contrast, in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts have generally found no threat of continuing criminal activity arising from conduct that extended over even longer periods." *Id.* (citing *U.S. v. Aulicino*, 44 F.3d 1102 (2d Cir.1995); *Mathon v. Marine Midland Bank, N.A.*, 875 F.Supp. 986 (E.D.N.Y.1995)).

129.    "Bipolar disorder (BD) is a severe chronic psychiatric disorder that has been associated

with cellular dysfunctions related to mitochondria, neurotrophin levels, and oxidative stress",

Bianca Pfaffenseller, *et al.*, *Impaired endoplasmic reticulum stress response in bipolar*

*disorder: cellular evidence of illness progression*, 17 Internat'l J. of Neuropsychopharm., pp.

1453–1463 (2014), doi:10.1017/S1461145714000443, and "[t]he correlation of stress and

adverse outcomes for those afflicted with depressive disorders has been even accepted by

notable fact checkers who had concluded, regarding Vince Foster, that "[t]he implication that

his death was connected to an expectation of his giving testimony against the Clintons is

equally false", that he "was distraught over accusations of malfeasance involving the White

House Travel Office, and he had sought treatment for depression prior to his suicide", while

"Foster consistently maintained that the Travel Office scandal was baseless." David Emery,

"Did Vince Foster Shoot Himself 'Three Times in the Back of the Head' to Avoid Testifying

Against Hillary Clinton?" *Snopes*, September 21, 2018.

130.    The Fourth Circuit has recently recognized that a mental or emotional disorder of itself is

a "condition of clinically significant distress", and when "[l]eft untreated, . . .can cause,

among other things, depression, substance use, self[-]mutilation, other self-harm, and

suicide", *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), while one

Massachusetts court had "conclude[d] that there was probable cause to show that the

coercive quality of the defendant's verbal conduct overwhelmed whatever willpower the

eighteen year old victim had to cope with his depression, and that but for the defendant's

admonishments, pressure, and instructions, the victim would not have gotten back into the

truck and poisoned himself to death", *Commonwealth v. Carter*, 474 Mass. 624 (2016),

while, characterizing Petitioner's sincerely held beliefs as medical misinformation,

Respondents have concededly acknowledged a dysphoric condition "that is characterized by

debilitating distress and anxiety resulting from the incongruence". *Id.*

131.    Federal public health authorities have acknowledged for over a decade that Petitioner has

a diagnosis of bipolar disorder, Cheryl J. Rawls, "Benefit Verification Letter," Department of

Veterans Affairs, March 6, 2020, and, hence, incurred a severe emotional distress attributed

to the conduct of Respondent.

132.    As noted by the Reviewing Court in *Carter*, 474 Mass., at 624, "[w]anton or reckless

conduct[:]

> "is conduct that creates a high degree of likelihood that substantial harm will result to
> another. It is conduct involving a grave risk of harm to another that a person undertakes
> with indifference to or disregard of the consequences of such conduct. Whether conduct
> is wanton and reckless depends either on what the defendant knew or how a reasonable
> person would have acted knowing what the defendant knew. If the defendant realized the
> grave risk created by his conduct, his subsequent act amounts to wanton and reckless
> conduct whether or not a reasonable person would have realized the risk of grave danger.
> Even if the defendant himself did not realize the grave risk of harm to another, the act
> would constitute wanton and reckless conduct if a reasonable person, knowing what the
> defendant knew, would have realized the act posed a risk of grave danger to another. It is
> not enough for the Commonwealth to prove the defendant acted negligently, that is, in a
> manner that a reasonably careful person would not have acted. The Commonwealth must
> prove that the defendant's actions went beyond negligence and amounted to wanton and
> reckless conduct as . . . defined . . . ." *Id.* (quoting *Model Jury Instructions on Homicide*
> 73 (2013)).

133.

134.    The Supreme Court has stated that on matters pertaining to public health, "[t]he only

'competent evidence' that could be presented to the court to prove these propositions was the

testimony of experts, giving their opinions", *Jacobson*, 197 U.S., at 11.which, of record

Facebook/Meta is not, especially on matters of "security".

135.    Moreover, it has long been the rule that "[i]f this choice [of a regulatory agency]

represents a reasonable accommodation of conflicting policies that were committed to the

agency's care by the statute, we should not disturb it unless it appears from the statute or its

legislative history that the accommodation is not one that Congress would have sanctioned",
*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) (citations omitted), and that "'[j]udicial
review of agency action. . . is limited to 'the grounds that the agency invoked when it took
the action,'" *Regents of the University of California*, 591 U.S., at ___ (quoting from
*Michigan v. EPA*, 576 U. S., at 743). (emphasis added)

### Count Eight: Declaratory Relief

**136.**    Paragraphs 1 to 135 are incorporated by reference.

**137.**    Under 28 U.S.C. § 2201(a), "[i]n a case of *actual controversy* within its jurisdiction, . . .
any court of the United States, upon the filing of an appropriate pleading, may declare the
rights and other legal relations of any interested party seeking such declaration, whether or
not further relief is or could be sought", and "[a]ny such declaration shall have the force and
effect of a final judgment or decree and shall be reviewable as such."

**138.**    Some have intimated that "[w]ith more than a million Americans dead from Covid-19,
and an estimated 15 million dead worldwide, that's inexcusable." Jamie Metzl & Matt
Pottinger, "We Still Don't Know the Truth About Covid," *supra*, while others have
suggested that "[f]ailure to comprehensively investigate the zoonotic origin through
collaborative and carefully coordinated studies would leave the world vulnerable to future
pandemics arising from the *same human activities* that have repeatedly put us on a collision
course *with novel viruses*", Edward C. Holmes, *et al.*, *The origins of SARS-CoV-2: A critical
review*, *supra*, acknowledging the existence of a controversy, which Petitioner had, at earliest
opportunity to have resolved, before "the U.S. Intelligence Community ha[d] 'coalesced
around two likely scenarios' but ha[d] not reached a definitive conclusion on this question",
finding "'two elements in the IC lean[ing] toward the former scenario and one lean[ing] more
toward the latter – each with low or moderate confidence". Briefing Room, "Statement by

President Joe Biden on the Investigation into the Origins of COVID-19," *White House*, May 26, 2021.

139.    With regard to Respondent OMB, "By. . . [their] conduct, as disclosed by the record, the [respondent]. . . is estopped from questioning the verity of the record." *Hill v. Woodward*, 78 Va. 765 (1884).

140.    Their "evident knowledge of the pendency of this suit and its object, . . . [their] seeming acquiescence, and. . . delay and refusal to speak, though not served with notice in the regular way, makes it proper for. . . [them]r to remain silent now that others have acquired rights while. . . [they were] standing by in silence, if not in actual acquiescence." *Id.*

141.    "It was not only competent for. . . [them] to speak in time and be made a party if. . . [they] had not been, but it was. . . [their] duty." *Id.*

142.    Accordingly, in declaratory relief, Petitioner seeks a declaration not only that the infectious dose and/or secondary attack rate are indeed classified information, but also that, in accordance with Executive Order 12,958, the Government owns and/or controls the biological causative agent for COVID-19, which, in accordance with *Myriad*, would then have to have found origin in a laboratory.

### *Count Nine: Injunctive Relief*

143.    Paragraphs 1 to 142 are incorporated by reference.

144.    Under the *FOIA*, a district court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant", 5 U.S.C. § 552(a)(4)(B), just as under the *FACE Act*, a "court may award appropriate relief, including temporary, preliminary or permanent injunctive relief", 18 U.S.C. § 248(c)(1)(B), none of which have been awarded during past actions, dismissed without prejudice, while courts have at least said, perhaps in mere dicta, "[t]he loss of *First*

*Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", *Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d, at 823 (quoting *Burns*, 427 U.S., at 347).

### Prayer for Relief

**145.**    Paragraphs 1 to 144 are incorporated by reference.

**146.**    For the reasons stated above, under Count One, Petitioner, under authority of the *FOIA*, 5 U.S.C. § 552(a)(4)(B), prays for the injunctive relief to which he has been entitled through several litigations, but denied, against Respondent OMB, and prays for such other equitable relief as deemed proper.

**147.**    For the reasons stated above, under Count Two, Petitioner, under authority of the *FACE Act*, 18 U.S.C. § 248(c)(1)(B), prays the "temporary, preliminary or permanent injunctive relief", to which he has been entitled, but denied, against Respondent Facebook/Meta, and prays for such other equitable relief as deemed proper.

**148.**    For the reasons stated above, under Count Three, Petitioner prays for relief to which he is entitled, under the *RFRA*, 42 U.S. Code § 2000bb–1(a), in redress for the "Government. . . substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability", the Government having failed to "demonstrate[] that application of the burden to the person. . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

**149.**    For the reasons stated above, under Count Four, Petitioner prays for relief to which he is entitled, under 42 U.S.C. § 1983, for deprivations of his rights under the *First Amendment* in free speech, as a candidate for political office, but also for his free exercise rights in devotional religious worship.

150. For the reasons stated above, under Count Five, Petitioner prays for relief to which he is entitled, under 42 U.S.C. § 1985(3), it having been established that two or more persons, *i.e.*, Facebook/Meta and the Executive Branch, to include OMB, did conspire "for the purpose of depriving, either directly or indirectly" Petitioner's "equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person. . . as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy".

151. For the reasons stated above, under Count Six, Petitioner prays for relief to which he is entitled, the White House having entered an agreement with Facebook/Meta, *see* Steve Nelson, "White House 'flagging' posts for Facebook to censor over COVID 'misinformation'," *supra*, "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means," *Marcantonio*, 155 F. Supp. 3D, at 619 (citationa omitted), resulting in damage to Petitioner, as noted above, "through an overt action done pursuant to the agreement". *Id.*

152. For the reasons stated above, under Count Seven, Petitioner prays for relief to which he is entitled, Respondents OMB and Facebook/Meta, having been found to have engaged in conduct that was intentional or reckless, offending "generally accepted standards of decency or morality", *Hustler Magazine, Inc.*, 485 U.S., at 46, and, thereby, giving rise to Petitioner's emotional distress, particularly severe for a person afflicted with a major depressive

condition, and during a global public health crisis during which "[p]eople with chronic

diseases and a history of medical/ psychiatric illnesses showed more symptoms of anxiety

and stress," Jiaqi Xiong, *et al.*, *Impact of COVID-19 pandemic on mental health in the*

*general population: A systematic review*, 277 J. Affect. Disord., pp. 55-64, December 1,

2020, doi: 10.1016/j.jad.2020.08.001, *Epub.*, August 8, 2020 (citing Mazza *et al.*, 2020;

Ozamiz-Etxebarria *et al.*, 2020; Özdin & Özdin, 2020).

**153.**     For the reasons stated above, under Count Eight, Petitioner prays for declaratory relief

to which he is entitled, under the *Declaratory Judgments Act*, 28 U.S.C. § 2201(a), and

Fed.R.Civ.Pro. 57, particularly, as articulated above, a declaration not only that the infectious

dose and/or secondary attack rate are indeed classified information, but also that, in

accordance with Executive Order 12,958, the Government owns and/or controls the

biological causative agent for COVID-19, which, in accordance with *Myriad*, would then

have to have found origin in a laboratory.

**154.**     For the reasons stated above, regarding Count Nine, Petitioner, under authority of the

*FACE Act*, 18 U.S.C. § 248(c)(1)(B), prays the "temporary, preliminary or permanent

injunctive relief", to which he has been entitled, but denied, against Respondent

Facebook/Meta, and prays for such other equitable relief as deemed proper in extending such

injunctive relief to other parties with whom they have conspired in deprivation of Petitioner's

*First Amendment* rights.

## <u>CERTIFICATION</u>

Petitioner declares under penalty of perjury that no attorney has prepared or assisted in the preparation of this document.

Michael David Webb, 955 S. Columbus Street, #426, Arlington, Virginia 22204
Name of Pro Se Party (Print or Type)

_____ Executed on: _____ (Date)
Signature of *Pro Se* Party


Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the County

of ___Alexandria_____ , in the Commonwealth of Virginia, this ___24_____

day of ___March_____.

_____
NOTARY PUBLIC

My commission expires _____ Registration Number: _7966925___

MISHEL'E TIPAN
NOTARY
PUBLIC
REG. #7966925
MY COMMISSION
EXPIRES
06/30/2025
COMMONWEALTH OF VIRGINIA

**IN THE**
**UNITED STATES DISTRICT COURT** US DISTRICT & BANKRUPTCY
**FOR THE DISTRICT OF COLUMBIA** COURTS FOR DC

CLERK

2023 MAR 24 P 1: 24

RECEIVED

MAJOR MIKE WEBB, d/b/a  MAJOR     )
MIKE  WEBB FOR VA, a/k/a FRIENDS   )
FOR MIKE WEBB, d/b/a MAJOR MIKE    )
WEBB FOR CONGRESS, d/b/a ANGELS    )
OF LIBERTY,                        )
    ***Petitioner, Pro Se,***          )
                              )    Civil Case No._____
                              )
v.                                 )
                              )
META PLATFORMS, INC., formerly     )
FACEBOOK,  INC., and OFFICE  OF    )
MANAGEMENT &  BUDGET (OMB)         )
    ***Respondents.***                )

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared or assisted in the preparation of this <u>Verified Complaint</u>.

## CERTIFICATION

Michael David Webb, 955 S. Columbus Street, #426, Arlington, Virginia 22204
Name of Pro Se Party (Print or Type)

_____ Executed on: \_\_\_\_3 - 24 - 23\_\_\_\_\_ (Date)
Signature of *Pro Se* Party

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the County

of \_\_\_Alexandria_____ , in the Commonwealth of Virginia, this \_\_24\_\_

day of \_\_March_____ 2023\_.

_____
NOTARY PUBLIC

My commission expires _____ Registration Number: \_\_79666925\_\_\_\_\_

MISHEL E TIPAN
NOTARY PUBLIC
REG. #7966925
MY COMMISSION
EXPIRES
06/30/2025
COMMONWEALTH OF VIRGINIA