**IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MAJOR MIKE WEBB, *et al.* | ) | |
| **Petitioner, Pro Se,** | ) | Civil Case No. 1:23-cv-00816-DLF |
| | ) | |
| v. | ) | |
| | ) | |
| FRIEDRICH, *et al.* | ) | |
| **Respondents.** | ) | |

## MOTION FOR SANCTIONS UNDER FED.R.CIV.P. 11

1. Comes now Petitioner, Major Mike Webb, in the above referenced action, to submit for the Trial Court's consideration the second motion for sanctions against the remaining Respondents in the action initially commenced on March 24, 2023, under the case caption *Webb v. Meta Platforms, Inc.*.

## Fed.R.Civ.P. 11

2. Paragraphs 1 to 2 are incorporated by reference.

3. "'The courts cannot prevent abuse of power, but can sometimes correct it.'" *U.S. v. Chalk*, 441 F.2d 1277(4th Cir. 1971) (quoting *Luther v. Borden*, 48 U.S. (7 How.) (1849)).

4. Still, "[a]ll power may be abused if placed in unworthy hands'", *Id.*

5. Fed.R.Civ.P. 11 proposes the controlling rule that when a party files a pleading with the court, the retained counsel "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that such pleading "is not being presented for any improper purpose, such as to harass, *cause unnecessary delay*, or needlessly increase the cost of litigation", that "the claims, defenses, and other legal contentions are warranted by *existing law or by a nonfrivolous argument*", that "the factual contentions have evidentiary support", that "the denials of factual contentions *are warranted on the evidence*" (emphasis added), which was not in evidence in the most recent, and untimely, motion to dismiss filed by the Government.

RECEIVED

JUL - 5 2024

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### *Sovereign Immunity*

6. Paragraphs 1 to 5 are incorporated by reference.

7. "'It must be remembered that the Constitution does not prohibit deprivations of liberty *per se*", but rather, "[t]he Constitution prohibits deprivations of liberty without due process.'" *Villante v. Dept of Corrections of Cty of N.Y.*, 786 F.2d 516 (2d Cir. 1986) (quoting *Patterson v. Coughlin*,761 F.2d 886 (2d Cir. 1985), *cert. denied*, 106 S.Ct. 879 (1986).

8. And, by and through its last dispositive pleading, the Government has advanced the dubious claim of an absolute and plenary, sovereign immunity, and it is of note that "[a]lthough the court in *National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543 (N.D.Cal. 1987), acknowledged the issue," in a matter involving not the magnitude of loss of life at issue before this Trial Court, "the defendant Veterans Administrations there expressly declined to assert immunity as a defense. " *Adamson v. Bowen*, 855 F.2d 668, 670 (10th Cir. 1988).

9. In a case of first impression the *Adamson* Court had noted that "[t]he *Equal Access to Justice Act (EAJA)*, 28 U.S.C. § 2412 (1981), expressly waives immunity against attorney's fee awards." *Id.*

10. "Under § 2412(b) of the *EAJA*, the United States is liable for attorney's fees 'to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award", and "[t]his section, enacted in 1980 and remaining in force to the present, would appear on its face to be sufficiently broad to waive the government's immunity from fee awards pursuant to the Federal Rules of Civil Procedure, which have 'the force of a federal statute.'" *Id.* (quoting *Sibbach v. Wilson Co.*, 312 U.S. 1 (1941)). *See also Rumsey v. George E. Failing Co.*, 333 F.2d 960 (10th Cir. 1964).

### *Legal Standards*

11. Paragraphs 1 to 10 are incorporated by reference.

12. In considering a motion under Fed.R.Civ.P. 11, "[t]he standard by which courts evaluate the conduct of litigation is objective reasonableness — whether a reasonable attorney admitted to practice before the district court would file such a document." *Adamson v. Bowen*, 855 F.2d 668 (citing *Burkhart v. Kinsley Bank*, 804 F.2d 588, n. 3 (10th Cir. 1986); *Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir. 1986)).

13. "The district court first must find that a pleading violates Rule 11", which "typically involves subsidiary findings, such as the current state of the law or the parties' and attorneys' behavior and motives within the context of the entire litigation, as well as a conclusion on the ultimate question whether the pleading violated Rule 11", while "[t]he second step is for the district court to impose an appropriate sanction." *Id.*

14. "If 'after reasonable inquiry, a competent attorney *could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law . . .*'" *Id.* (quoting *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir. 1985) (footnote omitted), *cert. denied*, 108 S.Ct. 269 (1987)), therefor "such conduct is sanctionable under Rule 11." *Id.*

15. Engaging in that diligence that is due for the particular circumstance, in a duty of inquiry, "[t]he attorney must 'stop, look, and listen" before signing a document subject to Rule 11", *Id.* (quoting *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151 (3d Cir. 1987)), which it appears had not been done here.

16. Accordingly, "[t]he test for imposition of Rule 11 sanctions is whether counsel's conduct was reasonable under the circumstances of the case", *Cope v. Auto-Owners Ins. Co.*, Civil Action No. 18-cv-0051-WJM-SKC (D. Colo. March 30, 2020) (citing *Ridder v. City of Springfield*, 109 F.3d 288 (6th Cir. 1997)), and that "does not require a finding of

subjective bad faith on the part of the offending attorney." *Id. Cf. Scott v. Boeing Co.*, 204

F.R.D. 698, 700 (D. Kan. 2002).

17. "The duty of candor established under Rule 11 exposes counsel to sanctions for arguing a

false position or continuing to advocate a position after learning that it ceases to have

merit or is no longer tenable." *Id.* (citing *Young v. Corbin*, 889 F. Supp. 582, 585

(N.D.N.Y. 1995)), and "[u]ltimately, Rule 11 seeks to curb abuses of the litigation

process." *Id.* (citing *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533

(1991)); however, "[i]t is not intended to function as a fee-shifting provision or to reward

parties who are victimized by litigation." *Id. See, e.g., Tidik v. Ritsema*, 938 F. Supp. 416

(E.D. Mich. 1996); *Watson v. City of Salem*, 934 F. Supp. 666 (D.N.J. 1996)

18. "[I]n determining whether (and what) sanctions are appropriate, a court should consider:

'(1) the *degree of actual prejudice* to the defendant; (2) the *amount of interference with*

*the judicial process*; . . . (3) the *culpability of the litigant*," [and] (4) *whether the court*

*warned* the party in advance that dismissal of the action would be a likely sanction for

noncompliance." *Id.* (emphasis added)

19. In fairness, where appropriate, "[b]efore a court orders dispositive sanctions, it should

also consider the efficacy of lesser sanctions", *Id.* (citing *Grady v. Broderson*, No. 13-cv-

00752-REB-NYW, 2015 WL 1384371, at *4 (D. Colo. Mar. 23, 2015) (quoting

*Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992)), and, "the *Ehrenhaus* factors

should be considered even in cases that do not involve dispositive sanctions." *Ibid.* (citing

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90 (D. Colo. 1996)).

<u>**Bad Faith**</u>

20. Paragraphs 1 to 19 are incorporated by reference.

21. "A lawyer shall represent a client zealously and diligently within the bounds of the law",

*D.C. Bar Rules of Professional Conduct*, 1.3(a), and "[a] lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or (2) Prejudice or damage a client during the course of the professional relationship." *D.C. Bar Rules of Professional Conduct*, 1.3(b).

22. "When the witness who intends to give evidence that the lawyer knows to be false is the lawyer's client and is the accused in a criminal case, the lawyer shall first make a good-faith effort to dissuade the client from presenting the false evidence; if the lawyer is unable to dissuade the client, the lawyer shall seek leave of the tribunal to withdraw", *D.C. Bar Rules of Professional Conduct*, 3.3(b).

23. By email, dated, December 11, 2023, OMB had clearly stated, "Because of the nature of your request – for records that are classified – requires the *FOIA* processors to be cleared, there has been some delay, but, as I understand it, we are close to a place where review can begin."

24. Yet, after Counsel for OMB had been replaced, by letter, dated January 26, 2024, Respondent OMB had acknowledged the existence of a *FOIA* request, dated "March 23, 2020",  and had conceded that OMB had "assigned this request the tracking number 2021-220, but had, for unarticulated reasons waited from that date before it had "initiated a search on January 13, 2022", and had "concluded its search," determining that "OMB was unable to locate any records responsive" to Petitioner's request, as in evidence at Exhibit **A**.

25. Moreover, "[i]f the lawyer is unable to dissuade the client or to withdraw without seriously harming the client, the lawyer may put the client on the stand to testify in a narrative fashion, but the lawyer shall not examine the client in such manner as to elicit testimony which the lawyer knows to be false, and shall not argue the probative value of the client's testimony in closing argument", *D.C. Bar Rules of Professional Conduct*, 3.3(b), and "[t]he duties stated in paragraph (a) continue to the conclusion of the

proceeding." *D.C. Bar Rules of Professional Conduct*, 3.3(c).

26.   "A lawyer who receives information clearly establishing that a fraud has been

perpetrated upon the tribunal shall promptly take reasonable remedial measures, including

disclosure to the tribunal to the extent disclosure is permitted by Rule 1.6(d)." *D.C. Bar*

*Rules of Professional Conduct*, 3.3(d).

27. While "[t]he outcome of constitutional cases ought to rest on firmer grounds than the

personal preferences of judges", *Van Orden v. Perry*, 545 U.S. 677 (2005), "[o]nly the

gravest abuses, endangering paramount interests, give occasion for permissible

limitation". *Sherbert v. Verner*, 374 U.S. 398 (1963).

28. Clearly, even when piercing the veil, "judicial immunity is not overcome [merely] by

allegations of bad faith or malice, *the existence of which ordinarily cannot be resolved*

*without engaging in discovery and eventual trial*", *Mireles v. Waco*, 502 U.S. 9 (1991)

(citing *Pierson v. Ray*, 386 U.S. 547 (1967), a trial already denied by the severance of one

party in a quiet dismissal, as noted, by subtle footnote, in the motion filed by the

remaining Respondents for the Government.

29. "Factors to consider in determining whether a judge's act is judicial include (1) the nature

of the act itself, and whether it is a function normally performed by a judge, and (2) the

expectation of the parties, and whether he or she dealt with the judge in his or her judicial

capacity." *Mobley v. Supreme Court of Ohio*, 2021-Ohio-391 (Ct. App. 10th Dist. 2021)

(quoting *Howard v. Supreme Court*, 2005 Ohio 2130 (Ohio Ct. App. 2005)).

30. "A judicial function thus includes interpreting the law in matters over which the judge has

jurisdiction", and "[a] judge will be liable *only if* (1) the judge acted *in a clear absence of*

*all jurisdiction*, or (2) the action at issue was *not judicial in nature*, meaning not normally

performed by a judge." *Id. (Ibid.)*

31. Thus, "[t]he inquiry *focuses on the nature of the act*, and not on whether the act was

proper." *Id.* (*Ibid.*). (emphasis added)

## Actual Malice

32. Paragraphs 1 to 31 are incorporated by reference.

33. Actual malice, "exists when the defendant knowingly" commits misconduct, or when engaged in action with "reckless disregard", *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and "mere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding it." *Luteran v. U.S.*, 93 F.2d 395 (8th Cir. 1937) (citing *Burkhardt v. U.S.*, 13 F.2d 841 (6th Cir. 1926)).

34. "Bad faith is not just intentional conduct but intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts", *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704 (Tex. 2020); *see also Schultz v. Schultz*, No. 05-20-00819-CV, 2022 WL 336564 (Tex. App. —Dallas, February 4, 2022).

35. "Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight." *Sullivan*, 376 U.S., at 254 (citing *Johnson Publishing* Co., 271 Ala. at 474).

## Reasonable Inquiry

36. Paragraphs 1 to 35 are incorporated by reference.

37. Most often, "the defendant must show that. . . [conduct] fell below an objective standard of reasonableness", and "[t]he proper measure. . . remains simply reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668 (1984).

38. While, generally, a defendant "is entitled to a rebuttable presumption of reasonableness", under this deferential standard, a party "can rebut this presumption only by demonstrating that his or her. . . [conduct] is unreasonable". *U.S. v. Mykytiuk*, 415 F.3d 606 (7th Cir.

2005).

39. While advancing no supporting facts to sustain its claim, the thrust of the Government demurrer rests upon the conclusory claim that the Amended Complaint is simply "bizarre conspiracy theories" or 'fantastic government manipulations' . . . inherently frivolous and. . . subject to dismissal". *Id.* (quoting *Christmann v. District of Columbia*, Civ. A No. 22-2189 (BAH), 2024 U.S. Dist. LEXIS 10335, at *12 (D.D.C. January 20, 2024) (quoting *Best v. Kelly*, 39 F.3d 328 (D.C. Cir. 1994).

40. "[R]eiterat[ing] the same rambling and fantastical arguments", Order, *Webb v. Austin*, 1:22-cv-03827-UNA (D.C. May 25, 2023), Petitioner had most respectfully averred in complaint simply that which has been conceded in even this argument, advanced over three years after the predicate offense giving rise to this third litigation, *i.e.* that the Government "has conceded that it did fail to respond to OMB FOIA Number 21-220, which it had acknowledged by the Agency to have been received on March 23, 2021", Am. Compl. ¶ 3, p. 1, a claim apparently ripe for dismissal, in the view of the Government.

41. For further support of this apparently bizarre claim, a reasonable inquiry would determine, as noted in the Amended Complaint, that "under the *FOIA*, '[i]f an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days". 5 U.S.C. § 552(a)(4)(viii)(II)(aa).'" Am. Compl. ¶ 3, p. 2.

42. Furthermore, "[i]f the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees)" *Id.*

43. Yet, albeit filed untimely, having failed, in its most recent demurrer to include a dismissal

of Petitioner's claim brought under the *Freedom of Information Act*, 5 U.S.C. § 552, a

reasonable inquiry should have revealed the existence of some tortious or unlawful

conduct, as such would satisfy the threshold of accomplish "an unlawful purpose or. . . a

lawful purpose by unlawful means, which. . . results in damage to plaintiff" through an

overt action done pursuant to the agreement", *Marcantonio v. Dudzinski*, 155 F. Supp. 3d

619, 622–37 (W.D. Va. 2015) (quoting *William v. AES Corp.*, 28 F.Supp.3d 553

(E.D.Va.2014) (citing *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F.Supp.2d 610

(E.D.Va.2009)), *see* Am. Compl. ¶ 3, p. 2, the Government, in attested pleadings filed to

the Trial Court, mindful of the rules of conduct prescribed by Rule 11, presents the claim

that "Plaintiffs civil conspiracy claim fails because he has not identified any underlying

tort", and avers for support that "[b]ecause the underlying tort claims fail, so too must the

civil conspiracy claim." Memorandum of Points and Authorities in Support of

Defendant's Partial Motion to Dismiss, p. 11 (quoting *Wilson v. Dep't of Transp.*, 759 F.

Supp 2d 55 (D.D.C. 2011).

44. Further, "'once the conspiracy has been established, the government need show only

'slight evidence' that a particular person was a member of the conspiracy.'" Am. Compl. ¶

30, p. 8 (quoting *U.S. v. Elliott*, 571 F.2d 880 (5th Cir. 1978) (quoting *U.S. v. Morado*, 454

F.2d 167 (5th Cir. 1972)). Am. Compl. ¶ 30, p. 8.

### **Improper Purpose**

45. Paragraphs 1 to 44 are incorporated by reference.

46. According to federal regulators, "[i]nfectious dose and secondary attack rate are standard

epidemiological metrics for assessment of risk. Self-Study Course SS1978, *Principles of

Epidemiology in Public Health Practice, Third Edition: An Introduction to Applied

Epidemiology and Biostatistics*, "Lesson 3: Measures of Risk," CDC (October 2006),

*updated* May 18, 2012." Affivavit in Support of Am. Compl. ¶ 244, p. 72.

47. According to authority upon which the Government relies, "'[d]ismissal of [a] *pro se* complaint at this stage is proper only 'if, after construing the complaint liberally in [the *pro se* plaintiff's] favor and granting [him] the benefit of *all reasonable inferences to be derived from the facts alleged*, he could prove no set of facts in support of his claim that would entitle him to relief.'" *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) (quoting *Henthorn v. Dep't of Navy*, 29 F.3d 682 (D.C. Cir. 1994)).

48. The nation's highest court has said that a litigant is "chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnson v. Standard Mining Co.*, 148 U.S. 360 (1893).

49. Moreover, defining duty, "[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself." *Cordova v. Hood*, 84 U.S. 1 (1872).

50. Simply and succinctly stated, risk management is "a systematic, cyclical process of identifying and assessing hazards, then mitigating the associated risks", AR 385-30, *Safety: Risk Management*, Para 1-8, December 2, 2014, wherein,"[b]efore beginning hazard identification the limits of the assessment must be defined". *Id.*[1]

51. In this five-step, methodological process, he has urged that "[i]n step 1, individuals identify the hazards that may be encountered in executing an activity." *Id.*

52. According to world public health authorities, after completion of a robust investigation, conducted by 1,800 teams of at least five epidemiologists that had painstakingly examined 55,924 laboratory confirmed cases in China at the beginning of the outbreak,

---

[1] "The risk assessment consists of the first two steps of the risk management process. In step 1, individuals identify the hazards that may be encountered in executing an activity. In step 2, they determine the impact of each hazard on the activity. The risk assessment provides for enhanced situational awareness. This awareness builds confidence and allows Soldiers, units, Army civilians, and organizations to implement timely, efficient, and effective protective control measures." *Id.*

*Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*,

dated February 16-24, 2020, 19 times more cases than had yet been reported in the entire

United States by mid-March 2020, Jessie Yeung, *et al.*, "March 15 coronavirus news,"

*CNN*, March 15, 2020[2], had stated, "Describing the situation as a pandemic *does not*

*change WHO's assessment of the threat posed by this virus.*" Tedros Adhanom

Ghebreyesus, "WHO Director-General's opening remarks at the media briefing on

COVID-19," *WHO*, March 11, 2020. (emphasis added)

53. That robust investigation had determined that the secondary attack rate in China had been

less than five percent. *Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra.*

54. "Follow[ing] the science and the scientists", Briefing Room, "Remarks by President

Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11,

2021, to the extent that "[r]eproducibility [of results] and replicability [of methods] are

fundamentally important aspects of the scientific method", Robert Gerlai, *Reproducibility*

*and replicability in zebrafish behavioral neuroscience research*, 178 Pharm. Biochem. &

Beh., pp. 30-38 (March 2019)

55. In a bookend study on the first variant, that finding had been revalidated, Ramanan

Laxminaraya, *Epidemiology and transmission dynamics of COVID-19 in two Indian*

*states*, 370 Science 6517, pp. 691-697 November 6, 2020, doi: 10.1126/science.abd7672,

Epub. September 30, 2020, and, in graphic illustration, this would reasonably calculate to

the equivalent of about the chances of winning a 35 to 1 payout on a two number

combination in American roulette, Luke Holmes, "Roulette Odds and Probability Guide

2023 – Bet Payouts and Winning Chances," *Roulette Sites*, December 9, 2022[3]; *see also*

---

[2] "US cases grow: There are now more than 3,000 cases of the novel coronavirus in the US, according to government agencies and the CDC". *Id.*
[3] A stage illusionist, of average ability, may manipulate "the spectators' attention at a high cognitive level; the direction of their gaze is not critical to the effect." Susana Martinez-Conde & Stephen L. Macknik, "Magic and the Brain: How Magicians," *The Scientific American*, December 1, 2008. And, scientifically, Gustav Kuhn, Benjamin W. Tatler and Michael F. Land have established that the essence of the trick is independent of the

Megan M. Sheehan, *et al.*, "Reinfection Rates among Patients who Previously Tested Positive for COVID-19: a Retrospective Cohort Study," *Johns Hopkins University*, March 15, 2021; Megan M. Sheehan, *et al.*, *Reinfection Rates Among Patients Who Previously Tested Positive for Coronavirus Disease 2019: A Retrospective Cohort Study*, 73 Clin. Inf. Dis.10, pp. 1882–1886, November 15, 2021[4]; *but see* Michel Sauret, "Shoot to kill the virus: Chief of Army Reserve receives COVID-19 vaccine shot," *USAR*, January 14, 2021[5].

56. As to a finding of probable cause, "'in justifying the particular intrusion[,] the police officer must be able to point to *specific and articulable facts* which . . . reasonably warrant that intrusion'", *South Dakota v. Opperman*, 428 U.S. 364 (1976) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)), as reasonably appears to be the case at bar, and "[s]uch a requirement of 'specificity in the information upon which police action is predicated is the central teaching of this Court's *Fourth Amendment* jurisprudence'". *Id.* (quoting *Ibid.* n. 18).

---

gaze of spectators at a ball being tossed in the air repeatedly, but rather "the magician's head and eye movements were critical to the illusion, because they covertly redirected the spectators' attentional focus (rather than their gaze) to the predicted position of the ball." *Id.* Hypothesizing that this may be explained by "representational momentum", these researchers suggest that "'[t]he final position of a moving object that disappears is perceived to be farther along its path than its actual final position—as if the predicted position was extrapolated from the motion that had just gone before". *Id.*

In one study, "[t]wo thirds of the participants reported seeing the ball vanish in mid-air, even though it never left his hand", and "[t]he participants saw something amazing — something that never actually happened", Ray Olson, "Revealing the Psychology of Playing Card Magic," *Scientific American*, July 31, 2012, demonstrating the power of mere illusion, predicting human behavior.

Yet, a crash course in pandemic biology, including graduate level advance instruction in virology and epidemiology, and now pharmacology, has been presented to a population where, of those who have even attended college, only 12% of associates degree graduates major in biology, Staff, "The Condition of Education: Undergraduate Fields," *IES/NCES*, https://nces.ed.gov/programs/coe/indicator_cta.asp (accessed April 21, 20210), only 6% of bachelors degree graduates major in biology, Staff, "Fast Facts: Most popular majors," *IES/NCES*, https://nces.ed.gov/fastfacts/display.asp?id=37 (accessed April 21, 2021)[2], and less than 2% continue on to graduate work, Staff, "The Condition of Education: Graduate Degree Fields," *IES/NCES*, https://nces.ed.gov/programs/coe/indicator_ctb.asp (accessed April 21, 2021).

[4] Describing a five percent chance of reinfection in six months as "rare".
[5] Lieutenant General Daniels assured soldiers that "[t]he vaccine is supported by science", and told troops that her motivation was "to protect myself, my family and my co-workers", explaining, "If I play roulette and contract the virus, I could be asymptomatic or on a respirator", and "I don't want to risk finding out where in the spectrum I'll fall". *Id.*

57. Similarly, to prevail under a theory of products liability, a plaintiff need only "establish *prima facie* that the device was defective when it left the manufacturer's hands". *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949 (1979).

58. Further, "[t]o constitute criminal negligence. . . , an accused's conduct 'must be of such reckless[ness]. . . as to indicate a callous disregard for human life and of the probable consequences of the act.'" *Davis v. Commonwealth*, 230 Va. 201 (1985) (citing *Lewis v. Commonwealth,* 211 Va. 684 (1971)).

59. "[M]onths of discord about the coronavirus epidemic ha[d] transformed the cloth mask into a potent political symbol, touted by Democrats as a key part of communal responsibility, labeled by some GOP leaders as a sign of government overreach and as a scarlet letter pinned on the weak." Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," *Washington Post*, June 13, 2020[6].

60. Yet, in the throws of a divisive, partisan election, for control of the White House, Democrat Party Nominee Joe Biden had "called for immediate mask mandates nationwide for the next three months, keeping the focus on drawing a stark contrast between how he would respond to the pandemic crisis compared to how he says it's been mishandled by President Donald Trump." John Verhovek, Molly Nagle & Libby Cathey, "Biden calls for mask mandates nationwide for 3 months, targeting Trump's pandemic response," *ABC News*, August 13, 2020.

61. In the optimal end state, even world public health authorities had strongly encouraged world leaders expecting "imported cases" to "[f]ully educate the general public". *Report*

---

[6] "'Our findings suggest, in multiple ways, that the use of masks is highly protective in health-care and community settings,' said the author of the review, Holger Schünemann, an epidemiologist and physician at McMaster University in Ontario.

But that conclusion came with an important caveat: 'We have low certainty in that,' Schünemann said, meaning the authors cannot be strongly confident in the result." *Id.*

*of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), supra.*

62. And, "[o]n his first full day in office, January 21, 2009, the President[, Barack Obama,] issued a memorandum to all executive departments and agencies emphasizing that the *FOIA* reflects a 'profound national commitment to ensuring an open Government'", Department of Justice Guide to the *Freedom of Information Act*, "President Obama's *FOIA* Memorandum and Attorney General Holder's *FOIA* Guidelines," *DoJ*, July 23, 2014, calling for "federal executive departments and agencies to administer the *FOIA* with 'a clear presumption: [i]n the face of doubt, openness prevails.'" *Id.*

63. According to (DoJ), President Obama "directed departments and agencies not to withhold information 'merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears'", *Ibid.*, and "[h]e instructed agencies to respond to requests 'promptly and in a spirit of cooperation.'" *Id.* (citations omitted).

64. He "further directed agencies to adopt a presumption in favor of disclosure with regard to all *FOIA* decisions", *Ibid.*, and "[t]hat presumption requires agencies to proactively release records, without waiting for specific requests, and use technology to inform citizens 'about what is known and done by their [g]overnment.'" *Ibid.*

65. "The distinguishing mark of a 'manifestly unlawful order' should fly like a black flag above the given order, as a warning reading 'Prohibited!'" *Government of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of Israel, 1961) (quoting *Chief Military Prosecutor v. Melinki, et al.* (13 Pesakim Mehoziim, p. 90)), and "[i]t is to be pointed out here that even the jurists of the Third Reich did not dare to put on paper that obedience to orders is above all". *Id.*

66. On similar facts, one tribunal considering crimes against humanity had concluded that "[t]he excuse given by the Accused in his evidence (Session 81, Vol. IV, p. xxxx5), that

all he did was to pass on a message which he received from Cracow, is not plausible,"

concluding that "undoubtedly he knew the value of the tale about 'administration of

tonics,' to which he put his signature." *Id.*

### *Harassment*

67. Paragraphs 1 to 66 are incorporated by reference.

68. "It is professional misconduct for a lawyer to: (a) Violate or attempt to violate the Rules

of Professional Conduct, knowingly assist or induce another to do so, or do so through the

acts of another; (b) Commit a criminal act that reflects adversely on the lawyer's honesty,

trustworthiness, or fitness as a lawyer in other respects; (c) Engage in conduct involving

dishonesty, fraud, deceit, or misrepresentation; (d) Engage in conduct that seriously

interferes with the administration of justice; (e) State or imply an ability to influence

improperly a government agency or official; (f) Knowingly assist a judge or judicial

officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

(g) Seek or threaten to seek criminal charges or disciplinary charges solely to obtain an

advantage in a civil matter." *D.C. Bar Rules of Professional Conduct*, 8.4.

69. While simply "[t]o prove he is entitled to *Kersey*[7] mitigation, . . [an attorney] must

'demonstrate '(1) by clear and convincing evidence that he had a disability; (2) by a

preponderance of the evidence that the disability substantially affected his misconduct;

and (3) by clear and convincing evidence that he has been substantially rehabilitated'", *In*

*the Matter of Christopher D. Libertelli*, Board Docket No. 20-BD-050/Disc. Docket No.

2019-D072 (D.C.App. February 2, 2022) (quoting *In re Schuman*, 251 A.3d 1044 (D.C.

2021) (quoting *In re Lopes*, 770 A.2d 561 (D.C. 2001)), the standard in some jurisdictions

for attorney misconduct, *see* Tex. R. Disc. P. 14.02[8], "to justify requiring a suspended

---

[7] *In re Kersey*, 520 A.2d 321 (D.C. 1987).
[8] "The Commission has the burden to prove the case for an interim suspension by a preponderance of the evidence", and "[i]f proved by a preponderance of the evidence," certain acts of misconduct may "establish[] conclusively that the attorney poses a substantial threat of irreparable harm to clients or prospective clients". *Id.*

attorney to prove fitness as a condition of reinstatement, the record in the disciplinary

proceeding must contain clear and convincing evidence that casts a serious doubt upon

the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 6 (D.C. 2005);

*In the Matter of:* Matthew B. Tully, Board Docket No. 22-BD-025/Disciplinary Docket

No. 2017-D030 Board Docket No. 22-BD-025 (D.C.App. June 20, 2023)/*In the Matter*

*of: Gregory T. Rinckey*, Board Docket No. 22-BD-025/Disciplinary Docket No. 2017-

D030 Board Docket No. 22-BD-025 (D.C.App. June 20, 2023). *See also* Board Rule 11.6.

70. "An unrepresented person," by clear and convincing evidence like Petitioner,

"particularly one not experienced in dealing with legal matters, might assume that a

lawyer will provide disinterested advice concerning the law even when the lawyer

represents a client", and "[i]n dealing personally with any unrepresented third party on

behalf of the lawyer's client, a lawyer must take great care not to exploit these

assumptions", Comment 1, *D.C. Bar Rules of Professional Conduct*, 4.3. *See also* D.C.

Bar Legal Ethics Committee Opinion 321, while, by clear and convincing evidence, even

the Trial Court has conceded that the most recent complaint had been "an improvement

on Webb's first attempt in this Court." *Webb v. Meta Platforms, Inc.*, 23-cv-816, p. 2

(DLF) (D.D.C. February 1, 2024)[9].

71. In another matter, one Trial Court had observed, with regard to what had been described

as the *pro se* litigant's "mere criticisms" and enigmatic allegations", Dismissal Order,

*Webb v. Northam*, Civil Action No. 3:20CV497 (E.D.Va. August 25, 2020), "We are not

the first court to see things this way", Order to Amend, *Webb v. Kimmel*, p.3

72. Yet, as noted in Petitioner's Reply, the Government had, in attempts to personally

negotiate a settlement with Petitioner,  already conceded, on December 11, 2023, that

---

[9] "On July 28, 2023, the Court dismissed Webb's initial complaint without prejudice for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. Dkt. 14. On August 7, 2023, in response to the Court's July order, Webb filed this amended complaint. Dkt. 17." *Webb v. Meta Platforms, Inc.*, 23-cv-816 (DLF), n.1 (D.D.C. Feb. 1, 2024).

"[s]ince it is my understanding that you have taken care of the only issue about which we could seek dismissal under *FOIA* – exhaustion of remedies – a free-standing *FOIA* claim unencumbered by all of the additional ornamentation that it bound to be dismissed means the prompt resolution you seek", as in evidence at Exhibit **B**, seeking to coax an unrepresented litigant to abandon the very claims the Government now, in a motion untimely brought, seeks to quash, describing these matters now as "nothing more than an 'unadorned, the-defendant-unlawfully harmed me accusation' that is ripe for dismissal", Memorandum of Points and Authorities in Support of Defendant's Partial Motion to Dismiss, p. 5 (quoting *Iqbal*, 556 U.S. at 662), but, if ripe for dismissal, the untimely motion, this late contravenes the logic of the Government's claim.

73. Under the clear and convincing burden, articulated under Board Rule 11.6, Counsel for the Government may be subject to sanction of even suspension.

### *Unnecessary Delay*

74. Paragraphs 1 to 73 are incorporated by reference.

75. "A lawyer shall act with reasonable promptness in representing a client." *D.C. Bar Rules of Professional Conduct*, 1.3(c).

76. "In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another", *D.C. Bar Rules of Professional Conduct*, 3.2(a), and "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." *D.C. Bar Rules of Professional Conduct*, 3.2(b).

### *Default Judgment Denied*

77. Paragraphs 1 to 76 are incorporated by reference.

78. "Procedural due process. . . extends potentially to any statutorily conferred benefit, whether or not it can be properly construed as a liberty or property interest", *Dilbert v.*

*Newsom*, No. C096274  (Cal. Ct. App. Apr. 8, 2024) (citing *Conejo Wellness Center, Inc.*

*v. City of Agoura Hills* 214 Cal.App.4th 1534 (2013)); "[b]ut, 'it still requires the

deprivation of some statutorily conferred benefit before it is implicated.'" *Id.* (quoting

*Ibid.*).

79. "While '[a] state-created right can, in some circumstances, beget yet other rights to

procedures essential to the realization of the parent right . . ., the underlying right must

have come into existence before it can trigger due process protection.'" *Id.*

80. As noted in Petitioner's Reply and in the Memorandum in Support, he had been entitled

long ago to a default judgment, under Fed.R.Civ.P. 55(a)[10], for, "[u]nless another time is

specified by this rule or a federal statute, the time for serving a responsive pleading"

dictates that "[a] defendant must serve an answer:. . . within 21 days after being served

with the summons and complaint", Fed.R.Civ.P. 12(a)(1)(A)(i), and, by clear and

convincing evidence, the Government having been duly served the Amended Complaint

on March 4, 2024 by all Respondents, while the Government filed its untimely Partial

Motion to Dismiss on June 17, 2024, well beyond the tolling of that deadline, introducing

undue delay, in prejudicial error as to the unrepresented litigant, Petitioner.

81. "A lawyer shall not. . . [k]nowingly disobey an obligation under the rules of a tribunal

except for an open refusal based on an assertion that no valid obligation exists". *D.C. Bar*

*Rules of Professional Conduct*, 3.4(c).

<u>*Pretrial Conference Denied*</u>

82. Paragraphs 1 to 81 are incorporated by reference.

83. As noted in Petitioner's Reply and in the Memorandum in Support, he had been entitled

long ago to a default judgment, for, under the controlling rule, "the district judge-or a

---

[10] " When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise
defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id.*

magistrate judge when authorized by local rule-must issue a scheduling order", Fed. R.

Civ. P. 16(b)(1), and "[t]he judge must issue the scheduling order as soon as practicable,

but *unless the judge finds good cause for delay*, the judge *must issue it within the earlier*

*of 90 days after any defendant has been served with the complaint or 60 days after any*

*defendant has appeared.* Fed.R.Civ.P. 16(b)(2) (emphasis added)

84. On the record, clearly, both the 60- and 90-day deadlines mandating that the action

proceed to pretrial conference have tolled.

85. Moreover, "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no genuine issue for trial", *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), and yet, now, untimely, the Government

moves, in part, save for the still undecided *FOIA* claim, to dismiss the Amended

Complaint, in contravention to the controlling rule, introducing undue delay, in

prejudicial error as to the unrepresented litigant, Petitioner.

### *Delayed FOIA Claim*

86. Paragraphs 1 to 85 are incorporated by reference.

87. The Government, which devotes some 3.25 pages in an attempt to dismiss Petitioner's

claims brought under the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C.

§248(a)(2), which protect the entrances of places of worship, arising, according to

Petitioner in retaliation, *see Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007)[11], albeit a claim

neither acknowledged nor perceived by the Government, apparently concedes that

---

[11] *Reid*, 508 F.3d at 674, articulates a timing/knowledge test to determine whether conduct is retaliatory, and, under this rule, the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time of [the same]". Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor". *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)). Moreover, "[o]nce the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

Petitioner had "alleged that OMB failed to respond to his *Freedom of Information Act ('FOIA)* request with the tracking number 21-220. Memorandum of Points and Authorities in Support of Defendant's Partial Motion to Dismiss, p. 1 (citing Am. Compl. ¶ 3).

88. By the Government's admission, "[a] Rule 12(b)(6) motion to dismiss assesses the sufficiency of a complaint, testing whether the plaintiff has pled sufficient facts to state a claim", *Id*, p. 3. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and "[t]o survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *accord Twombly*, 550 U.S. at 544).

89. While accepting "as true all of the allegations in a complaint is inapplicable to legal conclusions", *Id.* (quoting *Ibid.*), "only a complaint that states a claim for relief survives a motion to dismiss", *Id.* (quoting *Ibid.*), and yet Petitioner's accepted as true *FOIA* transaction, designated as OMB *FOIA* Number 21-220, has been extent, without a response, under the statutory deadline, since its acceptance and acknowledgement on March 23, 2021, as in evidence at Exhibit C, without a showing of good cause as to why, and with no admittance of injury to the Requestor to date.

90. Still, the Government concedes the existence of a request for declaratory relief with respect to the Amended Complaint, seeking "a declaration "not only for the infectious dose and/or secondary attack rate are indeed classified information", the information sought under OMB *FOIA* Number 21-220, "but also that, in accordance with *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), would then have to have found origin in a laboratory", *Id.* (quoting Am. Compl. ¶ 50).

91. "[P]ursuant to Federal Rule of Evidence 201, courts may take judicial notice of "matters of public record," but not of facts that may be "subject to reasonable dispute"," *U.S. v.*

*Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011) (citing *Lee v. City of Los Angeles*, 250

F.3d 668 (9th Cir. 2001)). *See also Kayal Orthopaedic Ctr. v. United Healthcare Ins. Co.*,

Civil Action L-6164-18, 3 (N.J. Super. Oct. 7, 2019).

92.   Accepting as true Petitioner's claim that the Government had, in fact, received a *FOIA*

request, on March 23, 2021, and taking into account "matters of public record," . . . not . .

. "subject to reasonable dispute"," *Corinthian Colleges*, 655 F.3d at 984 (citation

omitted), it is an indisputable fact that the President had, on May 26, 2021, two months

after acknowledging receipt of OMB *FOIA* No. 21-220, and one month after the tolling of

the statutory deadline for a response, publicly announced that "the U.S. Intelligence

Community ha[d] "coalesced around two likely scenarios" but has not reached a

definitive conclusion on this question", Briefing Room, "Statement by President Joe

Biden on the Investigation into the Origins of COVID-19," *The White House*, May 26,

2021, which a reasonable trier of fact would infer a plausible nexus to the information

sought by Petitioner, albeit not acknowledged yet by the Government or any court

reviewing Petitioner's claims, arguably raising a reasonable cause for suspicion of

"unusual conduct which leads. . . [one] reasonably to conclude in light of his experience

that criminal activity may be afoot." *Terry*, 319 U.S., at 1.

93.   According to the President's own words, "while two elements in the IC lean[ed] toward

the former scenario and one leans more toward the latter – each with low or moderate

confidence – the majority of elements d[id] not believe there [wa]s sufficient information

to assess one to be more likely than the other", Briefing Room, "Statement by President

Joe Biden on the Investigation into the Origins of COVID-19," *supra*, regarding a disease

that had been credibly to have possessed a less than five percent chance of infecting

anyone, which, to "a man of ordinary sense and understanding would, under the

circumstances," *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973), suggest a disease that could

neither zoonotically evolve or escape from a laboratory to set off a global public health

crisis, during which, in the run of the first variant, by the first anniversary, as

acknowledged by the President, had claimed the lives of over 527,000 Americans,

described as " more deaths than in World War One, World War Two, the Vietnam War,

and 9/11 combined." Briefing Room, "Remarks by President Biden on the Anniversary of

the COVID-19 Shutdown," *supra.*

94. "The fundamental requisite of due process of law is the opportunity to be heard",

*Goldberg v. Kelly*, 397 U.S. 254 (1970) (quoting *Grannis v. Ordean*, 234 U.S. 385 (1914),

and "[t]he hearing must be 'at a meaningful time and in a meaningful manner.'" *Id.*

(quoting *Armstrong v. Manzo*, 380 U.S. 545 (1965)).

*Fairly Debatable FOIA Response Delay*

95. Paragraphs 1 to 94 are incorporated by reference.

96. At least with regard to certain matters conspiratorial in nature, bizarre, or not, it is clear

that a prudential rule dictates that "review all of the evidence presented at trial *in the light*

*most favorable* to the government, crediting every inference that the jury might have

drawn in favor of the government." *U.S. v. Walker*, 191 F.3d 326 (2d Cir.1999) (internal

quotation marks omitted); *accord U.S. v. Martinez*, 54 F.3d 1040 (2d Cir.1995)

97. Moreover, if either of the two results, a reasonable doubt or no reasonable doubt, is fairly

possible, [the Court] must let the jury decide the matter", *U.S. v. Cuti*, 720 F.3d 453 (2d

Cir.2013) (quoting *U.S. v. Temple*, 447 F.3d 130 (2d Cir.2006)), and, thus, "[t]he task of

choosing among the permissible competing inferences that can be drawn from the

evidence is for the jury, not a reviewing court." *U.S. v. Salerno*, 499 F, App'x 110 (2d

Cir.2012) (quoting *U.S. v. Coppola*, 671 F.3d 220 (2d Cir.2010)).

98. Under this reasoning, at least Petitioner "can see no reason why. . . [the IC] should be

deemed any less competent today then they were in 1945", *Columbia Broadcasting v.*

- 22 -

*Democratic Comm*, 412 U.S. 94, 93 S. Ct. 2080 (1973); however, even the nation's

highest court has conceded that "courts traditionally have been reluctant to intrude upon

the authority of the Executive in military and national security affairs", *Department of*

*Navy v. Egan*, 484 U. S. 518 (1988).

99. Moreover, the "complex, subtle, and professional decisions as to the composition,

training, equipping, and control of a military force are essentially professional military

judgments", *Gilligan v. Morgan*, 413 U. S. 1 (1973), , and, hence, "it is difficult to

conceive of an area of governmental activity in which the *courts have less competence*",

*Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022) (Kavanagh, J. concurring)

(quoting *Egan*, 484 U.S. at 518).

100.    Government "action is reasonable if the matter in issue is fairly debatable", *Bd. of*

*Supervisors v. Lerner*, 221 Va. 30 (1980), and "for evidence to be of probative force it

must serve to prove the asserted proposition and it must be more than a mere surmise or

suspicion", *Marriage of York, Matter of*, 613 S.W.2d 764 (Tex. Civ. App. 1981) (citing

*Joske v. Irvine*, 91 Tex. 574 (1898). In *Bd. of Supervisors v. Snell Corp.*, 214 Va. 655

(1974).

101.    "An issue may be said to be fairly debatable when, measured by both quantitative and

qualitative tests, the evidence offered in support of the opposing views would lead

objective and reasonable persons to reach different conclusions." *Id.* (citing *Fairfax Cnty.*

*v. Williams*, 216 Va. 49, 58 (1975)).

102.    And, in *Bd. of Supervisors v. Snell Corp.*, 214 Va. 655 (1974), the Virginia Supreme

Court established the following test to determine whether the presumption of

reasonableness should prevail or has been overcome:

> [T]he Virginia Supreme Court established the following test to determine
> whether the presumption of reasonableness should prevail or has been
> overcome:

> Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance 'must be sustained.' If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained.

103.   "[C]onsiderable weight should be accorded to" those matters entrusted to regulatory agencies, and "[i]f this choice represents a reasonable accommodation. . . , we should not disturb it unless it appears from the statute. . . that the accommodation is not one that Congress would have sanctioned." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *But see Lopes Bright Enterprises v. Raimondo*, Record No. 22-451 (U.S. June 28, 2024)[12].

104.   "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702, and even the Government has acknowledged that Petitioner had served in the uniformed military services, distinguishing him at least from a veteran of the U.S. Navy, as a veteran of the U.S. Army. Dep't of Defense (DoD) Motion to Oppose Intervention, *U.S. Navy SEALs v. Biden*, Civil Action No. 4:21-cv-01236-O (N.D.Tex. May 23, 2022).

105.   "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule

---

[12] "Under *Chevron's* broad rule of deference, though, ambiguities of all stripes trigger deference, even in cases having little to do with an agency's technical subject matter expertise." *Id.*

702", and, even if not deemed to be an expert, but with acknowledged uniformed military service experience, distinguished from the "23% of youth would meet all the core eligibility requirements", Office of People Analytics (OPA), "The Target Population for Military Recruitment," *DoD* (May 2023)[13], Petitioner might, nonetheless, from a "rationally based. . . perception", Fed.R.Evid. 701, proffer, on a simple reading of the controlling regulations, that in the military, even the G2 is merely a part of the general staff, and "[s]taff members [merely] manage information related to their individual area of expertise," FM 6-0, *Commander and Staff Organizations and Operations, supra*," even if they "are not merely data collectors and transmitters", and are tasked to "analyze and clearly articulate information", still, they only "collect, process, store, display, and disseminate information that flows continuously into their headquarters", and "[t]hey provide answers to the commander's critical information requirements (known as CCIRs) as quickly as possible", reportedly, "[t]he Biden administration ended an inquiry into a possible connection between the origins of the novel coronavirus and a lab in Wuhan, a CNN report published Tuesday claims." Kylie Atwood, "Pompeo-led effort to hunt down Covid lab theory shut down by Biden administration over concerns about quality of evidence," *CNN*, May 26, 2021.

106.   And, while in no position to speak for the defense establishment, and certainly not incumbent upon him to do so, Petitioner suggests that such may be a reasonable, albeit debatable, rationale for the apparent indecision amongst agencies within the IC on the origins of the novel virus, subject to the judgment of the Trial Court.

### *Escape from a Laboratory*

107.   Paragraphs 1 to 106 are incorporated by reference.

---

[13] "12% would qualify and be available (i.e., not enrolled in college) for enlisted active duty service. 7% would qualify, be available, and score above the 50th percentile on the AFQT." *Id.*

108.   "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law'", *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and while the Government generally avers conclusory claims that Petitioner's allegations are "ripe for dismissal", it advances no specific claims to counter his factual claims.

109.   Some have contended that "the most likely explanation is a natural evolution from an animal reservoir to a human." Jerry Dunleavy, "Fauci says he still thinks nature, not Wuhan lab, 'most likely' origin for COVID-19," *Washington Examiner*, July 17, 2021.

110.   While there has been a total blackout regarding Petitioner's litigations, however, "[i]n the spring of 2021, with studies of the coronavirus pandemic's origins going nowhere and the issue embroiled in bitter partisan politics, David Relman, a microbiologist at Stanford, quietly made a request of his congresswoman", according to one story two years after the fact. Sheryl Gay Stolberg and Benjamin Mueller, "Lab Leak or Not? How Politics Shaped the Battle Over Covid's Origin," *The New York Times*, March 19, 2023, *updated* March 23, 2023.

111.   According to that account in a nationally prominent news publication, Relman "told his representative, Anna Eshoo, that he was organizing a letter from leading scientists calling for an open and independent investigation into the origins of Covid-19 — including into whether it had come from a laboratory in Wuhan, China", and "[a]s soon as the letter appeared online in the prestigious journal Science, Ms. Eshoo became one of the first Democrats in Congress to call for an investigation into the origins of Covid." *Id.*

112.   According to that account, "[w]ithin weeks, President Biden ordered a top-to-bottom intelligence review of how the pandemic began, which has since come to mixed conclusions." *Id.*

113.    According to that national news organization, they acknowledge that "[t]he problem

is that viruses can leak from labs with destructive effects", citing for example, "[t]he 2001

anthrax attacks leaked (purposely) from Fort Detrick, one of the most secure labs in

America, and a deadly 1977 flu outbreak likely came from a Soviet lab", credible claims

apparently according to "'Josh Clark's 'The End of the World' podcast. . .episode on near-

miss lab leaks." Julian E. Barnes, "The Covid Origins Debate," *The New York Times*, July

26, 2023.

114.    They suggest that "[t]hese patterns probably helped explain the conclusion that F.B.I.

intelligence officials made, with medium confidence, that a lab leak was the most

plausible origin of Covid", while "[t]he Department of Energy also considers the lab-leak

theory to be the more likely explanation, at least in part because of the safety protocols in

the Chinese labs." *Id.*

115.    And, if one can reasonably assume that both the world public health authorities who

had dispatched a robust investigative team to the "one country in the world that. . .ha[d]

the most knowledge of and experience with Covid-19: China", "specifically Hubei

province, . . where the Covid-19 disease emerged" and "where 83 percent of the 89,000

cases known. . .ha[d] been recorded", Julia Belluz, "China's cases of Covid-19 are finally

declining: A WHO expert explains why," *Vox Media*, March 2, 2020, *updated* March 3,

2020[14], were wholly incorrect, it may be appear plausible that "a 66-page master's thesis

from the Chinese medical doctor who treated the miners and sent their tissue samples to

_____

[14] "Bruce Aylward
I think people aren't paying close enough attention. The majority of the response in China, in 30 provinces, was about case finding, contact tracing, and suspension of public gatherings — all common measures used anywhere in the world to manage [the spread of] diseases.

The lockdowns people are referring to — the human rights concerns — usually reflect the situation in places like Wuhan [the city in Hubei province where the virus was first detected]. [The lockdown] was concentrated in Wuhan and two or three other cities that also exploded [with Covid-19 cases]. These are places that got out of control in the beginning [of the outbreak], and China made this decision to protect China and the rest of the world." *Id.*

the Wuhan Institute of Virology for testing", first identified by "Jonathan Latham, a

virologist, and Allison Wilson, a molecular biologist, . . . of the non-profit Bioscience

Resource Project in Ithaca," Isabel Vincent, "COVID-19 first appeared in a group of

Chinese miners in 2012, scientists say," *New York Post*, August 15, 2020, was plausibly

correct in its claim that "a paper published in Science magazine in 2005 by Scientist Shi

Zheng Li and Zhang Shu Yi from Wuhan Institute of Virology under Chinese Academy of

Science, [had] concluded that *the SARS-like-CoV* carried by bats *is not contagious to*

*humans*". Li Xu (Masters Thesis), "The Analysis of Six Patients With Severe Pneumonia

Caused By Unknown Viruses", *Kun Ming Medical University* (May, 2013) (citing

Wendong Li, *et al.*, *Bats are natural reservoirs of SARS-like coronaviruses*, 28 Science

310, October 28, 2005, *ePub.* September 29, 2005[15]), and that virus, underestimated in its

potential, had "'you know, escaped.'" Audrey McNamara, "Former CDC chief says 'most

likely' cause of coronavirus is that it 'escaped' from a lab," *CBS News*, March 27, 2021[16].

### *Zoonotic Evolution*

116.    Paragraphs 1 to 115 are incorporated by reference.

117.    On summary judgment, a "plaintiff is required to substantiate the jurisdictional

allegations in the complaint by affidavits or other competent proof, and not merely

reiterate the factual allegations in the complaint", *Trump v. Clinton*, 626 F.Supp.3d 1264

(2022) (citing *Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968 (11th Cir.

---

[15] Here we report that species of bats are a natural host of coronaviruses closely related to those responsible for the SARS outbreak. These viruses, termed SARS-like coronaviruses (SL-CoVs), display greater genetic variation than SARS-CoV isolated from humans or from civets. The human and civet isolates of SARS-CoV nestle phylogenetically within the spectrum of SL-CoVs, indicating that the virus responsible for the SARS outbreak was a member of this coronavirus group." *Id.*

[16] "Still, Redfield's comments sparked debate. 'I am of the point of view that I still think the most likely etiology of this pathogen in Wuhan was from a laboratory, you know, escaped,' Redfield told CNN's Dr. Sanjay Gupta during an interview taped in January, to be aired in full Sunday. 'Now, other people don't believe that, that's fine. Science will eventually figure it out. It's not unusual for respiratory pathogens that are being worked on in the laboratory to infect the laboratory worker.'" *Id.*

1986) (internal citation omitted)), and a court "must 'accept[ ] as true all unchallenged facts in the plaintiff's complaint.'" *Id.* (quoting *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350 (11th Cir. 2021).

118.    Moreover, "[t]o the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits," a court of competent jurisdiction "*must construe all reasonable inferences in favor of the plaintiff* ", *AcryliCon USA, LLC*, 985 F.3d at 1350 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010)) (emphasis added); however, that court "need only consider 'specific factual declarations within the affiant's personal knowledge,'" and not 'statements ... [which] are in substance legal conclusions.'" *Trump*, 626 F.Supp.3d at 1264 (quoting *Posner v. Essex Ins. Co. Ltd.*, 178 F.3d 1209 (11th Cir. 1999) (*per curiam*).

119.    According to apparently knowledgeable news sources, however, "[t]he intelligence community also says there is no evidence that the coronavirus research at the Wuhan lab could have been a precursor to the virus that causes Covid (as the Times Magazine story details)." Julian E. Barnes, "The Covid Origins Debate," *supra*.

120.    Perhaps, the Government suggests that it is reasonable to discount the apparently debatable claims of world public health authorities who had studied the outbreak contemporaneously  that there is a known probable source location for the the natural spillover, *i.e.* RaTG13, with at least a 96% affinity, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra*.

121.    Perhaps, the Government suggests that it is reasonable to discount the empirically established fact that *Rhinolophus affinis (R. affinis)*, happens to be a species unique to only two locations in Yunnan, Alexandre Hassanin, *et al.*, *Inferring the ecological niche of bat viruses closely related to SARS-CoV-2 using phylogeographic analyses of Rhinolophus species*, 11 Nature 114276, July 12, 2021, https://doi.org/10.1038/s41598-

021-93738-z (citing P. Zhou, *et al.*, *A pneumonia outbreak associated with a new coronavirus of probable bat origin*, 579 Nature, pp. 270–273 (2020), https://doi.org/10.1038/s41586-020-2012-7), specially southern Yunnan, *Id.* (citing C.J. Burgin, *et al.*, *Illustrated Checklist of the Mammals of the World* Vol. 2 (Lynx Edicions, 2020); Y. Han, *et al.*, *Identification of diverse bat alphacoronaviruses and betacoronaviruses in China provides new insights into the evolution and origin of coronavirus-related diseases*, 10 Front. Microbiol. 10, 1900 (2019), https://doi.org/10.3389/fmicb.2019.01900; D. Hu, *et al.*, *Genomic characterization and infectivity of novel SARS-like coronavirus in Chinese bats*, 7 Emerg. Microbes Infect. 154 (2018), https://doi.org/10.1038/s41426-018-0155-5), rather ironically also the location of a military grade virology institute, the "Yunnan Provincial Key Laboratory of Clinical Virology, Institution of Basic and Clinical Medicine of Yunnan Province (The First People's Hospital of Yunnan Province), Staff, "ClinVar," National Library of Medicine, https://www.ncbi.nlm.nih.gov/clinvar/submitters/508060/ (accessed October 2, 2023), which would tend to support claims that "[t]he intelligence community also says there is no evidence that the coronavirus research at the Wuhan lab could have been a precursor to the virus that causes Covid (as the Times Magazine story details)." Julian E. Barnes, "The Covid Origins Debate," *supra*.

122.    Perhaps, the Government suggests that it is reasonable to discount the empirically established fact that this distinct horseshoe bat that just happens to hibernate in the winter months, and has been identified as the source for the bat SARS-like coronavirus strain, BatCov RaTG13, Alexandre Hassanin, *et al.*, *Inferring the ecological niche of bat viruses closely related to SARS-CoV-2 using phylogeographic analyses of Rhinolophus species*, *supra*, for which "[a]lignment of the full-length genome sequence of the COVID-19 virus and other available genomes of Betacoronavirus showed the closest relationship", with

"identity 96%", *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, just as the raccoon dog (*Nyctereutes procyonoides*) is "the only canid with passive overwintering in areas with cold winters," and hibernates in the months of November and December. Anne-Mari Mustonen, *et al.*, *Seasonal Rhythms of Body Temperature in the Free-Ranging Raccoon Dog (Nyctereutes procyonoides) with Special Emphasis on Winter Sleep*, 24 J. of Biol. & Med. Rhythm Res. 6, pp. 1095-1107, July 7, 2009.

123.    Still, it may be to a reasonable trier of fact more than a possibility that, with its vast resources, certainly, the Government experts are aware that the Centers for Disease Control (CDC), in an early report had acknowledged that "[m]ost SARSr-BatCoVs ha[d] not been successfully cultured *in vitro*, except for some *Yunnan strains* that had human/civet SARS-like RBDs and were shown to use hACE2", citing specifically to Z. Wu, *et al.*, *Novel Henipa-like Virus, Mojiang Paramyxovirus, in Rats, China, 2012*, 20 Emerging Infectious Diseases 6, pp.1054-1056 (June 2014), https://dx.doi.org/10.3201/eid2006.131022, and that "[t]he predicted RBD region of SARS CoV-2 spike protein, corresponding to aa residues 318–513 of SARS-CoV (12), showed the highest (97% aa) identities with pangolin-SARSr-CoV/MP789/Guangdong and 74.1%–77.7% identities with human/civet/bat-SARSr-CoVs known to use hACE2 [table omitted]", Susanna K.P. Lau, *et al.*, *Possible Bat Origin of Severe Acute Respiratory Syndrome Coronavirus 2*, 26 Emerging Infectious Diseases 7, pp. 1542-1547 (July 2020), a report available in preprint as early as April 2020.

124.    Still, "nothing short of clairvoyance would have enabled [anyone]. . . to anticipate", *Link v. Wabash R. Co.*, 370 U.S. 626 (1962), that, while as late as 2011, the state of science in the open source environment had accepted that  the "lack of self-sufficiency means that viruses *cannot be cultured in artificial media* for scientific research", or *in*

*vitro*, and could "be grown only in living cells, fertilized eggs, tissue cultures, or bacteria", or *in vivo*, *Id.*, and "nothing short of clairvoyance would have enabled[anyone]. . . to anticipate that", *Link*, 370 U.S. at 626, at University of North Carolina (UNC) Chapel Hill, research scientists, including Ralph Baric and Zhengli-Li Shi, might have been reporting that they had "synthetically re-derived an infectious full-length SHC014 recombinant virus and demonstrate[d] robust viral replication both *in vitro* and *in vivo*", suggesting that "a *potential* risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" might exist. Vineet D Menachery, *et al.*, *A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence*, 21 Nat. Med. 12,1508-1513, November 9, 2015, *corrected* November 20, 2015, doi:10.1038/nm.3985.

125.  Further, "[a]n analysis of 7 million contacts of COVID-19 patients in the United Kingdom estimates that most transmissions resulted from exposures lasting 1 hour to several days and that households accounted for 40% of spread from spring 2021 to early 2022", Mary Van Beusekom, COVID contact-tracing study suggests length of exposure biggest factor in disease spread," *CIDRAP*, December 20, 2023, which, of necessity, has bearing upon the natural origins theory, which would have probably required at least an hour of interspecies contact to transmit an infectious dose sufficient to set off a chain of zoonotic events, originating from the bat coronavirus reservoir in Yunnan, a distance exceeding 1,000 miles, over which, apparently, not one, but two lineage strains had traversed, converging simultaneously in Yunnan around November to December in 2019, according to one respected microbiologist. Michael Worobey, *et al.*, *The Huanan Seafood Wholesale Market in Wuhan was the early epicenter of the COVID-19 pandemic*, 377 Science 6609, pp. 951–959, August 26, 2022, doi: 10.1126/science.abp8715, *Epub*. July 26, 2022.419.

126.   To the degree that "[i]t is a 'foundational principle of administrative law' that judicial

review of agency action is limited to 'the grounds that the agency invoked when it took

the action'", *Regents of University of California*, 591 U.S. ___ (2020) (quoting *Michigan*

*v. EPA*, 576 U.S., at 743), and, "[i]f those grounds are inadequate, a court may remand for

the agency to . . . offer 'a fuller explanation of the agency's reasoning at the time of the

agency action.'" *Id.* (quoting *Pension Benefit Guaranty Corporation*, 496 U.S., at 633), it

is of at least probative value that the Government's own peer reviewed reports had noted

in a study the same exposure threshold of at least an hour for infection in the first variant,

involving an index case who had travelled 614 miles, over two days, by train, with his

family, to a third floor dining room in Guangzhou, albeit anomalously not apparently

infectious prior to this "limited superspreader", affecting the index case and nine others,

age 20 to 84, with all requiring hospitalization, and the index case being hospitalized

immediately after departing the restaurant, but raising no inference of suspicion for Marr

or her colleagues. Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air*

*Conditioning in Restaurant, Guangzhou, China, 2020*, 26 Emerg. Inf. Dis. 7 (July

2020)[17], albeit an empirical claim ripe for dismissal, apparently according to the

Government.

127.   Lending further support to the apparently bizarre Guangzhou study findings reported

by the Government, "[b]acteria and viruses are almost unimaginably small", and

"[b]acteria are usually measured in microns (abbreviated "µm," 1 micron equals 1 one

millionth of a meter), while viruses are measured in the even more miniscule unit of

nanometers (abbreviated "nm," 1 nanometer equals 1 one billionth of a meter, or 1 one-

thousandth of a micron)." Madeline Drexler, *What You Need to Know About Infectious*

---

[17] "Families A and B were each seated for an overlapping period of 53 minutes and families A and C for an overlapping period of 73 minutes." *Id.*

*Disease*, National Academies Press (2011).

128.    According to the National Academies, "[t]o give a sense of these measures, consider

that the period at the end of this sentence is about 350 microns, or 350,000 nanometers, in

diameter", and, "[i]f we magnify the period to one thousand times its actual size (see far

left), a nearby *Pseudomonas aeruginosa*, the bacterium that causes hospital-acquired

pneumonia and bloodstream infections, becomes visible", while "[i]f, in turn, we magnify

Pseudomonas 75 more times, or to 75,000 times its actual size, an adjacent influenza

virus particle also becomes visible." *Id.*

129.    "Font sizes are typically measured in points, not inches", and "[t]he most common

font sizes in the chart size range from 6 to 72 points", while "[o]ne point is equal to 1/72

of an inch"; thus, "a 12-point font size would be approximately 1/6 of an inch", or 0.1667

inches. David Egee, "Font Size Chart To Inches: A Handy Reference For Designers And

Writers Alike," *FontSaga*, May 24, 2023.

130.    "To convert font sizes from points to inches, you can use the following formula:

inches = points / 72." *Id.*

131.    And, from an early point in the most recently terminated global public health crisis, it

had been determined that "[t]he size of encapsulated SARS-2 coronavirus particles

responsible for COVID-19 is $0.060 - 0.140\mu$ $(60 - 140nm)$"[18], and that may "have a peak

in their size. . . distribution at $1.0-1.4\mu$"[19], while "[i]n exhaled breath, it is often attached

to particles of respiratory secretions. . . that have a peak in their size. . . distribution at

[18] Zvi Bar-Yam & Yaneer Bar-Yam, *The Potential for Screening and Tracking of COVID-19 Using Particle Counters, Version 2*, New England Complex Systems Institute, March 29, 2020 (citing N. Chen, *et al.*, *Epidemiological and clinical characteristics of 99 cases of 2019 novel coronavirus pneumonia in Wuhan, China: a descriptive study*, 395 The Lancet 10223, pp. 507-513, February 15, 2020; doi:10.1016/S0140-6736(20)30211-7; N. Zhu, *et al.*, *A Novel Coronavirus from Patients with Pneumonia in China, 2019*, 382 N. Engl. J. Med., pp. 727-733, February 20, 2020, doi:10.1056/NEJMoa2001017, *Epub.* January 24, 2020).

[19] Zvi Bar-Yam & Yaneer Bar-Yam, *The Potential for Screening and Tracking of COVID-19 Using Particle Counters, Version 2*, New England Complex Systems Institute, March 29, 2020.

$1.0-1.4\mu$"[20].

**132.**   "A cough can travel as fast as 50 mph and expel almost 3,000 droplets in just one

go", and "[s]neezes win though—they can travel up to 100 mph and create upwards of

100,000 droplets." Each Breath, "How Fast Is a Sneeze Versus a Cough? Cover Your

Mouth Either Way!" *American Lung Association*, May 12, 2016,

https://www.lung.org/blog/sneeze-versus-cough  (accessed February 7, 2023); N. Mao, *et*

*al.*, Transmission risk of infectious droplets in physical spreading process at different

times: A review, Chuck Dinerstein, "The 'Physicks' Of COVID-19," American Council

on Science & Health, July 1, 2020. *But see also* WHO, *Natural Ventilation for Infection*

*Control in Health-Care Settings*, "Annex C: Respiratory Droplets" (2009); Xiaojian Xie,

*et al.*, *Exhaled droplets due to talking and coughing*, 6 J. R. Soc. Interface, pp. S703–

S714 (2009).

**133.**   "The population of respiratory particles emitted by the same person may differ

considerably in size (1 to 2000 µm or even larger) and number (thousands to millions)

from one respiratory activity to another one", Udaykumar Ranga, *SARS-CoV-2 aerosol*

*and droplets: an overview*, 32 VirusDis 2, pp. 190-197, (June 2021), doi: 10.1007/s13337-

021-00660-z, Epub. April 22, 2021, and some had early modeled a suggestion that

"[f]rom a single cough, a person with a high viral load in respiratory fluid ($2.35 \times 10^9$

copies per ml) may generate as many as $1.23 \times 10^5$ copies of viruses that can remain

airborne after 10 seconds, compared to 386 copies of a normal patient ($7.00 \times 10^6$ copies

per ml)", Yang Wang, Guang Xu & Yue-Wern Huang, *Modeling the load of SARS-CoV-2*

*virus in human expelled particles during coughing and speaking*, 15 PLoS One 10, pp.

---

[20] *Id.* (citing J.A. Otten & H.A. Burge, Vir. In. J. Macher (Ed), "Bioaerosols: Assessment and Control," pp. 1-6, Cincinnati: American Conference of Governmental Industrial Hygienists (1999); R.S. Papineni & F.S. Rosenthal, *The size distribution of droplets in the exhaled breath of healthy human subjects*, 10 J. of Aer. Med. 2, pp. 106-116 (1997).

e0241539, October 30, 2020, doi: 10.1371/journal.pone.0241539.

134.    "If a person is sick, the droplets in a single cough may contain as many as two

hundred million individual virus particles." Jason Socrates Bardi, *The Gross Science of a*

*Cough and a Sneeze*, Live Science, June 14, 2009, suggesting that a sneeze would

reasonably produce about 13.3 times more in volume of virus particles. "The Proceedings

of the National Academy of Sciences (PNAS), a peer reviewed journal of the National

Academy of Sciences (NAS), is an authoritative source of high-impact, original research

that broadly spans the biological, physical, and social sciences", and they boast that

"PNAS is one of the world's most-cited and comprehensive multidisciplinary scientific

journals." Editors, "About PNAS,"  120 PNAS 6, February 7, 2023.

135.    Their early modeling through the independent action hypothesis (IAH), which "states

that each virion has an equal, nonzero probability of causing an infection", a hypothesis

that has "demonstrated for infection of insect larvae by baculovirus[footnote omitted],

and of plants by Tobacco etch virus variants that carried green fluorescent protein markers

[footnote omitted]",  only to the extent to which IAH is valid for humans and SARS-CoV-

2", which "has not yet been firmly established", that "[f]or COVID-19, with an oral fluid

average virus RNA load of $7 \times 10^6$ copies per milliliter (maximum of $2.35 \times 10^9$ copies

per milliliter) [footnote omitted], the probability that a 50-μm-diameter droplet, prior to

dehydration, contains at least one virion is ~37%." Valentyn Stadnytskyi, *et al.*, *The*

*airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2*

*transmission*, 117 PNAS 22, pp. 11875-11877, May 13, 2020,

https://doi.org/10.1073/pnas.2006874117.

136.    In a sneeze, or sternutation, the droplets generally range "between 0.5–12 μm in

diameter", WHO, Natural Ventilation for Infection Control in Health-Care Settings,

"Annex C: Respiratory Droplets", *supra* (citing Cole & Cook, 1998; Tang et al., 2006),

- 36 -

and "[f]or a 10-µm droplet, this probability drops to 0.37%, and the probability that it contains more than one virion, if generated from a homogeneous distribution of oral fluid, is negligible." Valentyn Stadnytskyi, *et al.*, *The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission*, *supra*, and the degree to which that remote risk might be greater would, with as many as 200 million virus particles generated by a cough from a sick person, of necessity and logic, depend on the infectious dose, or the "dose of SARS-CoV-2 needed to transmit infection has not been established." Staff, "Scientific Brief: SARS-CoV-2 Transmission," *CDC*, May 7, 2021.

137.   And, utilizing this easy formulaic expression, based in science, akin to a methodological process relied upon by a trained, forensic sketch artist, a standard period in 12 point font, converted in inches to a diameter of 0.167 inches, would be empirically and wholly insufficient to hold the infectious dose for even a Syrian hamster, small rodent, for the largest SARS-CoV-2 particle might be filled by only 250 SARS-CoV-2 particles, but would require the equivalent of a throw rug, measuring in diameter at least 5.5 feet, or, in graphically illustrated presentation, to facilitate comprehension, a circular obstruction just two inches shorter than "most trusted voice in separating fact from fiction", Newsroom, "Who is Dr Anthony Fauci, the US's trusted voice on coronavirus?" *Aljazeera*, April 13, 2020. Against the most resistant of these rodents, perhaps possessing some natural immunity, the delivery of an infectious dose could be visualized as a 555 foot circle sufficiently large to conceal the entire Washington Monument.

138.   And, at least according to military planners, associated with the Government, "[t]he primary focus of the intelligence warfighting function is to provide timely, relevant, accurate, predictive, and tailored intelligence that focuses missions and operations." FM 2-0, *Intelligence*, March 23, 2010.

139.   Conversely, the mission of counterintelligence, is to "counter[] or neutralize[] foreign

intelligence and security services (FISS) and international terrorist organizations (ITO)

intelligence collection efforts", and "includes all actions taken to detect, identify, track,

exploit, and neutralize the multidiscipline intelligence activities of friends, competitors,

opponents, adversaries, and enemies." *Id.*

140.    While it may appear  "long and convoluted", Dismissal Order, *Webb v. Lopez, et al.*,

Civil Action No. 1:2023cv01239 (D.C. May 19, 2023), "You're not going to win if you

don't have the right information," according to the Secretary of Defense, and "rosying up

doesn't help us be successful in this fight." Howard Altman, "Defense Department IG

report finds no intelligence falsification at CentCom," *Tampa Bay Times*, February 2,

2017.

141.    And, "[i]t is now established doctrine that pleadings should not be scrutinized with

such technical nicety that a meritorious claim should be defeated," *Gordon v. Leeke*, 574

F.2d 1147 (4th Cir. 1978) (citing *Rice v. Olson*, 324 U.S. 786 (1945); *Holiday v. Johnston*,

313 U.S. 342 (1941),  such that, "especially a *pro se* complaint, should not be dismissed

summarily unless 'it appears 'beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief'"", *Id.* (quoting *Haines v. Kerner*,

404 U.S. 519 (1972) (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)).

142.

143.    This information helps explain why five intelligence agencies lean toward the natural-

transmission theory. While officials have not explicitly outlined the reasoning, the

scientific research tracking the virus's origins seems to favor natural transmission.

144.

145.    The C.I.A., the nation's premier spy agency, does not lean one way or the other.

Officials say that is because too much evidence has been lost — because of the chaos of

the pandemic, China's destruction of samples and the passage of time.

**146.**

**147.**    U.S. intelligence agencies work by stealing secrets from other countries. But American officials said that China did not appear to want to know what caused the pandemic. Some Chinese officials believe the case for natural transmission. Others are less convinced but know that if evidence points to a lab leak, it will be bad for their country. So they have every incentive not to look. If you want to keep a secret, as George Orwell wrote, you must hide it from yourself.

**148.**

**149.**    We have to be prepared that we might never know the answer.

**150.**    As even this Trial Court has noted regarding a matter first commenced on July 6, 2021, *see Webb v. Fauci*, Civil Action No. 3:2021cv00432 (E.D.Va. 2020), *aff'd* Record No. No. 21-2394 (4th Cir. 2022), *cert denied* Record No. 21-8242, 143 S.Ct. 79 (2022); *see also* Record No. 21-6868, 142 S.Ct. 1352 (2022), "We are not the first court to [not] see things this way." Dismissal Orde/Order to Amend, *Webb v. Meta Platforms, Inc.*, Civil Case No. 1:23-cv-00816 (D.C. July 28, 2023).

**151.**    Nonetheless, "each court of the United States shall determine the order in which civil actions are heard and determined, except that *the court shall expedite the consideration of . . .any action for temporary or preliminary injunctive relief*, or any other action if good cause therefor is shown", 28 U.S.C. § 1657.

**152.**    While the Government lawlessly refuses to recognize a *FOIA* claim's character as seeking injunctive relief, Memorandum of Points and Authorities in Support of Defendant's Partial Motion to Dismiss, p. 12[21], *but see* 5 U.S.C. § 552(a)(4)(B)[22], under

---

[21] "Finally, Plaintiff brings separate counts for declaratory, Am. Compl. ¶¶ 44-50, and injunctive relief. *Id.* ¶¶ 51-53. But neither declaratory nor injunctive relief is a stand-alone cause of action." *Id.*

[22] "On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.*

the controlling law, "[f]or purposes of this subsection, 'good cause' is shown if a right

under the *Constitution of the United States* or a Federal Statute *(including rights under*

*section 552 of title 5)* would be maintained in a factual context that indicates that a

request for expedited consideration has merit." 28 U.S.C. § 1657.

### *Increasing Cost of Litigation*

153.    Paragraphs 1 to 152 are incorporated by reference.

154.    "Freedom is indivisible, and when one man is enslaved, all are not free." John F.

Kennedy, *Ich Bin Ein Berliner*, June 26, 1963.

155.    According to one often quoted civil rights leader, a certain word "rings in the ear of

every Negro with piercing familiarity", for "[t]his 'Wait' has almost always meant

'Never'". Martin Luther King, Jr., *Letter from a Birmingham Jail*, April 16, 1963, and

"[a]ll persons within the jurisdiction of the United States shall have the same right in

every State and Territory. . . to sue, be parties, give evidence, and to the full and equal

benefit of all laws and proceedings for the security of persons and property as is enjoyed

by white citizens." 42 U.S.C. § 1981(a) (emphasis added). *But see Webb v. Porter*, Case

Number CL2101829 (Alexandria Cir. 2021), *aff'd* Record No. 220089 (Va. 2021), *cert.*

*denied* Record No. 21-8142 (U.S. 2021); *Webb v. Davenport*, Case No. CL22W03079-00

(Chesterfield Cir. 2022), *on appeal* Record No. 230277, (Va. 2023); *Webb v. Porter*, Case

No. CL22002367 (Alex. Cir. 2022); *Webb v. Porter*, Record No. 2013-23-4 (Va. 2024);

*Webb v. Porter*, Civil Case No. 1:23-cv-01346 (E.D.Va. 2023); *Webb v. Dehghani-Tafti*,

Case No. TBD (Arl. Cir. 2024).

156.    To "have access to their civil courts is not an evil to be regretted; rather, it is an

attribute of our system of justice in which we ought to take pride", and that "[t]he State is

not entitled to interfere with that access by denying its citizens accurate information about

their legal rights", *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,

471 U.S. 626 (1985) (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977)). *But see*

*Webb v. Porter*, Case Number CL2101829 (Alexandria Cir. 2021), *aff'd* Record No.

220089 (Va. 2021), *cert. denied* Record No. 21-8142 (U.S. 2021); *Webb v. Davenport*,

Case No. CL22W03079-00 (Chesterfield Cir. 2022), *on appeal* Record No. 230277, (Va.

2023); *Webb v. Porter*, Case No. CL22002367 (Alex. Cir. 2022); *Webb v. Porter*, Record

No. 2013-23-4 (Va. 2024); *Webb v. Porter*, Civil Case No. 1:23-cv-01346 (E.D.Va. 2023);

*Webb v. Dehghani-Tafti*, Case No. TBD (Arl. Cir. 2024).

157.    "A lawyer shall not knowingly: (1) Make a false statement of fact or law to a tribunal

or fail to correct a false statement of material fact or law previously made to the tribunal

by the lawyer, unless correction would require disclosure of information that is prohibited

by Rule 1.6; (2) Counsel or assist a client to engage in conduct that the lawyer knows is

criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed

course of conduct with a client and may counsel or assist a client to make a good-faith

effort to determine the validity, scope, meaning, or application of the law; (3) Fail to

disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by

opposing counsel and known to the lawyer to be dispositive of a question at issue and

directly adverse to the position of the client; or (4) Offer evidence that the lawyer knows

to be false, except as provided in paragraph (b)." *D.C. Bar Rules of Professional Conduct*,

3.3(a)(1).

158.    Moreover, "A lawyer may refuse to offer evidence, other than the testimony of a

defendant in a criminal matter, that the lawyer reasonably believes is false." *Id.*

159.    Mindful that "[a] showing of actual malice is apparently a prerequisite to recovery of

punitive damages, and the defendant may in any event forestall a punitive award by a

retraction meeting the statutory requirements", *Sullivan*, 376 U.S., at 254, the

Government has claimed that "Plaintiff Mike Webb", whose legal name is actually

"Major Mike Webb", as in evidence at Exhibit **D**; *see also* Scott Brodbeck, "Morning

Notes: Candidate Adds Military Rank to His Name," *ARL Now*, June 21, 2021[23] (quoting

Scott McCaffery, "Kadera gets company in School Board race," *Arlington Sun Gazette*,

June 9, 2021[24] , is a "self-described 'litigation hobbyist'," *but see* Order, *U.S. Navy*

*SEALs v. Biden*, Civil Action No. 4:21-cv-01236-O (N.D.Tex. May 23, 2022); Order,

*State of Missouri v. Biden*, Record No. 22-30531 (5th Cir. August 1, 2022); U.S. Attorney

General, Informal App. Opp. Brief, *Webb v. Garland*, Record No. 2022-2065(Fed. Cir.

2022)[25], "who estimates spending $1,800 per month on 'litigation'." Memorandum of

Points and Authorities in Support of Defendant's Partial Motion to Dismiss, p. 1 (citing

Mark Hand, "2023 *Candidate Profile: Major Mike Webb Running for House District 3,*

*Arlington Patch,* October 19, 2023), yet the Government neglects to mention that

Petitioner is also a "self-described" "former biological warfare planner", *Id.*, having been

not only a former Senior *FOIA* Analyst, who had also enjoyed the distinction of having

had his Facebook account permanently disabled by Respondent Meta Platforms, Inc.,

expressly for "security reasons", but who had also played a key role in staffing for the

U.S. Army the drafting of Executive Order 12,958, had served as the most junior

commissioned officer to have ever served as to Operations Officer for all U.S. Army

strategic counterintelligence in CONUS, identified as with a personnel security clearance

as high as the President, as well has having served as the *Aide de Camp* for the

---

[23] "Major Mike Webb, who has floated around the periphery of the Northern Virginia political scene for nearly the past decade, qualified for the School Board ballot. He will be the lone opposition to [Mary] Kadera, who last month won the Democratic endorsement over Miranda Turner… ('Major' was Webb's military rank but now also is a formal part of his name, as he did requisite legal paperwork add it.)". *Id.*

[24] "Major Mike Webb, who has floated around the periphery of the Northern Virginia political scene for nearly the past decade, qualified for the School Board ballot. He will be the lone opposition to Kadera, who last month won the Democratic endorsement over Miranda Turner." *Id.*

[25]Far more than "self-described", with a penchant "hot-button issues", according to the U.S. Attorney General, Informal App. Opp. Brief, *Webb v. Garland*, Record No. 2022-2065(Fed. Cir. 2022), it appears to be clear that, as far away as chic coffeehouses in Seattle, that Petitioner had been quite noticeably "against current government efforts and recommendations for safety during the COVID-19 pandemic." Staff, "Mary Kadera: Democrat," *Progressive Voters Guide*, September 15, 2021, https://progressivevotersguide.com/index.php/virginia/2021/general/mary-kadera (accessed June 25, 2022).

Commander of the 902d Military Intelligence Group, also known as "The Deuce", where he had been commended for "[a] solid effort by an exceptional officer", Ronald T. Sturmer & John E. Swift, III, DA Form 67-9, *Officer Evaluation Form*, July 5, 1995, and who had played a key staff role in standing up the Armed Forces Medical Intelligence Center (AFMIC), *see generally* DODD 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the precursor to the National Medical Intelligence Center (NMIC), *see generally* DODI 6420.01, *National Center for Medical Intelligence (NCMI)*, March 20, 2009, incorporating Change 3, effective September 8, 2020, which was the subject of the ABC News report, Josh Margolin & James Gordon Meek, "Intelligence report warned of coronavirus crisis as early as November: Sources 'Analysts concluded it could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020.

160.    The Government further fails to mention that Petitioner had been recognized as a "whistleblower", Order, *Webb v. Dep't of the Army*, Civil Action 1:22-cv-02236 (UNA) (D.D.C. Oct. 7, 2022), having been offered an unsolicited position with the Defense Intelligence Agency (DIA), in a Top Secret billet, as a GG-13 "procurement Analyst", as in evidence at Exhibit **E**, an officially disavowed "expired" mission, as in evidence at Exhibit **F**, apparently to the Government also a claim "ripe for dismissal". *See also Webb v. DoD*, Docket Number DC-3443-18-0299-I-1 (MSPB 2018); *Webb v. Department of the Army*, Civil Action 1:22-cv-02236 (UNA) (D.D.C. 2022), *aff'd* Record No. 22-5292 (D.C. Circuit 2022), *cert. denied*, Record No. 22-7394 (U.S. 2023); *Webb v. MSPB*, Case Number 1:19-cv-257 (E.D.Va. 2019), *aff'd* Record Number 19-1436 (4th Cir. 2019); *Webb v. MSPB*, Record Number 2019-1130 (D.C.Cir. 2018); *Webb v. MSPB*, Record Number 20-100 (Fed.Cir. 2018); *Webb v. DoD*, Docket Number DC-3443-18-0299-I-1 (MSPB 2018); *Webb v. DIA*, Civil  Case  No.  1:23-cv-02397 (D.C. 2023). *See also Webb v. Porter*, Case No. CL24001532 (Alexandria Cir. 2024), *on appeal* Record No. TBD (Va.

2024).

161. While acts of a "Good Samaritan" may provide evidence of character, *Estep v. Ballard*, 502 F. App'x 234 (4th Cir. 2012), "the law is well[-]settled that it is not contributory negligence *per se* for one voluntarily to risk his own safety or life in attempting to rescue another from imminent danger caused by the negligence of the defendant", such a party "would not be thereby relieved from the duty of exercising ordinary care for her own safety." *Wright v. Atlantic Coast Line R. Co.*, 110 Va. 670 (1910) (citation omitted).

162. Still, "[w]here the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, *the people* are regarded *as the real party*, and the relator at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and as such, interested in the execution of the laws." High, *Extr. Rem.*, sec. 431; *see also Ferry v. Williams*, 41 N.J.L. 332 (Sup. Ct. 1879).

163. Still further, wherever the "causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish", *California v. Texas*, 141 S. Ct. 2104 (2021) (internal quotation marks and citation omitted), and "[t]o satisfy that burden, the plaintiff must show at the least 'that third parties will likely react in predictable ways.'" *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019)).

164. However, generally, "[t]he plaintiff cannot base his claims on the legal rights or interests of third parties or on 'generalized grievances' or 'abstract questions of wide public significance'", and "'must assert his or her own legal rights and interests." *Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)).

165.     To establish standing, "(1) the plaintiff must have detrimentally relied on the predicate

acts. . . ; (2) the predicate acts must be the proximate cause of the injury to the plaintiff;

and (3) the plaintiff must suffer actual injury". *Choimbol v. Fairfield Resorts, Inc.*, 428

F.Supp.2d 437 (E.D.Va.2006).

166.     For purposes of standing, Article III Courts have defined an injury-in-fact as "'an

invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)).

167.     In the words of the President, "we were hit with a virus that was met with silence and

spread unchecked"; "[d]enials for days, weeks, then months that led to more deaths, more

infections, more stress, and more loneliness", but he assured all Americans and those

listening around the world that "we know what we need to do to beat this virus: Tell the

truth", and "[f]ollow the scientists and the science." Briefing Room, "Remarks by

President Biden on the Anniversary of the COVID-19 Shutdown," *supra*.

168.     Yet, while war footing, the President, summoning "every power. . . as President of the

United States to put us on a war footing to get the job done", had still conceded that,

"[w]hile it was different for everyone, we all lost something". *Id.*

169.     "You know, and there's something else we lost": "[w]e lost faith in whether our

government and our democracy can deliver on really hard things for the American

people." *Id.*

170.     According to the President, "the total deaths in America. . . [reached] 527,726", "more

deaths than in World War One, World War Two, the Vietnam War, and 9/11 combined",

Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19

Shutdown," *supra*, it was known that America had "lost at least 73,462 Black lives to

COVID-19", and that "Black people [had] account[ed] for 15% of COVID-19 deaths

where race [wa]s known", The Atlantic COVID Tracking Project (Boston University,"

"The COVID Racial Data Tracker", *COVID Tracking*, March 7, 2021. *See also Webb v.*

*Davenport*, Case No. CL22W03079-00 (Chesterfield Cir. 2022), *aff'd* Record No.

230277, (Va. 2023); *Webb v. Alfred Street Baptist Church*, *Webb v. Alfred Street Baptist*

*Church*, Civil Action No. 1:2023cv00096 (E.D.Va. 2023), *aff'd* No. 23-1397 (4th Cir.

2023). *But see also Webb v. Wilson*, Case Number CL21001769 (Alexandria Cir. 2021);

*Webb v. Porter*, Case No. CL22002367 (Alex. Cir. 2022); *Webb v. Porter*, Record No.

2013-23-4 (Va. 2024); *Webb v. Porter*, Civil Case No. 1:23-cv-01346 (E.D.Va. 2023);

*Webb v. McDonough*, Civil Action No. 1:2023cv01344 (D.C. 2023); *Webb v. Austin*, 1:22-

cv-03827-UNA (D.C. May 25, 2023), *on appeal* Record No. 23-5084 (D.D.C. 2023).

171.  "[T]he absence of demonstrated prejudice in the economic, family, public esteem, and

health areas, or as to the availability of evidence and witnesses" can be a fatal defect in a

criminal trial, and "[t]he burden for trial promptness is not solely upon the defense", but

rather, "[t]he right to 'a speedy trial' is constitutionally guaranteed and, as such, is not to

be honored only for the vigilant and the knowledgeable." *Hodges v. U.S*, 408 F.2d 543

(8th Cir. 1969).

172.  "The United States Attorney has a duty to press criminal cases to trial, to give them

any necessary priority, and to prevent, whenever possible, even the suggestion of

staleness", *Id.* (citing *Pitts v. North Carolina*, 395 F.2d 182 (4th Cir. 1968), "[a]nd the trial

court," where, "[w]hen the public interest so requires, *the court must order* that one or

more grand juries be summoned", Fed.R.Crim.Pro. 6(a) (emphasis added), and "which is

the neutral arbiter for the defense as well as for the prosecution, must do all it can to keep

its criminal dockets current." *Hodges*, 408 F.2d at 543 (citing *U.S. v. Mann*, 291 F.Supp.

268 (S.D.N.Y.1968)).

173.  And, under this view, on the very day that OMB *FOIA* Number 21-220 had been

- 46 -

received, "[g]lobally, COVID-19 confirmed cases continued to rise for a fourth

consecutive week, with just under 3.3 million new cases reported in the last week", and

[t]he only WHO region to report a decline in new deaths . . .was the Western Pacific

where deaths fell by nearly a third, compared to the previous week", while with 3,291,360

reported cases worldwide, attributed to 2,703,780 fatalities, 1,299,243 in the Americas

alone, Staff, "COVID-19 Weekly Epidemiological Update Data," *WHO*, March 21,

2021,all potential plaintiffs, if not barred by an assertion of sovereign discretion, might be

able to demonstrate "(1) an 'injury in fact' that is both '(a) concrete and particularized,'

and '(b) actual or imminent, not 'conjectural' or 'hypothetical;' ' (2) 'a causal connection

between the injury and the conduct complained of,' that is, 'the injury has to be fairly

traceable to the challenged action of the defendant;' and (3) it is likely that a favorable

decision will redress the injury", *Nickell v. Franklin Twp. Cmty. Sch. Corp.*, No.

116CV03193TWPMPB, 2017 WL 5952899, at *1–5 (S.D. Ind. Aug. 17, 2017) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), who, while the origins remain

unknown, could be some scientists electing a right to remain silent and escape liability, or

simply nature, according to the status quo, or for whom, short of an assertion of

prosecutorial discretion, might find their slayers brought to justice in a court. *But see*

*Webb v. Porter*,  Case Number CL2101829 (Alexandria Cir. 2021), *aff'd* Record No.

220089 (Va. 2021), *cert. denied* Record No. 21-8142 (U.S. 2021); *Webb v. Davenport*,

Case No. CL22W03079-00 (Chesterfield Cir. 2022), *on appeal* Record No. 230277, (Va.

2023); *Webb v. Porter*, Case No. CL22002367 (Alex. Cir. 2022); *Webb v. Porter*, Record

No. 2013-23-4 (Va. 2024); *Webb v. Porter*, Civil Case No. 1:23-cv-01346 (E.D.Va. 2023);

*Webb v. Dehghani-Tafti*, Case No. TBD (Arl. Cir. 2024).

174.    "Having aided in this community need, we felt that our direct action program could be

delayed no longer", and "[w]e must come to see, with one of our distinguished jurists,

that 'justice too long delayed is justice denied.'" Martin Luther King, Jr., *Letter from a Birmingham Jail*, , April 16, 1963.

175.   It was the thought of one oft-quoted and fondly admired member of the clergy that the word, "wait", "rings in the ear of every Negro with piercing familiarity", for "[t]his 'Wait' has almost always meant 'Never'", *Id.*; "[a]nd so we've come here today to dramatize a shameful condition", Martin Luther King, Jr., *I Have a Dream*, August 28, 1963, for "[w]ho is it that is supposed to articulate the longings and aspirations of the people more than the preacher?" Martin Luther King, Jr., *I've Been to the Mountaintop*, April 3, 1968.

176.   "With a good conscience our only sure reward, with history the final judge of our deeds, let us go forth to lead the land we love, asking His blessing and His help, but knowing that here on earth God's work must truly be our own." John F. Kennedy, *Inaugural Address*, January 21, 1963.

## Warranted by Existing Law

177.   Paragraphs 1 to 176 are incorporated by reference.

178.   "The distinguishing mark of a 'manifestly unlawful order' should fly like a black flag above the given order, as a warning reading 'Prohibited!'" *Eichmann*, 36 I.L.R. at 5 (quoting *Chief Military Prosecutor v. Melinki, et al.* (13 Pesakim Mehoziim, p. 90)), and "[i]t is to be pointed out here that even the jurists of the Third Reich did not dare to put on paper that obedience to orders is above all". *Id.*

179.   Still, "[g]reat cases like hard cases make bad law", *Northern Securities Co. v. U.S.*, 193 U.S. 197 (1904), and "Facebook assured Dr. Murthy that, though 'it's not great to be accused of killing people,'" and that recent case, involving free speech, which had found a day in court,  and a trial on the merits, had been described by a Justice, who had abstained from argument in a prior case with a nexus to the novel virus and related to this litigation, *see  Webb v. Fauci*, Record No. 21-6868 (2022) as "one of the most important

free speech cases *to reach this Court* in years." *Murthy v. Missouri*, Record No. No. 23–

411, 603 U.S. _____ (June 26, 2024) (Alito, J. dissenting, joined by Thomas, J. & Gorsuch,

J.) (emphasis added).

180.    According to Justice Oliver Wendell Holmes, "great cases are called great, not by

reason of their real importance in shaping the law of the future, but because of *some*

*accident* of immediate overwhelming interest *which appeals to the feelings and distorts*

*the judgment*", *Northern Securities Co.*, 193 U.S. at 197 (emphasis added), and, news

content analysts have observed, during "a once-in-a-century pandemic", characterized as

"threaten[ing] irreparable harm to an unknown (and unknowable) number of people", and

warranting that "the scope of [a court's] review . . . must be limited to a determination of

whether the [executive's] actions were taken in good faith and whether there is some

factual basis for [the Governor's] decision that the restrictions he imposed were necessary

to maintain order", Opp. Brief, *Hughes v. Northam*, Civil Action No. CL20-415 (Russell

Cy. Cir.) (quoting *U.S. v. Chalk*, 441 F.2d 1277 (4th Cir. 1971), have observed that

"months of discord about the coronavirus epidemic ha[d] transformed the cloth mask into

a potent political symbol, touted by Democrats as a key part of communal responsibility,

labeled by some GOP leaders as a sign of government overreach and as a scarlet letter

pinned on the weak." Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new

research supports wearing masks to control coronavirus spread," *supra*.

181.    In criminal law, the task of the court is "to determine whether the record contains

enough evidence for the triers of the facts to find beyond a reasonable doubt each element

of the offenses involved. *Calley*, 22 U.S.C.M.A. at 534 (citing *U.S. v. Papenheim*, 19

U.S.C.M.A. 203 (1970); *U.S. v Wilson*, 13 U.S.C.M.A. 670 (1963)).

182.    In review of a motion to dismiss, when not in abuse of its discretion, "the Court

accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the

nonmoving party." *Masi v. Harrington*, 23 CV 2132, 2 (N.D. Ill. Nov. 6, 2023). *See also Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661 (7th Cir. 2023)."

183.    "'*Der Sieger wird immer der Richter und der Besiegte stets der Angeklagte sein*[26],'" Matthew Phelan, "The History of "History Is Written by the Victors"", *SLATE*, November 26, 2019; *see also* Michael Getler , "The 'First Rough Draft'," *Washington Post*, May 25, 2002[27], and, here, it is of at least correlational note, quite contrary to the Government's claims of Petitioner being "self-described", that have determined that he is a "litigation hobbyist".

184.    In a motion to dismiss, a court may, in its discretion, draw any reasonable inference, and, in a motion for sanctions it may consider that, *inter alia*, "[a] lawyer shall not. . . [o]bstruct another party's access to evidence. . . or conceal evidence, . . . if the lawyer reasonably should know that the evidence is or may be the subject of discovery or subpoena in any pending or *imminent proceeding*", *D.C. Bar Rules of Professional Conduct*, 3.4(a) (emphasis added), and there is no genuine issue of fact whether or not, on March 23, 2020, the Government had acknowledged receipt of a *FOIA* request, designated by the Government as OMB *FOIA* No. 21-220, about which the Government had failed to respond, a request characterized as "simple", where the "agency using multi-track processing places in its fastest (nonexpedited) track based on *the volume and/or simplicity of records requested*", and not "complex", or  "a FOIA request that an agency using multi-track processing places in a slower track based on the *volume and/or complexity of records requested*."  Office of Information Policy (OIP), *Guidance XVIII FOIA Update 3*, "*FOIA* Update: OIP Guidance: Guidelines for Agency Preparation and

---

[26] "The victor will always be the judge, and the vanquished the accused." Matthew Phelan, "The History of "History Is Written by the Victors"", *SLATE*, November 26, 2019.
[27] "In 1963 the late Philip L. Graham, then the publisher of The Post and the newly acquired Newsweek magazine, gave a speech in which he described the "daily and the weekly grist of journalism" as providing what he called a "first rough draft" of history. It was, and remains, an apt description of the work reporters do, and the information readers, listeners and viewers absorb." *Id.*

Submission of Annual *FOIA* Reports," January 1, 1997.

185. In a motion to dismiss, a court may, in its discretion, draw any reasonable inference, and, in a motion for sanctions it may consider that, *inter alia*, "[a] lawyer shall not. . . [f]alsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law", *D.C. Bar Rules of Professional Conduct*, 3.4(b), while, under Executive Order 12,958, *Classified National Security Information*, April 17, 1995, Section 1.8, "[i]n no case shall information be classified in order to. . . *conceal violations of law, . . . prevent embarrassment. . . or. . . prevent or delay the release of information that does not require protection in the interest of national security*"; however, of record, despite receipt and acknowledgment therefor of a designated simple *FOIA* request, two presumably facially plausible scenarios have emerged from the Government regarding what had occurred even after the deadline had tolled for a response thereto: 1) review of the request received on March 23, 2021 did not even receive an order to commence until December 11, 2023, and 2) review did not commence until January 13, 2022.

186. And, despite a mandate dictating that "'a clear presumption: [i]n the face of doubt, openness prevails'", despite instructions to "agencies to respond to requests 'promptly and in a spirit of cooperation'", a despite a directive "to adopt a presumption in favor of disclosure with regard to all *FOIA* decisions", Department of Justice Guide to the *Freedom of Information Act*, "President Obama's *FOIA* Memorandum and Attorney General Holder's *FOIA* Guidelines," *supra*, the final disposition regarding Petitioner's simple *FOIA* request has not been addressed or resolved, although clearly in December, the Government had made contact with Petitioner to encourage him to relinquish his pursuit of the claims the Government now seeks to dismiss, described only now as "ripe for dismissal", but then described as "additional ornamentation" described as "encumbering" the request to enjoin that Agency from withholding that to which

Petitioner had a statutorily conferred right to receive three litigations and two years
before, facts about which a reviewing court, in discretion, is permitted to draw any
reasonable inferences.

187.    In a motion to dismiss, a court may, in its discretion, draw any reasonable inference,
and, in a motion for sanctions it may consider that, *inter alia*, "[a] lawyer shall not. . .
[k]nowingly disobey an obligation under the rules of a tribunal except for an open refusal
based on an assertion that no valid obligation exists", and, *D.C. Bar Rules of Professional
Conduct*, 3.4(c), as noted above, "each court of the United States shall determine the
order in which civil actions are heard and determined, except that *the court shall expedite
the consideration of . . .any action for temporary or preliminary injunctive relief*, or any
other action if good cause therefor is shown", to include those matters brough under the
*FOIA*, 28 U.S.C. § 1657, but over three years since a request under that provision had
been acknowledged as received, the IC has been tasked to "redouble efforts", Briefing
Room, "Statement by President Joe Biden on the Investigation into the Origins of
COVID-19," *supra*, "a microbiologist at Stanford, quietly [has] made a request of his
congresswoman", "a letter from leading scientists calling for an open and independent
investigation into the origins of Covid-19" has been prepared", Sheryl Gay Stolberg and
Benjamin Mueller, "Lab Leak or Not? How Politics Shaped the Battle Over Covid's
Origin," *supra*, and "years after the start of the global pandemic there has yet to be a
comprehensive forensic investigation into its origins", while "more than a million
Americans dead from Covid-19," described as "inexcusable", has not prompted the
Government to respond to a simple *FOIA* request, and a court, in its discretion, may, in a
motion to dismiss, draw all reasonable inferences from these facts.

188.    In drawing reasonable inferences, "evidence of . . . flight. . . [is] admissible even if
offered solely to prove his consciousness of guilt as to that predicate act", *U.S. v.*

*Pungitore*, 910 F.2d 1084 (3d Cir. 1990); *see also* Sherry Gaba, "Understanding Fight,

Flight, Freeze and the Fawn Response," *Psychology Today*, August 22, 2020[28] and, at

least according to one fabled tale, for babes in faith, "all the men of Israel, when they saw

the man, fled from him, and were sore afraid", 1 Samuel 17:24, whilst in science,

"*[a]ctioni contrariam semper & æqualem esse reactionem: sive corporum duorum*

*actiones in se mutuo semper esse æquales & in partes contrarias dirigi*", Isaac Newton,

*Philosophiae Naturalis Principia Mathematica*, Reg. Soc. PRÆSES, July 5. 1686[29].

189.    According to that account in a nationally prominent news publication, Relman "told

his representative, Anna Eshoo, that he was organizing a letter from leading scientists

calling for an open and independent investigation into the origins of Covid-19 —

including into whether it had come from a laboratory in Wuhan, China", and "[a]s soon as

the letter appeared online in the prestigious journal Science, Ms. Eshoo became one of the

first Democrats in Congress to call for an investigation into the origins of Covid." *Id.*

190.    In a motion to dismiss, a court may, in its discretion, draw any reasonable inference,

and, in a motion for sanctions it may consider that "[a] lawyer shall not bring or defend a

proceeding, or assert or controvert an issue therein, *unless there is a basis in law and fact*

for doing so that is not frivolous, which includes a good-faith argument for an extension,

modification, or reversal of existing law." *D.C. Bar Rules of Professional Conduct*, 3.1.

191.    And yet, by its motion, the Government goes to the extent to deny that any tortious

conduct had occurred to form a predicate for an allegation brought in conspiracy,

proffering to the Trial Court the argument that, "[b]ecause the underlying tort claims fail,

so too must the civil conspiracy claim." Memorandum of Points and Authorities in

---

[28] Medical science has determined that "[t]he most well-known responses to trauma are the fight, flight, or freeze responses", and science has evolved to recognize "a fourth possible response, the so-called fawn response." Id. Moreover, "[f]light includes running or fleeing the situation, fight is to become aggressive, and freeze is to literally become incapable of moving or making a choice." *Id.*
[29] "To an action there is always an equal and contrary reaction: or the actions of two bodies between themselves are always mutually equal and directed in opposite directions." *Id.*

Support of Defendant's Partial Motion to Dismiss, p. 11 (quoting *Wilson v. Dep't of Transp.*, 759 F. Supp 2d 55 (D.D.C. 2011).

192.    Article III Courts possess "the inherent power ... to set aside its judgment if procured by fraud upon the court", *Shaw v. AAA Eng'g and Drafting, Inc.*, 138 Fed.Appx. 62, 73 (10th Cir.2005)," and in this venue, "there is no statute of limitations for bringing a fraud upon the court claim, *Id.* (citing *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238 (1944)), because 'a decision produced by fraud on the court is not in essence a decision at all and never becomes final'", *Id.* (quoting *Kenner v. Comm'r of Internal Revenue*, 387 F.2d 689 (7th Cir.1968)).

193.    "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake", and "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.Pro. 9(b).

194.    Under the rule stated in *Thompson v. Bacon*, 245 Va. 107,425 S.E.2d 512 (1993), "[a] party alleging fraud must prove by clear and convincing evidence (1) a false representation," as found herein, "(2) of a material fact," as demonstrated above, "(3) made intentionally and knowingly," having been presented to an Article III Court under penalty of Fed.R.Civ.P. 11, "(4) with intent to mislead," and certainly directed at some objective, " (5) reliance by the party misled," in the court to which Petitioner had sought relief, "and (6) resulting damage to him", *Id.* (citing *Winn v. Aleda Constr. Co.*, 227 Va. 304 (1984)); *quod est demonstrandum.*

195.    "Clear and convincing evidence is such proof as will establish in the trier of fact a firm belief or conviction concerning the allegations that must be established." *Id.* (citing *Walker Agency, Inc. v. Lucas*, 215 Va. 535 (1975)).

## Evidentiary Support for Factual Contentions

196.    Paragraphs 1 to 195 are incorporated by reference.

197.    Evolutionary pressures notwithstanding, pandemics are times historically associated

with fear, confusion and despair, *see* Jeremy Howard, *et al.*, *An evidence review of face*

*masks against COVID-19*, 118 PNAS 4 December 5, 2020, pp. e2014564118; *see also*

Jeremy Howard, *et al.*, *Face Masks Against COVID-19: An Evidence Based Review*,

Preprints, April 12, 2020[30], and despite a statement placed in third grade science textbook

boldface type, many Americans apparently assumed that "asymptomatic" transmission[31],

which was specifically found "to be relatively rare and d[id] not appear to be a major

driver of transmission" was, at least to their not so "fully educated" minds, deemed to

have been a strong recommendation for countries expecting "imported cases"[32], *Report of*

*the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra*, the

radiating characteristics of an invisible enemy in the evolved science of miasma

transmission theories long rendered defunct by scientists, a theory even questioned

contemporaneously by Thomas Jefferson, despite the intrigued fascination with the topic

of his colleague Benjamin Rush, Benjamin Rush, *Lettr to Thomas Jefferson*, May 3,

1809[33], during a time when yellow fever was "like nothing known or read of by the

---

[30] "Historically, epidemics are a time of fear, confusion, and helplessness [footnotes omitted]."
[31] A due diligence inquiry would have found that, clinically, while symptoms require some form of diagnostic method or test to elicit from patient, like taking a temperature with a thermometer, to a clinical degree of significance, exhalation events, like coughing or sneezing, are, in fact, asymptomatic presentations or indications of potential infection, Adam Feldman (Reviewed by Deborah Witherspoon), "Why do signs and symptoms matter?" *Medical News Today*, February 22, 2018.
[32] The verb form for the word, "import" means "to bring from a foreign or external source: such as. . . to bring (something, such as merchandise) into a place or country from another country", importing the implicit condition of a grant of permission. Editors, "Import," *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/import (accessed November 26, 2023). Conversely, the verb form for the word "export" means, *inter alia*, "to carry or send (something, such as a commodity) to some other place (such as another country)", implying no permission from the country from which the item, commodity or merchandise had been exported for import. Editors, "Import," *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/export (accessed November 26, 2023).
[33] "I was much pleased to hear that your Grandson had returned to Philadelphia to prosecute the Study of medicine. After nearly 50 years spent in this study, and in all the laborious duties connected with its practice, I can truly say, they are both more agreeable to me than any other pursuits, and when it shall please God to cut the last of the few threads which remain of my life, I shall suffer nearly as much pain in being torn from my profession, as from the common Attachments of blood & friendship. I was about to conclude my letter by expressing a wish that we could in a long evening, review the early and late political events of our Country together, and trace the influence of the same principles under different names, upon each of them,—but—no— we would not waste a moment in conversing Upon such little Subjects. We would dismiss them to unite with the

Physician", Neely Tucker, "1793 Yellow Fever Epidemic: The Washingtons, Hamilton

and Jefferson," *Library of Congress*, May 28, 2020 (quoting Thomas Jefferson, *Letter to*

*David Humphreys*, September 11, 1793[34]), just as, in passive voice[35], federal regulators

had only stated:

> The virus is thought to spread mainly from person-to-person.
>
> Between people who are in close contact with one another (within about 6 feet).
>
> Through respiratory droplets produced when an infected person coughs or sneezes.
>
> These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. Staff, "How COVID-19 Spreads," CDC, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (emphasis added)[36]

198. Hence, for facility, it may be appropriate to note that "extrinsic evidence is admissible

to prove a meaning to which the language of a contract is reasonably susceptible, even

though on its 'four corner'" the instrument appears to the court to be clear and

unambiguous", *Brawthen v. H&R Blok*, 28 Cal. App. 3d 132 (1972), or, in Sesame Street

Simplicity, this connotes those communicative exchanges between agreeing parties

outside the written expression of their agreement.

---

Speculations upon Alchemy and perpetual motion, and dwell only upon those topics of Science and literature which are calculated to encrease the agricultural, domestic & moral happiness of our fellow Citizens." *Id.*
[34] "On September 11th, Thomas Jefferson, then Secretary of State, commented in a letter to a colleague, 'It is called a yellow fever, but is like nothing known or read of by the physicians. The week before last the deaths were about 40. The last week about 80. And this week I think they will be 200. And it goes on spreading.'" *Id.*
[35] "The active voice is usually more direct and vigorous than the passive", while "[t]his rule does not, of course, mean that the writer should entirely discard the passive voice, which is frequently convenient and sometimes necessary", W. Strunk & E.B. White, *Elements of Style*, University of Washington, https://faculty.washington.edu/heagerty/Courses/b572/public/StrunkWhite.pdf (accessed December 19, 2021
[36] Conflicting with official regulatory guidance, some researchers had "observed that home fabrics are hydrophilic to varying degrees, and hence soak water", which is the primary makeup composition of droplets, while "medical masks are hydrophobic, and tend to repel water", such that against hydrophilic "[i]ncoming droplets are thus soaked and 'held back' by home fabrics, *which might offer* an as of yet untapped and understudied *advantage* of homemade cloth masks." Onur Aydin, Bashar Emon & M. Taher A. Saif, *Performance of fabrics for home-made masks against spread of respiratory infection through droplets: a quantitative mechanistic study*, medRxiv (preprint), April 24, 2020. And yet, in reverential deference or obeisance to federal guidance, these researchers had at least diplomatically stated as late as April 2020 that "the mechanism of spread of the current novel coronavirus (SARS-CoV-2) *is not clearly understood*" but reiterated that "*it is thought that spread can occur through droplets* containing virus particles when infected persons sneeze, cough, or speak". *Id.*

199.    At least in the Commonwealth of Virginia, "[t]he credibility of a witness may be
attacked or supported by evidence in the form of reputation, subject to these limitations:
(1) the evidence may relate only to character trait for truthfulness or untruthfulness; (2)
evidence of truthful character is admissible only after the character trait of the witness for
truthfulness has been attacked by reputation evidence or otherwise; and (3) evidence is
introduced that the person testifying has sufficient familiarity with the reputation to make
the testimony probative." Va. S. Ct. R. 2:608(a).

200.    Moreover, "[e]xcept as otherwise provided in this Rule, by other principles of
evidence, or by statute, (1) specific instances of the conduct of a witness may not be used
to attack or support credibility; and (2) specific instances of the conduct of a witness may
not be proved by extrinsic evidence", Va. S. Ct. R. 2:608(b), and "[a] witness may be
impeached by a showing that the witness is biased for or prejudiced against a party.
Extrinsic evidence of such bias or prejudice may be admitted." Va.S.Ct.R. 2:610.

201.    All parties to an action possess a "duty to mitigate damages and minimize losses",
*Rev-Lyn Contracting Co. v. Patriot Marine*, LLC, 760 F. Supp. 2d 162, 165–72 (D. Mass.
2010) (citing Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 14–6 (4th ed.
2004)),

202.    In public health crises, "[t]he only 'competent evidence' that could be presented to the
court to prove these propositions was the testimony of experts, giving their opinions",
and, in that case, the nation's court of last resort had found that although the criminal
defendant's two retained attorneys had "'offered to prove and show by competent
evidence' these so-called facts", *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), weighed
in the balances, and. . . found wanting", *Daniel* 5:27 (KJV), esteemed and learned counsel
had brought none.

203.    In criminal law, "[c]onsiderations relevant to the due diligence inquiry 'include the

timeliness of the search, the importance of the proffered testimony, and whether leads of

the witness's possible location were competently explored,' and not just the validity of a

subpoena for his appearance." *People v. Martin*, No. B239366, 32 (Cal. Ct. App. Jul. 30,

2014) (quoting *People v. Wilson*, 36 Cal.4th 309 (2005)).

204.   "In the instant case, we cannot say that the decision of the. . . [Government is]  based

upon credible evidence, proven facts, and reasonable inferences drawn therefrom." *Coe v.*

*Coe*, 225 Va. 616 (Va. 1983).

205.   "A lawyer for the defendant in a criminal proceeding, or for the respondent in a

proceeding that could result in involuntary institutionalization, shall, if the client elects to

go to trial or to a contested fact-finding hearing, nevertheless so defend the proceeding as

to require that the government carry its burden of proof" *D.C. Bar Rules of Professional*

*Conduct*, 3.1; however, this is a civil, even if not deemed tortious, matter, by the

Government, and Petitioner has been repeatedly warned that "many of Plaintiff's claims

rely on legal theories premised on criminal violations that he cannot charge". Order, *Webb*

*v. Lopez*, Civil Action No. 1:23-cv-01239 (ACR) (D.C. May 19, 2023), p. 2, and that his

allegations "rely only on state violations, others rely on criminal violations which he

cannot charge". Order, *Webb v. Kimmel*, Civil Action No. 3:22cv392 (E.D.Va. January 23,

2023), at p. 2.

206.   The gravamen for the Government's case in chief, beyond a dubious claim of

sovereign immunity, revolves around the proposition that, as noted above, Petitioner's

claims are "ripe for dismissal", "bizarre conspiracy theories" or 'fantastic government

manipulations' . . . inherently frivolous and. . . subject to dismissal". *Id.* (quoting

*Christmann*, Civ. A No. 22-2189 (BAH), 2024 U.S. Dist. LEXIS 10335, at \*12 (D.D.C.

January 20, 2024) (quoting *Best*, 39 F.3d at 328), drawn from its presumably reasonable

inferences, based upon a due diligence inquiry.

207.   "Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation", *D.C. Bar Rules of Professional Conduct*, 1.1, and a due diligence inquiry especially by the Government would determine that Petitioner is a former Senior *FOIA* Analyst, having served as a federal contractor on assignment with CDC during litigation arising from their responses to the ebolavirus outbreak crisis.

208.   Moreover, in contrast to any experience and expertise the Government may possess, acting in the capacity of Operations Officer for the 902d Military Intelligence Group, Affiant had was responsible for "[a]ssist[ing] in planning, development, prioritizing and managing current operations for a Counterintelligence Group comprised of four battalions and 42 detachments throughout CONUS", Brian S. Line & Michael A. Simmons, DA Form 67-9, *Officer Evaluation Form*, April 15, 1997, and had been "[r]esponsible for the Oversight and Group management of all Red Teams". *Id. See generally* John Schab, "GIAC (GPEN) Gold Certification: Tackling DoD Cyber Red Team Deficiencies Through Systems Engineering," *The SANS Institute* (2017).

209.   "Red teaming is an essential capability in preparing and assessing the Department of Defense's (DoD) ability to execute their mission", and, a "red team is a group of people (military, civilian, contractor) who emulate an adversary's tactics, techniques, and procedures against a targeted mission or capability (Maunual, 2013)." *Id.*

210.   "The Department of Defense Manual 8570.01M defines a red team as 'An independent and focused threat based effort…based on formal; time bounded tasking to expose and exploit information operations vulnerabilities of friendly forces as a means to improve readiness' (Officer A. S., 2015)." *Id.*

211.   "The key point of the definition is that red team activity is focused and threat-based with a formal bounded tasking in a contested cyber environment." *Id.*

212.   According to unclassified sources, Affiant had "[c]oordinated mission execution by task organizing Group assets and monitoring implementation until complete."

213.   According to unclassified sources, Affiant had "[c]oordinated Group Operations with INSCOM and other MACOM operations offices." Brian S. Line & Michael A. Simmons, DA Form 67-9, *Officer Evaluation Form*, *supra*.

214.   Arguably it raises a reasonable inference of suspicion as to why Defense Intelligence Agency had identified Affiant as only one of three persons deemed fully qualified for a Top Secret billet for which he had not even applied in 2016. *See Webb v. DoD*, Docket Number DC-3443-18-0299-I-1 (MSPB 2018); *Webb v. Department of the Army*, Civil Action 1:22-cv-02236 (UNA) (D.D.C. 2022), *aff'd* Record No. 22-5292 (D.C. Circuit 2022), *cert. denied*, Record No. 22-7394 (U.S. 2023); *Webb v. MSPB*, Case Number 1:19-cv-257 (E.D.Va. 2019), *aff'd* Record Number 19-1436 (4th Cir. 2019); *Webb v. MSPB*, Record Number 2019-1130 (D.C.Cir. 2018); *Webb v. MSPB*, Record Number 20-100 (Fed.Cir. 2018); *Webb v. DoD*, Docket Number DC-3443-18-0299-I-1 (MSPB 2018); *Webb v. DIA*, Civil Case No. 1:23-cv-02397 (D.C. 2023). *See also Webb v. Porter*, Case No. CL24001532 (Alexandria Cir. 2024), *on appeal* Record No. TBD (Va. 2024).

215.   "In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include. . . the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question," Comment 1, *D.C. Bar Rules of Professional Conduct*, 1.1, and, of note, the Government has had since March to prepare this rather tardy argument.

216.   In a motion to dismiss, a court may, in its discretion, draw any reasonable inference, and, in a motion for sanctions it may consider that, "[i]n determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include

- 60 -

the relative complexity and specialized nature of the matter," Comment 1, *D.C. Bar Rules of Professional Conduct*, 1.1, and by describing Petitioner's arguments as ripe for dismissal, a reviewing court might inquire from what experience or evidentiary support any reasonable trier of fact could rely upon to rebut Petitioner' assertions and claims.

217.    "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 (1948), and a reasonable inference of suspicion arises where "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443 (S.D.N.Y. 2005).

218.    "In many instances, the required proficiency is that of a general practitioner"; however, "[e]xpertise in a particular field of law may be required in some circumstances", such as where "by representations made to the client, has led the client reasonably to expect a special level of expertise in the matter undertaken by the lawyer."

219.    Imposing a reasonable standard, where a "regulation is content neutral, any incidental effect it has on speech is subject to the intermediate scrutiny that governs time, place, and manner restrictions", *A.N.S.W.E.R. Coal.*, 845 F.3d at 1199 (citing *Ward v. Rock Against Racism* , 491 U.S. 781 (1989)), and "[t]o survive such scrutiny, the regulation must be 'narrowly tailored to serve a significant governmental interest' and 'leave open ample alternative channels for communication of the information'", *Id.* (quoting *Ibid.*) *see also Henderson v. Lujan*, 964 F.2d 1179 (D.C. Cir. 1992), and this Trial Court has, by dismissal, deemed the conduct of former Respondent Meta Platforms, Inc., to have been at least reasonable, neutral, with an incidental effect on Petitioner's free speech, as well as

finding at most a *de minimis* infringement of his right to access the religiously devotional practice of online worship on that platform during what has been described as a public health crisis, during which the former Virginia Governor, stated publicly, "The point I would make, Dr. Oliver can follow me, is that this virus is highly contagious." Transcript, "Ralph Northam Virginia COVID-19 Press Conference Transcript April 27," *Rev*, April 27, 2020.

220.    With regard to the species of extrinsic fraud, a "court may grant relief under its inherent equity power if, because of the fraud of his opponent, the aggrieved party was prevented from presenting his claim or defense to the court. *Aheroni v. Maxwell*, 205 Cal.App.3d 284 (1988) (citing *In re Marriage of Stevenoti*, 154 Cal.App.3d 1051 (1984); *DeMello v. Souza*, 36 Cal.App.3d 79 (1973).

221.    "Two essential conditions are found in a classic case in equity which seeks to set aside a judgment: first, the judgment is one entered against a party by default under circumstances which prevented him from presenting his case; second, these circumstances result from extrinsic fraud practiced by the other party or his attorney." *Id.* (citing *Otani v. Kisling*,  219 Cal.App.2d 438 (1963)).

222.    "The vital question is 'whether the successful party has by inequitable conduct, either direct or insidious in nature, lulled the other party into a state of false security, thus causing the latter to refrain from appearing in court or asserting legal rights.'" *Id.* (quoting *Colich v. United Concrete Pipe Corp.*, 145 Cal.App.2d 102 (1956). At least under the law of contracts, "extrinsic evidence is admissible to prove a meaning to which the language of a contract is reasonably susceptible, even though on its 'four corners' the instrument appears to the court to be clear and unambiguous"; however, "this rule must be restricted to its stated bounds; it does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the words used in their written agreement", and

"[w]hile it allows parol evidence for this purpose, it is unconcerned with extrinsic

collateral agreements." *Brawthen v. H & R Block, Inc.*, 28 Cal. App. 3d 132 (1972).

223.   "Perhaps the most fundamental legal skill consists of determining what kind of legal

problems a situation may involve, a skill that necessarily transcends any particular

specialized knowledge", and "[a] lawyer can provide adequate representation in a wholly

novel field through necessary study", Comment 2, *D.C. Bar Rules of Professional*

*Conduct*, 1.1, which does not reflect in the demurrer argument.

224.   "In an emergency a lawyer may give advice or assistance in a matter in which the

lawyer does not have the skill ordinarily required where referral to or consultation or

association with another lawyer would be impractical"; "however, assistance should be

limited to that reasonably necessary in the circumstances, for ill-considered action under

emergency conditions can jeopardize the client's interest", *Id.*, an SOS call required, but,

in assumption of risk, tragically, not made.

225.

226.      .

## Facts Warranting Denials

227.   Paragraphs 1 to 226 are incorporated by reference.

228.   "'It is emphatically the province and duty of the judicial department to say what the

law is'", *Marbury v. Madison*, 1 Cranch 137 (1803); nonetheless, "[t]he ultimate purpose

of the judicial process is to determine the truth", *Caldor, Inc. v. Bowden*, 330 Md. 632

(1993), and "[w]e who are seeking truth and not victory, whether right or wrong, have no

reason to turn our eyes from any source of light which presents itself, and least of all from

a source so high and so respectable as the decision of the supreme court of the United

States." *U.S. v. Burr*, 25 F. Cas. 55 (C.C.D. Va. 1807).

229.   Even a soldier "must use common sense", *Calley v. Callaway*, 519 F.2d 184 (5th Cir.

1975), and "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful." *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973).

230.    "[M]ere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding it", *Luteran v. U.S.*, 93 F.2d 395 (8th Cir. 1937) (citing *Burkhardt v. U.S.*, 13 F.2d 841 (6th Cir. 1926)).

### *Evidentiary Support*

231.    Paragraphs 1 to 230 are incorporated by reference.

232.    Under Fed.R.Civ.Pro. 11(b)(3), a litigant filing a pleading, by signature, attests that "the factual contentions have evidentiary support or, if specifically so identified, will likely hav e *evidentiary support* after a reasonable opportunity for further investigation or discovery". (emphasis added)

233.    Since acknowledgement of receipt of a *FOIA* request, Respondent OMB has elected a dubious right to remain silent, even through two prior litigations, *see Webb v. Fauci*, Civil Action No. 3:21-CV-00432 (E.D.Va. 2022), *aff'd* Record No. 21-2394, *cert. denied* Record No. 21-8242 (U.S. 2022); *Webb v. Fauci*, Record No. 21-6868 (U.S. 2022); *Webb v. OMB*, Civil Action No. 3:22-cv-00418-DJN (E.D.Va. 2022), *aff'd* Record No.  No. 22-1698 (4th Cir. 2023), sharing a silence, along with a request for an untimely extension by the Trial Court, with Respondent Meta Platforms, Inc., by at least coincidence.

234.    "The ultimate purpose of the judicial process is to determine the truth", *Caldor, Inc. v. Bowden*, 330 Md. 632 (1993), and "[w]e who are seeking truth and not victory, whether right or wrong, have no reason to turn our eyes from any source of light which presents

itself, and least of all from a source so high and so respectable as the decision of the

supreme court of the United States." *U.S. v. Burr*, 25 F. Cas. 55 (C.C.D. Va. 1807).

235.    On analogous facts, finding a party having been served notice, "even if not in the

usual way", Courts of the Commonwealth have found, to prevent a manifest injustice, that

"[i]t was not only competent for. . . [them] to speak in time and be made a party if. . .

[they] had not been, but it was. . . [their] duty." *Hill v. Woodward*, 78 Va. 765 (1884).

Finding one notoriously accused who had endeavored, through subterfuge and disguise to

evade capture of a decade and a half, that tribunal had concluded, "undoubtedly. . . [they]

knew the value of the tale about 'administration of tonics,' to which. . . [they] put. . .

[their] signature." *Government of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of

Israel, 1961).

### *Warranted on the Evidence*

236.    Paragraphs 1 to 235 are incorporated by reference.

237.    Under Fed.R.Civ.Pro. 11(b)(4), a litigant filing a pleading, by signature, attests that

"the denials of factual contentions are warranted on the evidence or, if specifically so

identified, are reasonably based on belief or a lack of information." (emphasis added)

238.    Summary judgment "is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law", *Sanders v. Ocwen Loan

Servicing*, No. CIV.A. 10-1450, 2011 WL 1898911, at *1–3 (W.D. La. May 17, 2011)

(citing *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293 (5th

Cir.2004); Fed.R.Civ.P. 56(c), and there is no genuine issue of fact that the infectious

dose, a standard epidemiological metric recognized by federal public health authorities,

*Principles of Epidemiology in Public Health Practice, Third Edition: An Introduction to

Applied Epidemiology and Biostatistics* "Lesson 3: Measures of Risk: Section 2:

Morbidity Frequency Measures," *CDC*, May 18, 2012,  defined as the specific amount of

"SARS-CoV-2 needed to transmit infection has not been established", Staff, "Scientific

Brief: SARS-CoV-2 Transmission," *CDC*, May 7, 2021, suggesting three years after, in

December 2019, "three bronchoalveolar lavage samples were collected from a patient

with pneumonia of unknown etiology – a surveillance definition established following the

SARS outbreak of 2002-2003 – in Wuhan Jinyintan Hospital", *Report of the WHO-China*

*Joint Mission on Coronavirus Disease 2019 (COVID-19)*, dated February 16-24, 2020,

raises a reasonable inference to support a conclusion, facially plausible, that that

information is classified.

239.   Similarly, while federal public health authorities have published the secondary attack

rate for other highly contagious diseases, like smallpox, Staff, "Transmission," *CDC*,

December 5, 2016, https://www.cdc.gov/smallpox/clinicians/transmission.html (accessed

August 25, 2020), chickenpox, *Staff*, "Chickenpox (Varicella): For Healthcare

Professionals," *CDC*, December 31, 2018,

https://www.cdc.gov/chickenpox/hcp/index.html (accessed August 29, 2020), and

measles, Staff, "Transmission of Measles," *CDC*, February 5, 2018,

https://www.cdc.gov/measles/transmission.html (accessed August 20, 2020), a similarly

facially plausible inferences arises, while "evidence of . . . flight. . . [is] admissible even

if offered solely to prove his consciousness of guilt as to that predicate act." *U.S. v.*

*Pungitore*, 910 F.2d 1084 (3d Cir. 1990). *See also U.S. v. Climico*, No. S2 11 CR. 974-08

CM, 2014 WL 4230320, at *1–7 (S.D.N.Y. Aug. 7, 2014). *See also* Sherry Gaba,

"Understanding Fight, Flight, Freeze and the Fawn Response," *Psychology Today*, August

22, 2020.

240.   Petitioner, as a former *Aide de Camp* and former Operations Officer, for all U.S.

Army strategic counterintelligence, playing a key staff role in standing up the

Armed Forces Medical Intelligence Center (AFMIC), *see generally* DODD 6420.1,

- 66 -

*Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the

precursor to the National Medical Intelligence Center (NMIC), *see generally* DODI

6420.01, *National Center for Medical Intelligence (NCMI)*, March 20, 2009,

incorporating Change 3, effective September 8, 2020, which was the subject of the

ABC News report, Josh Margolin & James Gordon Meek, "Intelligence report

warned of coronavirus crisis as early as November: Sources 'Analysts concluded it

could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020; *see also*

Fed. R.Evid. 702[37], has cited to regulatory authority that dictates that "'[I]nformation'

means any knowledge that can be communicated or documentary material, regardless of

its physical form or characteristics, that is owned by, produced by or for, or is under the

control of the United States Government." Part I, Section 1.1(b), Executive Order 12,958,

*Classified National Security Information*, April 17, 1995.

241.  Moreover, "'[i]nformation' means may information or material, regardless of its

physical form or characteristics, that is owned by, produced by or for, or is under the

control of the United States Government." Section 6.1(b), Executive Order No. 12,356,

*National Security Information,* April 2, 1982.

242.  In *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), the

Supreme Court held "that a naturally occurring DNA segment is a product of nature and

not patent eligible merely because it has been isolated, but that cDNA is patent eligible

because it is not naturally occurring."

243.  *A priori*, if this information is owned by, produced by or for, or is under the control of

the United States government, despite reports to the contrary, by simple operation of law,

---

[37] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in
the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will
help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on
sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has
reliably applied the principles and methods to the facts of the case." *Id.*

as a product not of nature, it would, of necessity, have to have been cultivated in a laboratory. *Diamond v. Chakrabarty*, 447 U.S. 303 (1980); *Association for Molecular Pathology*, Docket No. 12-398, 566 U.S., at ___ . *But see* Kristian G. Andersen, *et al.*, *The proximal origin of SARS-CoV-2*, 26 Nature Medicine, pp. 450-455 (April 2020); James Gornan & Carl Zimmer, "Scientist Opens Up About His Early Email to Fauci on Virus Origins," *The New York Times*, June 14, 2021; Timothy H.J. Nerozzi, "Fauci says COVID-19 origin evidence points 'strongly' toward 'natural occurrence'," *Fox News*, June 16, 2022.

244.    "Globally, as of 12:00pm CET, 2 November 2023, there have been 771,679,618 confirmed cases of COVID-19, including 6,977,023 deaths, reported to WHO", and "[a]s of 24 October 2023, a total of 13,534,457,273 vaccine doses have been administered." Staff, "WHO Coronavirus (COVID-19) Dashboard," *WHO*, November 2, 2023, https://covid19.who.int/ (accessed November 6, 2023).

245.    Clearly, "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful." *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973). Moreover, under a rule of law, "once the conspiracy has been established, the government need show only 'slight evidence' that a particular person was a member of the conspiracy." *U.S. v. Elliott*, 571 F.2d 880 (5th Cir. 1978) (citations omitted).

246.    Similarly, as to Respondent Meta Platforms, Inc., through pleadings, permitted by the Trial Court, in extension, they have backed away from reports, accepted as fact on consideration of a demurrer, that that major social media platform had been subjected to pressures from the White House to disable accounts like Petitioner's, Gabriel Rivera,

"Facebook took down COVID-19 posts after pressure from the Biden administration. 'I

can't see Mark in a million years being comfortable with that,' an exec said in newly

uncovered emails," *Business Insider*, July 29, 2023, which had occurred within a

reasonable time after he had brought suit regarding a *FOIA* request that the White House

refused to answer, *Webb v. Fauci*, Civil Action No. 3:21-CV-00432 (E.D.Va. 2022), *aff'd*

Record No. 21-2394, *cert. denied* Record No. 21-8242 (U.S. 2022); *Webb v. Fauci*,

Record No. 21-6868 (U.S. 2022), and had permanently disabled his account not for

medical information, but expressly for "security reasons", within a reasonable time after

the infamous announcement from the White House regarding "problematic accounts",

Steven Nelson, "White House 'flagging' posts for Facebook to censor over COVID

'misinformation'" *New York Post*, July 15, 2021[38]. *But see also*; Melissa Quinn, "Biden

says he's asked intelligence community to 'redouble' efforts in examining origins of

COVID-19," *CBS News*, May 27, 2021[39]; Amended Complaint, ¶ 38p, p. 14-15.

247.    Clearly, such actions, arguably under color of law, satisfy the sufficiency level, raising

a facially plausibly claim of retaliation, *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007);

*Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998); *Marano v. DoJ*, 2 F.3d 1137 (Fed. Cir.

1993)); *Roncales v. County of Henrico*, Civil Action No. 3:19cv234 (E.D.Va. March 3,

2021), and Respondent Meta Platforms, Inc.'s "proffered explanation

is unworthy of credence." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

### *Conclusion*

248.    Paragraphs 1 to 247 are incorporated by reference.

---

[38] "Psaki and Murthy would not answer a shouted question about the fact that Dr. Anthony Fauci, President Biden's chief medical adviser and the government's top infectious diseases expert, has himself vacillated on COVID-19 information. Fauci did not promote mask-wearing in February, March and early April 2020 as the respiratory virus spread in the US, despite the historical use of masks to counter airborne viruses and their successful early adoption in East Asia. But Fauci later pushed even wearing two masks at a time." *Id.*
[39] "President Biden said. . . he ha[d] ordered the U.S. intelligence community to 'redouble' its efforts to investigate the origins of COVID-19 after a new report fueled questions about whether the virus originated in a lab in Wuhan, China." *Id.*

249.    In accordance with 28 U.S.C. § 1657(a), "[n]otwithstanding any other provision of

law, each court of the United States shall determine the order in which civil actions are

heard and determined, except that the court *shall expedite the consideration of. . . any*

*action for temporary or preliminary injunctive relief*, or any other action if good cause

therefor is shown", and mindful of the fact that "[f]or purposes of this subsection, 'good

cause' is shown if a right under the *Constitution of the United States* or a Federal Statute

(including rights under section 552 of title 5) would be maintained in a factual context

that indicates that a request for expedited consideration has merit". *Id.*

250.    "But none of this happened", '[i]t violated our most basic protection codes", "[a]nd it

is the best indication of a massive plot." Oliver Stone & Zachary Sklar, *JFK*, Warner

Studios (1991).

251.    "[W]e all took an oath upon assuming office 'to support and defend the Constitution

of the United States,' as did the [P]resident and all members of the military", Leon

Panetta, *et al.*, "89 former Defense officials: The military must never be used to violate

constitutional rights," *Washington Post*, June 5, 2020 (quoting 5 U.S.C. § 3331).

252.    Privates in initial entry duty (IED) training are instructed that their very first General

Order is to "guard everything within the limits of. . . [their] post and quit. . . [their] post

only when properly relieved", that their second General Order is to "obey. . . special

orders and perform all. . . duties in a military manner", and that their third General Order

is to "report violations of. . . special orders, emergencies, and anything not covered in. . .

[their] instructions, to the commander of the relief." Staff, "3 General Orders," *Army*

*Study Guide*,

https://www.armystudyguide.com/content/Prep_For_Basic_Training/Prep_for_basic_gen

eral_information/3-general-orders.shtml (accessed October 9, 2023).

253.    Accordingly, by operation of law, if a standard metric for assessment of risk was

deemed to be classified information, as defined under Executive Order 12,958, it would have to have found its proximal origin in a laboratory.

254.     Furthermore, "[i]f the act is among the litany of crimes listed in § 2332b(g)(5)(B), which include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' then it is a federal crime of terrorism", *Id.* (quoting 18 U.S.C. § 2332b(g)(5)(B)); "[a]nd for all intents and purposes at sentencing, that person is a terrorist." *Id.*

255.     "That's the real question, isn't it? Why?" Oliver Stone & Zachary Sklar, *JFK, supra.*

256.     While using biological agents as a weapon of terror is a separate felony under 18 U.S.C. § 175, as would describe a biological agent cultivated in a laboratory, which the causative biological agent for COVID-19 appears to be, transnational terror, under 18 U.S.C. § 2332b, is not only a felony, punishable by death or life imprisonment, but is also a predicate offense under the federal racketeering statute, under 18 U.S.C. § 1961(1)(G).

257.     Under 18 U.S.C. § 2332b(a)(1)(A), "[w]hoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b). . . kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States. . . in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c)", which provides, in relevant part, that "[w]hoever violates this section shall be punished. . . for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life", 18 U.S.C. § 2332b(c)(1)(A).

258.     However, under 18 U.S.C. § 2332b(b)(1)(C), for jurisdictional purposes, "the victim, or intended victim, is the United States Government, *a member of the uniformed services,*

or any official, officer, employee, or agent of the legislative, executive, or judicial

branches, or of any department or agency, of the United States" (emphasis added), and, as

of December 2022, when the Department of Defense discontinued reporting data, to date,

a total of 96 uniformed service members had been fatalities to COVID-19, Staff,

"Spotlight: Coronavirus: DoD Response," *DoD*, December 8, 2022,

https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (accessed February 26,

2024), the first of whom was identified as "Aviation Ordnanceman Chief Petty Officer

Charles Robert Thacker Jr., 41, of Fort Smith, Arkansas," a "crew member of the aircraft

carrier *USS Theodore Roosevelt*", at the U.S. Naval Hospital in Guam of COVID-19, just

"11 days after his captain was fired for pressing the Navy for greater action to safeguard

his crew from the virus." Newsroom, "U.S. Navy ID's Arkansas sailor as first active-duty

military member to die of coronavirus," *CBS News*, April 17, 2020.

259.    "Individuals who act entirely independently of the foreign terrorist organization to

advance its goals or objectives shall not be considered to be working under the foreign

terrorist organization's direction and control", *Holder v. Humanitarian Law Project*, 561

U.S. 1 (2010) (citation omitted), and "a terrorist is 'any one (*sic*) who attempts to further

his views by a system of coercive intimidation.'" *U.S. v. Christianson*, 586 F.3d 532 (7th

Cir. 2009)  (citation omitted).

260.    Moreover, "a defendant is presumed to continue his involvement in a conspiracy

unless he makes a substantial affirmative showing of 'withdrawal, abandonment, or

defeat of the conspiratorial purpose.'" *U.S. v. Heard*, 709 F.3d 413 (5th Cir. 2013)

(citation omitted), and "[m]ere cessation of activity in furtherance of the conspiracy is not

sufficient to show withdrawal." *Id. (citing  U.S. v. Torres*, 114 F.3d 520 (5th Cir.1997)

(citing *U.S. v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)).

261.    Nonetheless, "[i]f two or more persons. . . conspire. . . for the purpose of depriving,

either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3). Clearly, the history of Respondents in this protracted action, the lack of good faith, even now, requesting yet more time to attempt to quash a civil complaint brought by an unrepresented litigant, and the burden posed upon Petitioner and the courts warrant at this time injunctive relief from such abuses, while there appear to be no other available sanctions more reasonably calculated to cure this harm short of injunction.

**WHEREFORE**, for the reasons, grounded in fact, articulated above, under authority of the Trial Court's inherent powers, and Fed.R.Civ.P. 11, sanctions are appropriate against the Government, and not barred by any claim of sovereign immunity, and Petitioner should be granted that to which he is entitled under the *FOIA*, to include a proper trial on

the merits, even if requiring amendment to a more suitable form for the complaint, and

may, in the Trial Court's discretion, be awarded such other equitable remedies as deemed

proper and necessary in a court of competent jurisdiction.

Respectfully submitted,

Major Mike Webb
3445 Washington Boulevard, Apartment # 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: Mike.Webb84@gmail.com
Date: July 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of July 2024, I will that I will mail this <u>Motion for Sanctions Under Fed.R.Civ.P. 11</u>, by hand delivery and/or email to the following parties, named in suit.

Dana Remus, Esq.
White House Counsel
Executive Office of the President (EOP)
Eisenhower Executive Office Building
1650 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 395-5895
Email: dremus@who.eop.gov

John J. Bardo, Esq.
Assistant United States Attorney
c/o Matthew M. Graves, Esq.
Brian Hudak, Esq.
Civil Division
601 D Street NW
Washington, District of Columbia  20530
Telephone: (202) 252-7874
Email: John.Bardo@usdoj.gov

Respectfully submitted,

Major Mike Webb
3445 Washington Boulevard, Apartment 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: Mike.Webb84@gmail.com
Date: July 5, 2024

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAJOR MIKE WEBB, *et al.*<br>    *Petitioner, Pro Se,*<br><br>v.<br><br>DABNEY L. FRIEDRICH, U.S.<br>DISTRICT COURT FOR THE DISTRICT<br>OF COLUMBIA, EXECUTIVE OFFICE<br>EXECUTIVE OFFICE OF THE<br>PRESIDENT (EOP), and OFFICE OF<br>MANAGEMENT & BUDGET (OMB),<br>    *Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Case No. 1:23-cv-00816-DLF |

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared or assisted in the preparation of this **Motion for Sanctions Under Fed.R.Civ.P. 11.**


Respectfully submitted,


Major Mike Webb
3445 Washington Boulevard, Apartment # 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: Mike.Webb84@gmail.com
Date: July 5, 2024